# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| HELABA INVEST KAPITALANLAGEGESELLSCHAFT mbH; LÄNSFÖRSÄKRINGAR AB; LANDESBANK BERLIN INVESTMENT GmbH; LBBW ASSET MANAGEMENT INVESTMENTGESELLSCHAFT mbH; SGSS DEUTSCHLAND KAPITALANLAGEGESELLSCHAFT mbH; and UNIVERSAL-INVESTMENT-GESELLSCHAFT mbH, | : : : : : : : : : : | Case No.: |
| Plaintiffs, | : : | |
| v. | : : | COMPLAINT |
| BP plc, BP AMERICA INC., BP EXPLORATION & PRODUCTION INC., ANTHONY B. HAYWARD, DOUGLAS J. SUTTLES, ANDREW G. INGLIS, DAVID RAINEY, H. LAMAR McKAY, and ROBERT W. DUDLEY, | : : : : : : | DEMAND FOR JURY TRIAL |
| Defendants. | : ::| |

## TABLE OF CONTENTS

I.     NATURE OF THE ACTION ...................................................................................1

II.    JURISDICTION AND VENUE ...............................................................................5

III.   THE PARTIES..........................................................................................................7

       A.     Plaintiffs .......................................................................................................7

       B.     Defendants ....................................................................................................9

              1.     Corporate Defendants ........................................................................9

              2.     Individual Defendants......................................................................10

       C.     Non-Parties .................................................................................................14

IV.    CONFIDENTIAL WITNESSES ...........................................................................15

V.     BP CLAIMED TO TAKE EXTENSIVE MEASURES IN RESPONSE TO ITS
       REPEATED SAFETY VIOLATIONS AND CATOSTROPHIC INDUSTRIAL
       INCIDENTS ...........................................................................................................16

       A.     BP's Relevant Operations ...........................................................................16

       B.     Prior To The Relevant Period, Repeated Catastrophic Incidents Focus
              Public Scrutiny On BP's Ability To Operate Safely ...................................17

              1.     Flawed   Safety   Management   Systems   Cause   Grangemouth
                     Incidents..........................................................................................17

              2.     Unsafe Deepwater Drilling and Extraction Operations in the Gulf
                     of Mexico and Other Sites ..............................................................18

                     a.     The *Ocean King* Incidents ............................................... 18

                     b.     The *Discover Enterprise* Incident.................................... 19

                     c.     The *GSF Adriatic IV* Incident ........................................ 20

                     d.     The *Thunder Horse* Incident........................................... 20

              3.     Safety Lapses Cause a Massive Explosion at BP's Texas City
                     Refinery, Leading, *Inter Alia*, to the CSB Investigation, the Baker
                     Panel, and the Baker Report.............................................................20

              4.     Safety Problems at Prudhoe Bay, and the Booz Allen Report...................23

C.    BP Claims To Adopt The Baker Panel Recommendations, Primarily Through Purported Implementation Of OMS ........................................................25

    1.    BP Adopts the Baker Panel Recommendations to Improve Process Safety ...................................................................................................25

    2.    BP Purportedly Implements OMS Company-Wide, Including in BP's Gulf of Mexico Operations .................................................30

VI.   DEFENDANTS' SCIENTER ...........................................................................32

A.    Defendants' Scienter With Respect to the Intended Scope and Actual Implementation of OMS, Including in the Gulf of Mexico ...................................32

    1.    Defendants Never Intended OMS to Apply to All BP Operations, and Knew Substantial Operations, Including Operations in the Gulf of Mexico, Would be Untouched by OMS .................................................32

    2.    Defendants' Establishment of GORC and SEEAC, Tasked with Overseeing and Monitoring Process Safety Reforms, Allowed Defendants to Understand the Precise Scope of OMS Rollout at Any Given Time ...................................................................................35

        a.    BP's Group Operations Risk Committee (GORC) ...................... 35

        b.    BP's Safety, Ethics and Environment Assurance Committee (SEEAC) ...................................................................................... 37

    3.    Defendants Understood that BP's OMS Rollout in the Gulf of Mexico Had Not Been Completed by 2008, But in Fact Had Only Begun in Late 2009, and Had Not Been Completed Prior to the *Deepwater Horizon* Disaster ...................................................................39

    4.    Defendants Knew that BP's Internal Cost-Cutting and Restructuring of its Gulf of Mexico Operations Had Impaired OMS Implementation and BP's Ability to Operate Safely .......................41

B.    Defendants' Scienter With Respect To Their Misrepresentations And Omissions Concerning BP's Operational Safety And Its Deepwater Drilling Operations ..............................................................................................43

    1.    Hayward Understood That a Deepwater Blowout Constituted One of BP's Greatest Risks ..............................................................................44

    2.    Faulty Cementing Jobs and Other Stability Issues Were Known as the Most Frequent Causes of Well Control Problems ...............................45

3.      Defendants Knew or Recklessly Disregarded that BOPs Were Known to Fail, Yet Did Not Adjust their Process Safety Procedures Accordingly...................................................46

4.      BP Received No Less Than One Hundred Safety Warnings for its Safety Protocol Lapses in its North Sea Deepwater Drilling Operations.........................................................50

5.      BP's Internal Reporting Structures Mandated that the CEO and Board Review Process Safety and Risk ....................................52

6.      SEEAC Approved BP's Publications Regarding Safety ...........................53

7.      Defendants Consciously Limited the Scope of Safety & Operations Audits so as Not to Apply to the Majority of BP's Deepwater Drilling Fleet .................................................................53

C.      Defendants' Scienter Is Further Established By Their Disregard of Safety and Operational Concerns........................................................................54

1.      Defendants Knew of, or Recklessly Disregarded, Significant Process Safety Problems with Third-Party Rigs and, in Particular, Rigs Leased from Transocean...................................................54

2.      Concerns about the Integrity of Safety Processes in Alaska.....................55

3.      Regulators Repeatedly Informed BP of its Continuing Safety Deficiencies.............................................................................57

D.      Defendants' Scienter Is Further Established By BP's Retaliation Against Individuals Who Raised Concerns About Operational Safety And Integrity........59

1.      Whistleblower Retaliation in the Gulf of Mexico.....................................60

2.      Whistleblower Retaliation in Alaska ........................................................62

E.      Defendants' Scienter As To The Amount Of Oil Spilling From Macondo...........65

1.      Defendants' Publicly Stated Estimates Were Contradicted by Contemporaneous Internal BP Documents, Data, Estimates, and Calculations.............................................................................65

2.      Defendants Misrepresented the Scope of the Leak to Reduce the Amount BP Would Owe in Fines .............................................................69

3.      BP Pleads Guilty in Connection with a DOJ Criminal Investigation, and Admits Concealing Critical Spill Information from the Public.............................................................................69

4.    BP Pleads Guilty in Connection with an SEC Investigation, and Admits Concealing Critical Spill Information from the Public ................79

VII.   MATERIALIZATION OF THE UNDISCLOSED RISKS: THE DRILLING OF MACONDO, THE MACONDO BLOWOUT, AND ITS AFTERMATH ......................81

A.    BP's Systematic Failures Caused The Explosion On And The Sinking Of The *Deepwater Horizon* Rig ................................................................81

1.    BP Acquires the Rights to Macondo and Begins its Preparation to Drill Despite Having an Inadequate and Error-Filled Oil Spill Response Plan ........................................................................81

2.    BP Safety Failures in Casing and Cementing the Well ............................86

3.    BP's Safety Failures in Conducting Final Well Integrity Tests, Capping the Well, and Monitoring the Well................................92

4.    The BOP Failures and the Loss of the *Deepwater Horizon*......................97

5.    BP's Continuing Failures to Activate the BOP Following Abandonment of the *Deepwater Horizon* ....................................99

B.    BP Was Wholly Unprepared To Contain The Macondo Oil Spill......................100

1.    BP Was Knowingly or Recklessly Unprepared to Manage and Respond to a Spill in the Gulf of Mexico ................................100

2.    BP's Failed Use of Unprecedented Amounts of Dispersant....................104

3.    BP's Failed Use of a Cofferdam ............................................................107

4.    BP's Failed "Top Kill" and "Junk Shot" Efforts ....................................109

5.    BP's "Top Hat" Fails to Collect the "Vast Majority" of the Oil ............111

6.    Macondo Is Finally Capped ....................................................................112

VIII.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS ....................................................................114

A.    Defendants' False And Misleading Statements And Omissions Concerning BP's Progress On Implementing Claimed Safety Improvements, Including OMS Scope And Implementation........................................................114

1.    The November 8, 2007 False and Misleading Statements......................116

2.    The February 22, 2008 False and Misleading Statements ......................116

3.      The February 27, 2008 False and Misleading Statements ......................117

4.      The March 4, 2008 False and Misleading Statements ...........................1178

5.      The April 17, 2008 False and Misleading Statements ..........................1189

6.      The December 17, 2008 False and Misleading Statements ....................120

7.      The February 24, 2009 False and Misleading Statements ......................121

8.      The March 4, 2009 False and Misleading Statements ...........................122

9.      The April 16, 2009 False and Misleading Statements ...........................125

10.     The February 26, 2010 False and Misleading Statements ......................126

11.     The March 5, 2010 False and Misleading Statements ...........................128

12.     The March 22, 2010 False and Misleading Statements ..........................130

13.     The March 23, 2010 False and Misleading Statements ..........................132

14.     The April 15, 2010 False and Misleading Statements ...........................133

B.  Defendants' Misrepresentations And Omissions Concerning BP's Ability
    To Respond To An Oil Spill In Deepwater ........................................136

    1.  The March 10, 2009 False and Misleading Statements ..........................136

    2.  The June 30, 2009 False and Misleading Statements ...........................140

C.  Defendants' Misrepresentations And Omissions Concerning The Amount
    Of Oil Spilling From The Macondo Well ..........................................141

    1.  Defendants Represent the Spill Rate to be 1,000-5,000 BOPD ..............142

        a.  The April 28-29, 2010 False and Misleading Statements ........... 142

        b.  The April 29-30, 2010 False and Misleading Statements ........... 144

        c.  Additional Reasons Why the April 28-30, 2010 Statements
            Were False, Misleading, and Made with *Scienter* ..................... 144

    2.  Defendants Represent the Spill Rate to be 5,000 BOPD ........................147

        a.  The May 4-5, 2010 False and Misleading Statements ................ 147

        b.  The May 5, 2010 False and Misleading Statements .................. 147

        c.       The May 10, 2010 False and Misleading Statements ................. 148

        d.       The May 14, 2010 False and Misleading Statements ................. 149

        e.       The May 17, 2010 False and Misleading Statements ................. 151

        f.       The May 21, 2010 False and Misleading Statements ................. 152

        g.       The May 22, 2010 False and Misleading Statements ................. 153

        h.       Additional Reasons Why Defendants' 5,000 BOPD
                   Representations Were False, Misleading, and Made
                   with Scienter ........................................................................... 154

IX.    DEFENDANTS' CONDUCT CAUSED PLAINTIFFS' LOSSES................................158

X.     NO SAFE HARBOR APPLIES TO DEFENDANTS' FALSE AND
        MISLEADING STATEMENTS..................................................................169

XI.    DEFENDANTS INTENDED FOR PLAINTIFFS TO RELY ON THEIR FALSE AND
        MISLEADING STATEMENTS AND OMISSIONS .......................................170

        A.    Communications Made Directly To Investors....................................170

        B.    Statements Made To Investors During Industry Conferences .............171

        C.    Defendants' Post-Spill Statements To The Public................................171

XII.   PLAINTIFFS' RELIANCE IS PRESUMED THROUGH THE FRAUD-ON-THE
        MARKET DOCTRINE .........................................................................172

XIII.  PLAINTIFFS' RELIANCE ON DEFENDANTS' FALSE AND  MISLEADING
        STATEMENTS AND MATERIAL OMISSIONS..........................................173

XIV.  PLAINTIFFS' RELIANCE ON THE PRICE INTEGRITY OF BP  SECURITIES ......175

XV.   PLAINTIFFS' CLAIMS ARE TIMELY....................................................176

XVI.  PLAINTIFFS' CLAIMS, PRAYER FOR RELIEF, AND DEMAND FOR JURY
        TRIAL..............................................................................................177

Plaintiffs Helaba Invest Kapitalanlagegesellschaft mbH, Länsförsäkringar AB, Landesbank Berlin Investment GmbH, LBBW Asset Management Investmentgesellschaft mbH, SGSS Deutschland Kapitalanlagegesellschaft mbH and Universal-Investment-Gesellschaft mbH (collectively, "Plaintiffs"), by their undersigned counsel, make the following allegations upon personal knowledge as to Plaintiffs' own acts and upon information and belief as to all other matters. Plaintiffs' information and belief is based on their counsel's ongoing investigation. The investigation of counsel is predicated upon, among other things, a review of public filings by BP plc ("BP" or the "Company"), and its subsidiaries and affiliates, with the United States Securities and Exchange Commission ("SEC"), including, among other things: reports filed on Forms 6-K and 20-F; press releases and public statements issued by the Company and its subsidiaries and affiliates; media reports about the same entities; publicly available data relating to the price and trading volume of BP shares; reports issued by securities analysts who followed BP; factual allegations in pleadings and other documents filed in the criminal action and plea deal between the United States Department of Justice ("DOJ") and BP, in the enforcement action and settlement between the SEC and BP, and in other civil lawsuits; the Court's Orders denying in part Defendants' motions to dismiss the claims in Civil Action Nos. 4:10-md-2185 (S.D. Tex.) and 4:12-cv-1256 (S.D. Tex.); and testimony and documents produced in *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL 2179 (E.D. La.) (the "MDL 2179 action"). Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION

1.       Plaintiffs purchased BP ordinary shares on the London Stock Exchange ("LSE") and BP American Depositary Shares ("ADSs") on the New York Stock Exchange ("NYSE")

(collectively "BP Shares") during the period starting November 8, 2007 through June 25, 2010 (the "Relevant Period").  One ADS is equal to six ordinary shares.

2.      Plaintiffs lost tens of millions of dollars as a result of Defendants' (defined herein) false and misleading statements regarding:  (i) the extent of BP's commitment to a "safety first" approach to oil drilling, which Defendants claimed to have implemented in the wake of catastrophic oil spills caused by a "profits first" corporate culture; (ii) the size of the oil spill that followed the April 20, 2010 explosion on the *Deepwater Horizon*, one of BP's Gulf of Mexico oil rigs (the "April 20, 2010 Explosion"), and BP's ability to contain the spill; and (iii) the extent of BP's likely responsibility for the catastrophe.

3.      On April 20, 2010, as the crew aboard BP's *Deepwater Horizon* oil rig drilled the exploratory Macondo well 3.5 miles beneath the waters of the Gulf of Mexico, high-pressure gas from the well shot up through the pipe that led to the surface, ignited, and engulfed the rig in flames.  The fire killed 11 workers, injured 17 others, and sank the rig.

4.      The April 20, 2010 Explosion was the manifestation of a much deeper problem. BP had cut so many safety corners constructing the Macondo well that, immediately following the April 20, 2010 Explosion, it spewed 2.3 million gallons of oil, *every day*, into the Gulf of Mexico.  In five days, the well released more oil than was released during the entire Exxon Valdez disaster.  Worse yet, BP had no plan or ability to quickly stop the spill.  By the time the well was capped almost three months later, 206 million gallons had been released into the Gulf of Mexico – the worst environmental disaster in the history of marine oil exploration.

5.      The causes of this catastrophic spill were not a surprise to Defendants.  Long before the Relevant Period, BP's corporate culture consistently placed cutting costs above

maintaining safe operations, as evidenced by a rash of oil spills, accidents, and governmental warnings between 2000 and 2007.

6.     In the wake of these accidents and at the insistence of federal regulators, BP established an independent panel to review and improve its safety procedures, with former United States Secretary of State James Baker, III installed at its head (the "Baker Panel").  After completing its investigation, the Baker Panel issued a report on January 16, 2007 (the "Baker Report"), finding, in the words of a Presidential Commission that subsequently investigated the spill (the "Presidential Commission Report"), that "BP management had not distinguished between occupational safety – concern over slips, sprains, and other workplace accidents – and process safety:  hazard analysis, design for safety, material verification, equipment maintenance, and process-changing reporting.   And the [Baker P]anel further concluded that BP was not investing leadership and other resources in managing the highest risks."  More specifically, the Baker Panel found that:  "from the top of the company, starting with the Board and going down . . . BP has not provided effective process safety leadership and has not adequately established process safety as a core value."

7.     The Baker Panel singled out organizational problems as the root cause of BP's failure to learn from, and respond to, major incidents, finding "a lack of operating discipline, toleration of serious deviations from safe operating practices, and apparent complacency toward serious process-safety risks."  The Baker Panel identified ten specific recommendations that BP could implement "to help bring about sustainable improvements in process safety performance."

8.     Defendants immediately professed their commitment to implementing the Baker Panel's recommendations.  Lord Edmund John Philip Browne ("Browne"), BP's then Chief Executive Officer ("CEO"), responded to the Baker Panel's recommendations with the following

statement, among others: "BP gets it.  And I get it too."  Admitting that "BP's safety lapses have been chronic," Browne promised a "sustained Group-wide effort to move BP towards excellence in process safety."

9.      Browne's acknowledgement, in the wake of the Baker Report, of BP's troubled past – and his pledge to investors that BP would be a different company going forward – signaled a purported sea change in BP's operations.

10.     Throughout the Relevant Period, Defendants repeatedly returned to this pledge and to the recommendations of the Baker Panel, assuring investors – in a series of materially false and misleading statements – that BP had learned its lesson, that BP had implemented concrete changes to render its operations, including those in the Gulf, newly safe and reliable, and that BP was prepared to address an oil spill in the Gulf.

11.     Unfortunately, as also detailed herein, Defendants' representations were not true, and Defendants themselves knew such statements to be untrue even as they made them.

12.     The April 20, 2010 Explosion, the oil spill at the Macondo well and their aftermath partially revealed the falsity of Defendants' prior statements.

13.     These events also presented Defendants with a moment of truth.  They could either immediately come clean about their prior misrepresentations, tell investors everything they knew about BP's actual commitment to safety, disclose all the information they had about the seriousness of the disaster, and admit that BP had little to no plan or ability to contain the situation, or they could continue misrepresenting the facts in an effort to prop up BP's stock price, which was then under enormous pressure as investors worried about the impact of the spill on BP's profitability.

14.     Defendants chose the latter course.  They minimized the magnitude of the oil spill, overstated BP's ability to control it, and understated the amount of money BP would have to pay to clean it up.  For example, in a string of post-spill emails, a BP official urged lower level employees to conceal BP's internal flow-rate projections – which were 60 times higher than the 1,000 barrels/day projection Defendants provided publicly.

15.     Throughout the Relevant Period, Defendants' false and misleading statements deceived the market (including Plaintiffs) as to BP's true risk profile, causing the artificial inflation of the BP Shares that Plaintiffs purchased.

16.     As the truth of the above matters – including the actual scope and implementation of BP's purported safety reforms, BP's true capacity to respond to deepwater oil spills (or lack thereof), and the amount of oil spilling into the Gulf of Mexico from the Macondo well – slowly emerged in the days, weeks, and months following the April 20, 2010 Explosion, BP Shares plunged in value.  From the April 20, 2010 Explosion through June 25, 2010, BP ADSs fell in value by 55%, from a closing price of $60.48 per share on April 20, 2010 to $27.02 on June 25, 2010, while BP ordinary shares fell in value by over 50%, from a closing price of 655.40 pence per share to 304.60 pence per share.

17.     This lawsuit seeks to hold Defendants accountable for the misrepresentations they made to the market (including Plaintiffs), and the tens of millions of dollars in losses they caused Plaintiffs to suffer.

## II.    JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over these claims due to (i) federal question jurisdiction – 28 U.S.C. §§ 1331 and 1337, and § 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa; (ii) diversity jurisdiction – 28 U.S.C. § 1332, in

that Plaintiffs and Defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interests and costs; and (iii) supplemental jurisdiction.

19.     This Court has personal jurisdiction over each defendant named herein.  Each defendant is either a corporation that conducts business and maintains operations in this District, or is an individual who resides in this District or has sufficient minimum contacts with this District, State, or the United States to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.  For example, the Individual Defendants, defined below, issued false and misleading statements from Texas, including during the aftermath of the April 20, 2010 Explosion, when they worked from BP's "crisis center" and from the Unified Command created to address the spill, and issued misleading statements regarding the magnitude of and BP's responsibility for the oil spill.

20.     This Court has personal jurisdiction over Defendants BP, BP Exploration & Production, Inc. and BP America, Inc.  BP has its principal office in the United States, and is authorized to do business in Texas.  The Company regularly transacts business in Texas and derives substantial revenue within Texas.  The headquarters of BP Exploration & Production, Inc. and BP America, Inc. are located in Texas.  BP, BP America, Inc., and BP Exploration & Production, Inc.'s registered agent is CT Corporation, 350 North Saint Paul, Dallas, Texas 75201.

21.     Venue for the federal law claims is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).

22.     Venue for the state law claims is proper in this Court because a significant part of the alleged wrongdoing occurred in this Judicial District, where BP has a presence.

## III.   THE PARTIES

### A.   Plaintiffs

23.     The following Plaintiffs purchased BP Shares during the Relevant Period and have been damaged thereby:

a.      Helaba Invest Kapitalanlagegesellschaft mbH ("Helaba") is an asset manager headquartered in Germany.  During the Relevant Period, Helaba purchased BP ordinary shares on the LSE at prices that were artificially inflated as a result of Defendants' misconduct and materially false and misleading public statements.  Helaba suffered substantial losses on those investments, and was damaged thereby.  Specifically, Helaba engaged in more than 100 transactions in BP ordinary shares on the LSE during the Relevant Period, including purchases made every month except January through March 2008, May through October 2008, and June 2010.

b.      Länsförsäkringar AB ("Länsförsäkringar") is an insurance company headquartered in Sweden.  During the Relevant Period, Länsförsäkringar purchased BP ordinary shares on the LSE at prices that were artificially inflated as a result of Defendants' misconduct and materially false and misleading public statements.  Länsförsäkringar suffered substantial losses on those investments, and was damaged thereby.  Specifically, Länsförsäkringar engaged in more than 300 transactions in BP ordinary shares on the LSE during the Relevant Period, including purchases made every month except November through December 2007 and July 2008.

c.      Landesbank Berlin Investment GmbH ("LBB Invest") is an asset manager headquartered in Germany.  During the Relevant Period, LBB Invest purchased BP ordinary shares on the LSE at prices that were artificially inflated as a result of Defendants' misconduct and materially false and misleading public statements.  LBB Invest suffered substantial losses on

those investments, and was damaged thereby. Specifically, LBB Invest engaged in approximately 50 transactions in BP ordinary shares on the LSE during the Relevant Period, including purchases made every month except November 2007, March 2008, May 2008, July 2008, September 2008, November 2008, February through March 2009, June 2009, October 2009, December 2009, January through March 2010 and June 2010.

        d.    LBBW Asset Management Investmentgesellschaft mbH ("LBBW") is an asset manager headquartered in Germany. During the Relevant Period, LBBW purchased BP ordinary shares on the LSE at prices that were artificially inflated as a result of Defendants' misconduct and materially false and misleading public statements. LBBW suffered substantial losses on those investments, and was damaged thereby. Specifically, LBBW engaged in approximately 100 transactions in BP ordinary shares on the LSE during the Relevant Period, including purchases made every month except November through December 2007, May 2008, May 2009, July 2009, October through November 2009, January 2010, and May through June 2010.

        e.    SGSS Deutschland Kapitalanlagegesellschaft mbH ("SGSS") is an asset manager headquartered in Germany. During the Relevant Period, SGSS purchased BP ordinary shares on the LSE at prices that were artificially inflated as a result of Defendants' misconduct and materially false and misleading public statements. SGSS suffered substantial losses on those investments, and was damaged thereby. Specifically, SGSS engaged in approximately 200 transactions in BP ordinary shares on the LSE during the Relevant Period, including purchases made every month except July 2009 and June 2010.

        f.    Universal-Investment-Gesellschaft mbH ("Universal") is an asset manager headquartered in Germany. During the Relevant Period, Universal purchased BP Shares on the

LSE and NYSE at prices that were artificially inflated as a result of Defendants' misconduct and materially false and misleading public statements.  Universal suffered substantial losses on those investments, and was damaged thereby.  Specifically, Universal engaged in more than 500 transactions in BP ordinary shares on the LSE and ADRs on the NYSE during the Relevant Period, including purchases made every month.

      **B.**    **Defendants**

          **1.**      **Corporate Defendants**

      24.     BP is a United Kingdom corporation with extensive United States contacts including:  (i) BP is the largest oil and gas producer in the United States and the largest producer in the Gulf of Mexico; (ii) BP runs a huge oil field in Alaska's Prudhoe Bay; (iii) BP operates refineries in Texas, California, Washington, Ohio, and Indiana; (iv) 40% of BP's assets and workers are located in the United States; (v) several BP brands and gas stations including, ARCO, BP and Castrol, are sold and located throughout the United States; (vi) roughly 40% of BP's ordinary shares are owned by United States investors; (vii) BP regularly files annual reports and other documents with the SEC; (viii) during the Relevant Period, in particular following the April 20, 2010 Explosion, BP's top executives and senior engineers, including the Individual Defendants, worked and made statements in the United States; and (ix) BP's current CEO, Defendant Robert W. Dudley ("Dudley"), is a United States citizen.  As stated on BP's corporate website, "BP's roots in the United States go deep, starting in 1866 with the founding of the Atlantic Petroleum Storage Company in the Pennsylvania oilfields.  Since then, our heritage has come to embody some of the most famous names in American energy:  Amoco, ARCO, and Standard Oil."  Throughout the Relevant Period, BP controlled, directly or indirectly, Defendants BP Exploration & Production, Inc. and BP America, Inc.

25.     BP America, Inc. ("BP America"), a wholly-owned subsidiary of BP, is a Delaware corporation with its principal place of business in Houston, Texas.  BP America produces oil and gas products in the United States.  Throughout the Relevant Period, BP America controlled Defendant BP Exploration & Production, Inc. and that entity's issuance of material information to the public.

26.     Defendant BP Exploration & Production, Inc. ("BP E&P" or "BP Exploration"), a wholly-owned subsidiary of BP, is a Delaware corporation with its principal place of business in Houston, Texas.

27.     Defendants BP, BP America, and BP E&P are collectively referred to herein as the "BP Defendants."

### 2.     Individual Defendants

28.     Anthony B. Hayward ("Hayward") served as the Company's CEO from May 2007 until October 2010, and served as an executive director of the Company from 2003 to November 2010.  From 2002 to 2007, Hayward served as the CEO of BP E&P, which oversaw exploration and drilling in the Gulf, among other places.  Hayward was a member of BP's executive management, and was responsible for the day-to-day running of BP.  Starting in 2006, Hayward headed the Group Operations Risk Committee ("GORC"), an executive committee that reviewed BP's safety protocols, including BP's Operating Management System ("OMS"), and responded to safety incidents in BP's operations.  Hayward also was the executive liaison to the Safety, Ethics & Environment Assurance Committee ("SEEAC"), the Company's Board committee responsible for ensuring that BP's safety protocols are implemented and followed, including implementation of the Baker Panel's recommendations.  GORC prepared regular safety reports for SEEAC, including quarterly reports called Health Safety Environment & Operations Integrity Reports, otherwise known as the "Orange Book."  During the Relevant

Period, Hayward signed certain BP Annual Reports, and made many of the other false and/or misleading statements alleged herein.  Hayward's conduct is attributable to BP throughout the Relevant Period.  Hayward directly or indirectly controlled the BP Defendants throughout the Relevant Period.

29.     Douglas Suttles ("Suttles") served as Chief Operating Officer for BP E&P from January 2009 until at least January 2011.  In January 2007, he was named President of BP Exploration (Alaska) Inc.  During the Relevant Period, Suttles made false and/or misleading statements as alleged herein.  Suttles' conduct is attributable to BP and BP E&P throughout the Relevant Period.  Suttles directly or indirectly controlled BP E&P from at least January 2009 through the end of the Relevant Period.

30.     Andrew G. Inglis ("Inglis") served as the CEO of BP E&P and as an executive director of BP from February 2007 until October 2010.  Beginning in July 2004, Inglis was Executive Vice President and Deputy CEO of BP E&P.  Inglis was a member of BP's executive management.  As CEO of BP E&P, Inglis attended SEEAC meetings to report on topics specific to BP E&P.  Inglis was also a member of GORC, provided special reports on BP E&P to the Chairman of GORC (Hayward), and received quarterly Orange Book reports that monitored the progress of OMS implementation across BP.  Inglis considered himself at the apex of responsibility during the Relevant Period (with the possible exception of Hayward) for BP E&P's activities worldwide:

> Q:     Do you feel any responsibility, sir, at all for what happened on April 20th of 2010?
>
> A:     As the CEO of [BP E&P], I am responsible for the safe and reliable operations across all of the E&P operations globally.
>
> *        *        *
>
> Q:     And that, of course, would include [the] Gulf of Mexico, correct?

11

A: Again, as I said, I was responsible for the – safety and reliability of – of our operations globally.  So that would include the Gulf of Mexico operations.

*  *  *

Q: All right.  And in terms of safety for drilling and exploration in the Gulf of Mexico and worldwide insofar as safety is concerned, other than perhaps Dr. Hayward, you would have been the highest in line of authority; is that true?

A: In terms of the – the responsibility for their safe and reliable operations, yes.

Inglis Dep. 75:24-76:5; 79:18-24; 80:13-22.  Inglis' conduct as alleged herein is attributable to BP and BP E&P throughout the Relevant Period.  Inglis directly or indirectly controlled BP E&P throughout the Relevant Period.

31. David Rainey ("Rainey") is BP America's Vice President of Exploration for the Gulf of Mexico.  Rainey was the person within BP who had "ultimate accountability" for implementing OMS in the Gulf of Mexico and he participated in the Gulf of Mexico gap assessment in 2009 that identified significant risks to BP in the Gulf of Mexico.  Rainey was also a member of BP's executive management.  In the days after the *Deepwater Horizon* disaster, Rainey served on behalf of BP as Deputy Incident Commander at Unified Command, headquartered in Robert, Louisiana, in the Eastern District of Louisiana.  Unified Command consisted of representatives from the United States government as well as BP and Transocean Ltd. ("Transocean"), the designated "responsible parties" for purposes of responding to the spill.  Led by the United States Coast Guard, Unified Command coordinated the oil spill response.  Rainey was BP's second highest-ranking representative at Unified Command.  Rainey's conduct as alleged herein is attributable to BP and BP America throughout the Relevant Period.  Rainey directly or indirectly controlled BP E&P and BP America throughout the Relevant Period.

32.     H. Lamar McKay ("McKay") has served as Chairman and President of BP America since January 2009.  McKay began his career in 1980 at Amoco Production Company.  Since 1998, he has worked for BP in various capacities, including as the Head of Strategy and Planning for Worldwide Exploration and Production, the Business Unit Leader for the Central North Sea in Aberdeen, Scotland, and the Chief of Staff for Worldwide Exploration and Production.  In May 2007, McKay became the Senior Group Vice President of BP and Executive Vice President of BP America, in which capacity he led BP's negotiations on the settlements for both the Texas City refinery disaster and Alaska pipeline oil spills (both detailed herein).  McKay is a member of BP's executive management.  He holds a degree in Petroleum Engineering and is based in Houston, Texas.  McKay's conduct as alleged herein is attributable to BP and BP America throughout the Relevant Period.  McKay directly or indirectly controlled BP E&P and BP America since at least January 2009.

33.     Dudley became Group Chief Executive of BP on October 1, 2010 and has served as an Executive Director on BP's Board of Directors since April 6, 2009.  Between June 23, 2010 and September 30, 2010, Dudley served as the President and CEO of BP's Gulf Coast Restoration Organization.  From April 6, 2009 until June 22, 2010, Dudley was an Executive Vice President and a member of the executive management team with responsibility for BP's activities in the Americas and Asia.  Prior to that, Dudley served in a variety of top roles at BP, including from 2003 to 2008 as President and CEO of TNK-BP, a joint venture between BP and Russian partners.  During the events following the April 20, 2010 Explosion and the Macondo well oil spill, Dudley was BP's Managing Director and one of the top BP officials coordinating BP's spill response.  Dudley's conduct as alleged herein is attributable to Defendant BP

throughout the Relevant Period. Dudley directly or indirectly controlled the BP Defendants since at least April 6, 2009.

34.     Defendants Hayward, Suttles, Inglis, Rainey, McKay, and Dudley are collectively referred to hereafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of BP's SEC filings, press releases and presentations to securities analysts, money and portfolio managers and investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made regarding BP's operations were materially false or misleading when made. Each Individual Defendant made materially false or misleading statements, or omitted to disclose material facts, to investors and disseminated such material misstatements through the use and means of interstate commerce within the United States and caused investors to purchase BP Shares at artificially inflated prices.

35.     The Corporate Defendants and the Individual Defendants are collectively referred to herein as "Defendants."

### C.     Non-Parties

36.     Browne served as BP's CEO from 1995 until April 2007, during which time he made repeated statements, attributable to BP, concerning BP's commitment to improving the safety of its operations. Browne joined BP as an apprentice in 1966 and held various positions, including Managing Director and CEO of BP E&P, prior to becoming CEO in 1995. Browne

was a member of BP's executive management team, which was responsible for the day-to-day running of BP.

37.     William Castell ("Castell") joined BP's Board of Directors in 2006 as the chairman of SEEAC.  At each SEEAC meeting, Castell and other SEEAC members were provided a report from GORC, usually presented in person by Hayward, and each quarter, SEEAC received the Orange Book.  Additionally, SEEAC was provided with regular reports on the implementation of the Baker Panel's recommendations and reports on the development and implementation of OMS.

38.     Robert Malone ("Malone") served as Chairman and President of BP America from July 2006 until February 2009, and as an Executive Vice President of BP until March 2009.  Malone holds a degree in Petroleum Engineering, had worked for BP for 34 years, and served on BP's executive management team.

## IV.     CONFIDENTIAL WITNESSES

39.     As alleged in the Second Consolidated Amended Class Action Complaint for All Purchasers of BP ADS Securities (the "Class Complaint") in Civil Action No. 4:10-md-2185 (S.D. Tex.), Confidential Witness 1 ("CW1") is a confidential witness on process safety and risk assessment and management.  Through 2005, CW1 consulted directly with the BP Board of Directors and executive management.  Specifically, CW1 acted as a safety systems and risk assessment consultant for, among other things, deepwater platforms and offshore drilling, including but not limited to the Gulf of Mexico.  Subsequent to the consultation, through the present, CW1 has been apprised of information related to BP's process safety and risk assessment and management in its Gulf operations.

40.     As alleged in the Class Complaint, Confidential Witness 2 ("CW2") is a former BP senior manager and an expert in offshore oil and gas drilling and completions.  CW2

possessed information related directly to BP's deepwater exploration in the Gulf of Mexico, including but not limited to process safety implementation.  Prior to separating from BP in 2009, CW2 reported directly to senior BP executives and indirectly to Inglis.

41.     As alleged in the Class Complaint, Confidential Witness 3 ("CW3") is an oil industry operational safety expert and former consultant to the BP Board of Directors.  CW3 presented information and analyses directly to Hayward and non-party Browne on issues including implementation of process safety and risk management practices.

## V.     BP CLAIMED TO TAKE EXTENSIVE MEASURES IN RESPONSE TO ITS REPEATED SAFETY VIOLATIONS AND CATOSTROPHIC INDUSTRIAL INCIDENTS

### A.     BP's Relevant Operations

42.     BP is a global oil and gas company and is the third-largest energy company in the world.  BP is active in every area of the oil and gas industry, including drilling exploration and production, refining, distribution and marketing, petrochemicals, power generation, and trading.  With operations in over 80 countries, BP produces approximately 3.8 million barrels of oil equivalent per day.  Its largest division, BP America, is the largest producer of oil and gas in the United States.

43.     BP's exploration and production segment, BP E&P, includes oil and natural gas exploration, field development and production, and marketing and trading of natural gas.  It has exploration and production activities in the United States (including in the Gulf of Mexico) and around the world.

44.     Throughout the Relevant Period, BP touted BP E&P and, more specifically, its operations in the Gulf of Mexico, a region BP hailed as a "profit centre" and a "high margin" production area.  BP described the Gulf of Mexico as "an important source of domestic energy,

and offshore deepwater developments" and told investors that oil from the Gulf of Mexico accounted for one-sixth of all oil produced in the United States.

45.     Specifically, in BP's 2008 Annual Report filed on March 4, 2009 on Form 20-F, Defendants highlighted the safety and success of BP's operations in the Gulf of Mexico, emphasizing the fact that BP was one of the largest deepwater operators in the world.   At the same time, they failed to disclose that BP (i) had not implemented safety measures for its Gulf of Mexico operations, (ii) had disregarded safety warnings about BP's operations, and (iii) lacked robust risk management processes that left the Company dangerously exposed to a catastrophic accident.

**B.      Prior To The Relevant Period, Repeated Catastrophic Incidents Focus Public Scrutiny On BP's Ability To Operate Safely**

46.     Prior to and during the Relevant Period, BP suffered frequent and sometimes catastrophic industrial incidents, including incidents related to its offshore drilling operations. These incidents and their associated consequences, including substantial financial costs and penalties for BP, precipitated significant market and regulatory scrutiny of BP's ability to conduct its operations safely and successfully.

**1.      Flawed Safety Management Systems Cause Grangemouth Incidents**

47.     Between May 29 and June 10, 2000, BP's Grangemouth storage and refining complex in Scotland experienced three major incidents.   These included a power failure leading to the emergency shutdown of the oil refinery; the rupture of a key steam pipe; and a fire in the refinery's catalytic cracker unit, which produces gasoline.   The UK Health and Safety Executive ("HSE") investigated the incidents and issued a report in 2003 finding in all three incidents "weaknesses in [BP's] safety management systems on-site over a period of time."   BP carried out an internal investigation, which concurred with many of the HSE's findings.   BP later pled guilty

to criminal charges stemming from the incidents and paid over £1 million in fines.

### 2. Unsafe Deepwater Drilling and Extraction Operations in the Gulf of Mexico and Other Sites

#### a. The *Ocean King* Incidents

48.     In 2002, the *Ocean King*, a drilling rig under BP's operational control in the Gulf of Mexico, experienced two separate blowout incidents within a three-month span, raising questions about BP's process safety and well design procedures and practices.

49.     The first incident occurred in August 2002, when the *Ocean King* suffered a gas blowout while drilling a well in the Gulf of Mexico's Grand Isle Block near Louisiana.  The crew's efforts to contain the well failed, and they soon evacuated the rig because of the high level of airborne gas.  The flow of gas and other material exploded, causing a fire on the rig and $2 million in damage.

50.     During its investigation of BP's safety practices, the United States Department of the Interior's Minerals Management Service ("MMS") discovered that BP had inexplicably installed a non-compliant blowout diverter system, which contributed to the explosion and fire, rather than the one specifically designed and approved for the rig.  MMS also found that the fire's effects were intensified because BP personnel had stored pressurized containers of flammable gas too close to the diverter output.  Worse still, the investigation revealed that BP engineers, because of a nearby well drilling project, knew that there was a shallow gas pocket at 2,700 feet beneath the sea floor, the precise depth which the rig had reached when the well blew out.  The incident was both caused by and revealed a host of systemic safety issues involving BP's failures to build and execute wells as designed, ensure the proper design of the drill rig, and keep accurate and up-to-date designs of its equipment.

51.     Just three months later, in November 2002, after the *Ocean King* had undergone major repairs and returned to the Grand Isle Block, a second incident occurred, similar to the first.  After cementing the steel casing in another newly drilled well hole, mud and gas began to flow onto the rig, indicating a failed cementing job.  After an unsuccessful effort to contain the well, the crew evacuated.  The MMS issued a harsh critique of the second incident, noting the flawed attempt to bring the well under control, and serious deficiencies in BP's safety protocols and knowledge of its own equipment.

52.     The two incidents in 2002 resulted in MMS issuing a special "Safety Alert" to all drilling companies in the Gulf of Mexico regarding the serious risk of a blowout in the event of a failed cementing job.  The Safety Alert specifically mentioned MMS's findings regarding the *Ocean King* incident, cautioning others in the industry about the "erroneous chain of decisions, inadequate training of personnel or knowledge of the diverter system, and inadequate planning" that caused the *Ocean King* incident.

### b.     The *Discoverer Enterprise* Incident

53.     In May 2003, BP suffered a near blowout not far from the Macondo well.  In that incident, the Transocean *Discoverer Enterprise*, on contract with BP, drifted off its drill site just as a well was being completed, breaking the riser pipe linking the rig to the ocean floor.  The breaking of the riser was strikingly similar to what occurred on the *Deepwater Horizon* after it exploded.  Fortunately for BP, the backup "deadman" switch on the rig's blowout preventer ("BOP") worked:  the BOP's rams closed, preventing the flow of oil or gas into the Gulf of Mexico from the damaged riser.  A subsequent inspection, however, showed that pieces of broken riser pipe were leaning against the BOP, close to its control lines, and that the BOP itself was partially damaged – demonstrating that the "fail safe" BOP device, regardless of its

19

immediate effectiveness, was subsequently vulnerable to damage or incapacitation by a falling

riser pipe – an outcome which in fact occurred during the *Deepwater Horizon* incident.

**c.**     **The *GSF Adriatic IV* Incident**

54.     In August 2004, BP experienced a blowout in the Nile delta, off the coast of

Egypt, when the *GSF Adriatic IV*, a gas drilling rig leased from Global Santa Fe (which, in 2007,

merged with Transocean), exploded while completing a well for a joint consortium, which

included BP.  The fire raged for over a week before the well was brought under control, and

Egypt's natural gas production was reduced by 10% to 15% because of the incident.  As with the

*Deepwater Horizon* incident, the blowout occurred after a final cementing job failed.

**d.**     **The *Thunder Horse* Incident**

55.     In July 2005, BP's massive and newly-deployed production and drilling rig in the

Gulf of Mexico, *Thunder Horse*, was evacuated for a passing hurricane and almost capsized after

a key internal valve, which had been installed backwards, allowed ballast water to accumulate in

one section of the rig, causing a dangerous tilt.  When the rig was later put in dry-dock for

repairs, cracks were discovered in the rig's underwater pipelines.  A senior engineering

consultant who worked on the *Thunder Horse* project later told *The New York Times* that the

pipeline cracks "could have been catastrophic" and that BP "would have lost a lot of oil a mile

down before you would have even known.  It could have been a helluva spill – much like the

*Deepwater Horizon*."  The *Thunder Horse* repairs took three years to complete.

**3.**     **Safety Lapses Cause a Massive Explosion at BP's Texas City
Refinery, Leading, *inter alia*, to the CSB Investigation, the Baker
Panel, and the Baker Report**

56.     On March 23, 2005, an explosion occurred at BP's Texas City refinery.  Fifteen

people were killed and approximately 170 were injured.  The United States Environmental

Protection Agency's ("EPA") criminal investigative division launched a criminal investigation,

20

as did the United States Occupational Safety and Health Administration ("OSHA"), EPA civil inspectors, the United States Chemical Safety and Hazard Investigation Board ("CSB"), and the Texas Environmental Quality Commission ("TCEQ").

57.     The next day, non-party Browne flew to Texas City and held a press conference at which he acknowledged the gravity of the incident, saying, "Yesterday was a dark day in BP's history.  It is the worst tragedy I have known during my 38 years with the company."  While asserting that BP believed that the Texas City explosion was unrelated to previous incidents, he pledged to "leave nothing undone in our efforts to determine the cause of this tragedy," and to carry out any reforms necessary.

58.     In April 2005, OSHA placed BP under its Enhanced Enforcement Program for employers who are "indifferent to their obligations under the OSHA Act."  EPA civil inspectors entered into a settlement with BP, laying out a timeline and plan to bring the refinery's operations into compliance with EPA regulations.  The TCEQ reached a similar agreement with BP in mid-2006.

59.     On April 15, 2005, Browne referred to Texas City as "the saddest and most moving day of my entire career at BP."  Later, in May 2005, he told the *Houston Chronicle*, "BP takes responsibility for what happens at its sites.  We want BP to be a safe place to work.  So as well as mourning for those we have lost, we are determined to learn from this tragedy and improve our safety record."

60.     In mid-2005, the CSB recommended that BP appoint an independent commission to investigate the Company's internal safety culture and uncover the causes of the incident as well as to investigate other general concerns with BP's safety environment.  Browne issued a statement saying that BP would comply with the recommendation.  He added, "The Texas City

explosion was the worst tragedy in the recent history of BP, and we will do everything possible to ensure nothing like it happens again. Today's recommendation from the CSB is a welcome development, and we take it seriously."

61.     In response to the CSB's recommendation, in October 2005, BP announced the formation of the "U.S. Refineries Independent Safety Review Panel," chaired by former Secretary of State James Baker. In a prepared statement, Brown stated: "The panel will have BP's full support and cooperation. We are determined to do everything possible to prevent a tragedy like this from ever happening again by ensuring that safety practices at our operations are effective and comprehensive."

62.     As further detailed in Section V.C, *infra*, the Baker Panel began conducting investigations in October 2005 and issued its final report on January 16, 2007.

63.     In March 2007, CSB completed its investigation of the Texas City incident and issued its report on March 22, 2007. The report flagged weaknesses in BP's safety culture. It criticized BP's management for its lack of "focus on controlling major hazard risk," finding that managers provided "ineffective leadership and oversight." CSB's report also identified the Company's repeated failure to heed warning signs and internal concerns raised by its own staff, writing that BP's managers "provided ineffective leadership and oversight" and "did not implement adequate safety oversight, provide needed human and economic resources, or consistently model adherence to safety rules and procedures." Finding a direct correlation between the blast and BP's cuts in safety and staffing budgets, the CSB concluded that BP "did not effectively evaluate the safety implications of major organizational, personnel, and policy changes." Finally, the CSB report criticized BP for failing to learn from its earlier, similar mistakes.

4.        **Safety Problems at Prudhoe Bay, and the Booz Allen Report**

64.        In early 2006, an oil spill of 210,000 to 260,000 gallons occurred from BP's Prudhoe Bay pipelines on Alaska's North Slope, facing the Arctic Sea.   Although first discovered on March 2, 2006, the pipeline had been leaking for weeks.   Joint federal and state investigations, encompassing both criminal and civil matters, began in March 2006.   The investigations ultimately addressed not only the March 2006 leak, but weaknesses in other parts of the pipeline as well as a subsequent leak on another part of the pipeline in August 2006.

65.        On July 25, 2006, Lord Browne told analysts and investors that Texas City and the oil spill in Alaska had caused "great shock within BP."   He took personal responsibility, stating, "These are things I want to apologize for.   These caused a lot of stress and distress to people, and to some families irreparable damage."   He stated, "First and foremost, we are committed to safety, integrity and the environment.   We're redoubling our efforts in this sphere, notably in North America."   He added that BP did not want to wait for the outcome of governmental investigations before acting, and that it would devote another $1 billion, in addition to the $6 billion already committed over four years, to upgrade safety at BP's United States refineries and to replace infield pipelines in Alaska.   Regarding Texas City and the Alaskan pipeline spill, he said, "We have to get the priorities right, and Job 1 is to get these things that have happened, get them fixed and get them sorted out.   We don't just sort them out on the surface, we get them fixed deeply."   He also underscored the importance of BP having safe operations in the United States, stating, "BP has some 40 percent of its assets and its staff in the United States . . . .   We are the largest indigenous producer of oil and gas combined.   It is of vital importance to BP and to Americans who depend significantly on us for secure energy supplies that our U.S. businesses operate to the highest standards of safety and integrity."

66.     An EPA criminal investigation concluded that widespread corrosion in the pipelines had led to the March and August leaks, that BP could have prevented the leaks by maintaining and inspecting its pipelines, and that the duration of the spill indicated BP's criminal neglect of the pipeline.

67.     In 2007, BP pled guilty to a criminal charge in connection with the March 2006 spill, admitting that BP's "criminal negligence" caused the corrosion – and thus the spill itself. BP was sentenced to three years of probation and fined $22 million.

68.     The 2006 spill was BP's second criminal plea in the United States in less than a decade.  In the late 1990s, BP had been indicted because its engineers were injecting dangerous materials into a well casing to dispose of the materials.  In response, BP pled guilty in 2000, was placed on probation for five years, and entered into a compliance agreement with the EPA's debarment division.

69.     In the wake of the 2006 spill from its Prudhoe Bay pipeline, BP retained consulting firm Booz Allen Hamilton ("Booz Allen") to "identify potential organizational, process, and governance issues" that related or contributed to the incident.  In March 2007, Booz Allen issued its report to BP, warning BP about deficiencies in its safety-related corporate governance.  The Booz Allen report found that BP's executive management and Board of Directors had created a culture focused on cost-cutting and ensuring that budget targets were met, while ignoring safety issues and critical maintenance.  Among other findings, Booz Allen found major shortcomings in the Company's internal communications culture, noting in particular that "critical risk data" and concerns about major risks were not properly communicated within BP.  More specifically, the report noted that "[r]isk-related vertical and horizontal communications do not elevate critical risk data to senior leadership."  Booz Allen

effectively put Defendants on notice that they could not rely on the Company's internal reporting mechanisms to receive "critical risk data" and thus understand the risk of catastrophic operating failure.

70.     In May 2007, CSB chairman Carolyn Merritt testified before Congress about similarities between the Booz Allen report on the Alaska spill and the CSB's report on Texas City, noting that "[v]irtually all of the seven root causes identified for the Prudhoe Bay incidents have strong echoes in Texas City," and identifying "common findings" that included "flawed communication of lessons learned, excessive decentralization of safety functions and high management turnover.  BP focused on personal safety statistics but allowed catastrophic process safety risks to grow."

### C.     BP Claims To Adopt The Baker Panel Recommendations, Primarily Through Purported Implementation Of OMS

#### 1.     BP Adopts the Baker Panel Recommendations to Improve Process Safety

71.     In 2005, at the CSB's urging and after the Texas City Refinery disaster, BP established its own independent panel to review and improve its safety procedures, chaired by former United States Secretary of State James Baker, III, *i.e.*, the Baker Panel.  After completing its investigation, the Baker Panel issued the Baker Report on January 16, 2007, finding, in the words of the Presidential Commission, that "*BP management had not distinguished between occupational safety – concern over slips, sprains, and other workplace accidents – and process safety:  hazard analysis, design for safety, material verification, equipment maintenance, and process-changing reporting*.  And the [Baker P]anel further concluded that BP was not investing leadership and other resources in managing the highest risks."  More specifically, the Baker Panel found that:  "*from the top of the company, starting with the Board and going down . . . BP has not provided effective process safety leadership and has not adequately established process*

*safety as a core value*."   Indeed, even then-BP CEO Browne admitted that BP had failed to adequately address process safety issues prior to the Texas City disaster and that it was those failures that led to the explosion.  For example, Browne stated, in part, that:

> We had emphasised that individuals had to be safe as they went about their daily work – "personal safety."  That led to dramatic improvements.  *But we had not emphasised that processes and equipment had to be safe under all circumstances and operated in a safe way at all times – "process safety."*

72.     The Baker Panel singled out organizational problems as the root cause of BP's continued failure to learn from, and respond to, major incidents, finding "a lack of operating discipline, toleration of serious deviations from safe operating practices, and apparent complacency toward serious process safety risks."

73.     The Baker Report proffered ten recommendations "to help bring about sustainable improvements in process safety performance" at BP:

> RECOMMENDATION #1 – PROCESS SAFETY LEADERSHIP – The Board of Directors of BP p.l.c., BP's executive management (including its Group Chief Executive), and other members of BP's corporate management must provide effective leadership on and establish appropriate goals for process safety. Those individuals must demonstrate their commitment to process safety by articulating a clear message on the importance of process safety and matching that message both with the policies they adopt and the actions they take.

> RECOMMENDATION #2 – INTEGRATED AND COMPREHENSIVE PROCESS SAFETY MANAGEMENT SYSTEM – BP should establish and implement an integrated and comprehensive process safety management system that systematically and continuously identifies, reduces, and manages process safety risks at its U.S. refineries.

> RECOMMENDATION #3 – PROCESS SAFETY KNOWLEDGE AND EXPERTISE – BP should develop and implement a system to ensure that its executive management, its refining line management above the refinery level, and all U.S. refining personnel, including managers, supervisors, workers, and contractors, possess an appropriate level of process safety knowledge and expertise.

> RECOMMENDATION #4 – PROCESS SAFETY CULTURE – BP should involve the relevant stakeholders to develop a positive, trusting, and open process safety culture within each U.S. refinery.

26

RECOMMENDATION #5 – CLEARLY DEFINED EXPECTATIONS AND ACCOUNTABILITY FOR PROCESS SAFETY – BP should clearly define expectations and strengthen accountability for process safety performance at all levels in executive management and in the refining managerial and supervisory reporting line.

RECOMMENDATION #6 – SUPPORT FOR LINE MANAGEMENT – BP should provide more effective and better coordinated process safety support for the U.S. refining line organization.

RECOMMENDATION #7 – LEADING AND LAGGING PERFORMANCE INDICATORS FOR PROCESS SAFETY – BP should develop, implement, maintain, and periodically update an integrated set of leading and lagging performance indicators for more effectively monitoring the process safety performance of the U.S. refineries by BP's refining line management, executive management (including the Group Chief Executive), and Board of Directors. In addition, BP should work with the U.S. Chemical Safety and Hazard Investigation Board and with industry, labor organizations, other governmental agencies, and other organizations to develop a consensus set of leading and lagging indicators for process safety performance for use in the refining and chemical processing industries.

RECOMMENDATION #8 – PROCESS SAFETY AUDITING – BP should establish and implement an effective system to audit process safety performance at its U.S. refineries.

RECOMMENDATION #9 – BOARD MONITORING – BP's Board should monitor the implementation of the recommendations of the Panel . . . and the ongoing process safety performance of BP's U.S. refineries. The Board should, for a period of at least five calendar years, engage an independent monitor to report annually to the Board on BP's progress in implementing the Panel's recommendations . . . . The Board should also report publicly on the progress of such implementation and on BP's ongoing process safety performance.

RECOMMENDATION #10 – INDUSTRY LEADER – BP should use the lessons learned from the Texas City tragedy and from the Panel's report to transform the company into a recognized industry leader in process safety management. The Panel believes that these recommendations . . . can help bring about sustainable improvements in process safety performance at all BP U.S. refineries.

74.     Following the release of the Baker Panel recommendations, BP ceaselessly and publicly represented that it intended to implement its process safety improvement mandates across all lines of its business, and that it in fact was doing so. BP made specific such representations throughout the Relevant Period, alleged herein to have been materially false and

misleading.  By way of illustration, BP made similar representations repeatedly throughout 2007, including:

> a.     In a January 16, 2007 press conference responding to the findings of the

Baker Report, Browne announced:

> If I had to say one thing which I hope you will all hear today it is this 'BP gets it.' And I get it too.  This happened on my watch and, as Chief Executive, I have a responsibility to learn from what has occurred.  *I recognise the need for improvement and that my successor, Tony Hayward, and I need to take a lead in putting that right by championing process safety as a foundation of BP's operations.*

> b.     On May 9, 2007, BP issued its 2006 Sustainability Report, made available

to the investing public on BP's website, which stated in part:

> During 2006, we undertook specific investments and targeted programmes in response to the Texas City incident as well as building more comprehensive systems for managing process safety across the group. . . .  During 2006, we built on the learning from more recent incidents and industry best practice to develop a new operating management system (OMS) to achieve further improvements and reductions in risk.  Our goals remain unchanged: no accidents, no harm to people and no damage to the environment.  *The OMS is a comprehensive system that covers all aspects of our operations*, including three dimensions of safety – personal safety, process safety and the environment.

> However, we recognize that we have more to do to achieve excellence in process safety . . . .  *The [Baker P]anel made 10 recommendations, all of which BP will implement*, in areas ranging from leadership to performance indicators . . . .

> *            *            *

> *The new OMS will apply to all operations* by the end of 2010 and includes safety, integrity, environmental management and health . . . .  Each site will have its own local OMS, based on a consistent group-wide framework . . . .  The aim of the OMS is to have consistent standards of design, construction, operating procedures and maintenance that help to ensure the reliability and integrity of our plants.

> c.     On May 16, 2007, Malone testified before the United States House of

Representatives Committee on Energy and Commerce, Subcommittee on Oversight and Investigations.  During his testimony, Malone stated that:  "Today, I want to assure you that we

get it.  We have learned the lessons of the past."  Malone also submitted written testimony to the

Committee, which stated, in part:

> *BP America is committed to safety, and the expectation of our management is that*
> *budget guidelines should never result in a compromise in safety performance.*
>
>      \*   \*   \*
>
> I continue to meet with employees to reinforce my expectations of them: that they
> must ensure that our operations are safe, that they understand they have both a
> right and responsibility to shut down any process they feel is unsafe or
> operationally unsound, and that they are encouraged to raise concerns on any
> issue.

    d.   On July 24, 2007, in a BP conference call with analysts and investors,

Hayward stated:

> First, safety.  We are ensuring that we have consistent, safe, reliable operations
> across BP.  *We are implementing the Baker Panel recommendations.  We are also*
> *in the early days of establishing a new way of operating in BP – with the*
> *progressive rollout of a common group-wide Operating Management System.*

    e.   On September 25, 2007, at the Sanford Bernstein 4th Annual Strategic

Decisions Conference, Inglis represented the purported scope of BP's OMS:

> One aspect of our focus on safe and reliable operations that I mentioned earlier, is
> our new standardized *Operating Management System (OMS).  This will provide a*
> *blueprint for safety and all aspects of operations throughout BP*, making sure
> operations are undertaken to a consistently high standard worldwide.

    f.   On October 25, 2007, BP issued a press release announcing the resolution

of various law enforcement investigations, including those related to the Texas City refinery

explosion and the Prudhoe Bay oil spill.  The press release claimed that "BP America is in the

midst of a comprehensive effort to improve its safety culture and *to strengthen and standardize*

*process safety and risk management programs at all BP-operated facilities*," and quoted Malone,

who stated that "*we have made real progress in the areas of process safety performance and risk*

*management*."

      2.      **BP Purportedly Implements OMS Company-Wide, Including in BP's Gulf of Mexico Operations**

75.    As part of BP's professed commitment to process safety, BP represented OMS to be the cornerstone of BP's efforts at improving its process safety protocols, and told investors that OMS was designed to address the Baker Panel's recommendation to establish and implement an integrated and comprehensive system that would systematically identify, reduce and manage process safety risks.  Hayward repeatedly and publicly referred to OMS as the means by which BP would improve its process safety performance.

76.    In 2007, BP introduced OMS at 12 representative pilot sites and by early 2008 BP purportedly sought to implement OMS company-wide.  According to Ellis Armstrong, Chief Financial Officer ("CFO") of BP E&P and a Fed. R. Civ. P. 30(b)(6) witness in the MDL 2179 action, BP's executive management made the determination to extend the Baker Panel process safety recommendations across the entirety of the BP Group, including exploration and production in the Gulf of Mexico, rather than limiting implementation to its refineries.  *See* Armstrong Dep. 57:1-13.

77.    Beginning in 2007 and continuing throughout the relevant period, Defendants represented, *inter alia*:  (1) their purported intent to apply and roll out OMS to all BP operations; and (2) their purported progress toward this goal, including roll-out of OMS to Gulf of Mexico operations.  For example:

      a.    BP's 2006 Sustainability Report, made public on May 9, 2007, represented that "OMS is a comprehensive system that covers *all aspects* of our operations . . . ," and that "[t]he new OMS will apply to *all operations.*"  BP also represented in its 2007 Annual Review, made public the same day, that "OMS is the foundation for a safe, effective, and high-performing BP."

b.     On September 25, 2007, Inglis, speaking at the Sanford Bernstein 4th Annual Strategic Decisions Conference, stated:  "One aspect of our focus on safe and reliable operations that I mentioned earlier is *our new standardised Operating Management System (OMS).  This will provide a blueprint for safety and all aspects of operations throughout BP*."

c.     On May 20, 2008, BP released its 2007 Sustainability Report, where Hayward, in the "Group chief executive's introduction" to that report, stated that BP had "agreed to implement all [the Baker Panel's] recommendations and we are now working to do so." Describing BP's efforts in that regard, Hayward stated, "[w]e are also now introducing our new operating management system (OMS), designed to bring greater consistency to our operations. . . .  My executive team continues to monitor closely our safety performance."  In that regard, the 2007 Sustainability Report further noted that the Hayward-led GORC met fourteen times in 2007.

d.     On February 24, 2009, BP released its 2008 Annual Review, where Hayward, in the "Group Chief Executive's Review," stated that "[t]he BP operating management system (OMS) turns the principle of safe and reliable operations into reality by governing how *every BP project, site, operation, and facility is managed*."

e.     On March 4, 2009, BP released its 2008 Annual Report on Form 20-F, signed by Hayward, which stated that OMS was a "*framework for operations across BP* that is integral to improving safety and operating performance in *every site.*"

78.     During the Relevant Period, Defendants presented specific information about OMS, including the number of sites in which the program was supposedly implemented, specific sites where it was supposedly already implemented, and statistical percentages demonstrating that the Company was supposedly on track with implementation.  BP presented this hard data on

OMS implementation – and the benefits that OMS had allegedly already begun to achieve – alongside the Company's expectations for continued success in its Gulf of Mexico operations.

79.     In particular, BP's 2008 and 2009 Annual Reports on Form 20-F included Defendants' representations that OMS was in place at BP's exploration and production projects in the Gulf of Mexico.  BP stated unequivocally that, "[e]ight sites completed the transition to OMS in 2008," including "the Gulf of Mexico."

## VI.   DEFENDANTS' SCIENTER

### A.    Defendants' Scienter With Respect To The Intended Scope And Actual Implementation Of OMS, Including In The Gulf Of Mexico

#### 1.   Defendants Never Intended OMS to Apply to All BP Operations, and Knew Substantial Operations, Including Operations in the Gulf of Mexico, Would be Untouched by OMS

80.     Defendants represented publicly that OMS was intended to be implemented across all BP operations, and that Defendants were in fact progressively extending OMS to BP's far-flung operating sites, including in the Gulf of Mexico.  However, as Defendants knew, and contrary to their representations, BP never intended for OMS to apply to the entirety of BP's operations.  In fact, OMS was specifically not applicable to drilling rigs that BP did not fully own.

81.     Thus, massive portions of BP's riskiest and potentially most profitable exploration and production projects were largely exempt from OMS because the well sites were physically drilled by contracted drilling rigs.  Indeed, BP used contracted rigs to drill the majority of its wells in the Gulf of Mexico.  Armstrong Dep. 247:18-248:4.  This practice and the intent to exclude contracted drilling rigs from OMS coverage meant that OMS did not apply to the vast majority of BP's deepwater drilling operations in the Gulf of Mexico, including the Transocean-owned *Deepwater Horizon*.  Six out of seven drilling operations for BP in the Gulf

of Mexico during early 2010 were not covered by OMS, among them the *Deepwater Horizon*. *See* Motion to Dismiss Transcript 66:6-68:20, *In re: BP Plc Sec. Litig.*, (2011) (No. 4:10-md-02185) ("MTD Tr.").

82. The deposition testimony of several key BP personnel in the MDL 2179 action confirms this reality. John Mogford ("Mogford"), BP's former Global Head of Safety & Operations and a GORC member, testified that "OMS was designed for BP owned and operated institutions, so the focus was on BP production facilities where BP had people . . . according to the guidance for where it was to be applied, on – OMS was not designed to be implemented on contractor sites or vessels." Mogford Dep. 150:13-19. According to Mogford, this key limitation of the OMS was known to GORC, including Hayward and Inglis, because the "OMS document, it was approved, and the scope was approved . . . at the GORC." *Id.* at 461:18-19. Mogford testified that GORC held "a discussion that the scope was that [OMS] applied to BP owned and operated and controlled sites." *Id.* at 461:23-25.

83. Likewise, in his deposition in MDL 2179, Hayward testified that BP's OMS and safety systems did not apply to third-party contractors in the Gulf of Mexico, including the *Deepwater Horizon*:

> Q. And, again, the effective well control system, is that something that is both part [Transocean]'s and part BP's?
>
> A. Yes, *very largely Transocean, because it is a Transocean Drilling Team that implement the well control procedures. There's no one from BP involved in implementing well control procedures.* So what we have to do is determine that the well control procedures that Transocean has and that are documented as their well control procedures are appropriate, and, of course, that they're . . . followed.
>
> Q. Okay. But if there are well control procedures and process procedures in place in the Gulf of Mexico, BP procedures, those are applicable as well as the [Transocean] procedures?

A.      Well, I don't want to be pedantic, *but BP doesn't have well control procedures to manage a well that is beginning to flow, because we're not actually drilling any of the wells that our contractors are.*  So what we want to verify is that those procedures are in place, and they're deemed to be appropriate, and people have been trained such that they know them, and when a situation occurs, that they implement and follow them to control the well.

Hayward Dep. 668:7-669:5.

84.      John Baxter, Group Head of Engineering for BP and a GORC member, testified that OMS did not apply to the *Deepwater Horizon*, and that as a result numerous safety and risk management procedures instituted in direct response to the Baker Panel recommendations were not applicable to the majority of BP's drilling fleet in the Gulf of Mexico, including the *Deepwater Horizon.*  Baxter Dep. 175:14-15.  For example, BP did not apply its Integrity Management, Major Accident Risk ("MAR") analysis, Safety & Operations Audits, or Control of Work to the majority of its drilling rig fleet, including the *Deepwater Horizon*, because OMS was limited to rigs that were fully owned by BP.  *Id.* at 175:11-12; 186:24-187:8; 191:20-192:23; 210:3-10.  This was confirmed by Pat O'Bryan, Vice President of Drilling & Completions, who testified that "[t]he only drilling rig that we had in our fleet [in the Gulf of Mexico] that would fall under the BP OMS is the BP-owned rig the PDQ on Thunderhorse."  O'Bryan Dep. 413:6- 9.

85.      Several BP employees familiar with BP's drilling and completions in the Gulf of Mexico revealed that upstream operations – *i.e.*, drilling rigs, including the *Deepwater Horizon* – did not receive information on OMS.  For instance, John Guide, Wells Team Leader for the *Deepwater Horizon*, testified that he had no formalized training on OMS until January 2011.  Guide Dep. 433:5-8.  Ronnie Sepulvado, Well Site Leader on the *Deepwater Horizon* since 2003, stated that he did not know what the Gulf of Mexico local OMS was, that he had only "heard" of process safety, and he was completely unfamiliar with thirteen policies that were ostensibly part of the Gulf of Mexico Local OMS.  Sepulvado Dep. 357:16-20, 391:6-394:10.

Additionally, Cheryl Grounds, Chief Engineer of Process and Process Safety, stated that "[m]y understanding is it was frequently stated in the company is [*sic*] that drilling managed their own work.  And we had a lot of work to do in process safety elsewhere, so that was prioritized.  So I focused on producing assets and major capital projects[.]"  Grounds Dep. 88:18-24.  These statements confirm that the scope of OMS was never intended to apply to some of BP's most critical projects involving drilling rigs that were not fully-owned by BP.

> **2.    Defendants' Establishment of GORC and SEEAC, Tasked with Overseeing and Monitoring Process Safety Reforms, Allowed Defendants to Understand the Precise Scope of OMS Rollout at Any Given Time**

> **a.    BP's Group Operations Risk Committee (GORC)**

86.    In connection with its vow to adopt the Baker Report's recommendations and improve process safety through implementation of OMS, BP established GORC and tasked it with oversight and implementation of OMS, among other responsibilities.  GORC met monthly and included sectional CEOs, with Hayward as Committee Chair.  GORC's role was to educate Hayward and to ensure that operational risks were identified and properly managed.

87.    Hayward and Inglis both testified that they were knowledgeable about the scope and implementation of OMS through their participation in GORC.  Inglis testified:

> A.    The group operations – Group Operations Risk Committee was set up by – by Tony Hayward to monitor our safety and integrity performance.  It was there to act as a vehicle for continuing to improve our performance.  That was through OMS.  So part of it was to actually look at how OMS was being implemented.  It connected into the OMS audit function, so that reported in to GORC.

Inglis Dep. 279:21-280:4.

88.    Similarly, as the CEO of BP and Chairman of GORC, Hayward was responsible for overseeing OMS development and implementation, which gave him detailed knowledge in these areas:

> Q.    And you are very familiar with process safety because of your position as Chair of the Group Operating Risk Committee, aren't you?
>
> A.    I am.
>
> *        *        *
>
> Q.    And one of the responsibilities you had . . . as Chair of [GORC] . . . tell me whether I read this correctly, quote, "Oversight of development and implementation of BP's Operating Management System . . ."
>
> A.    That's correct.

Hayward Dep. 149:10-13; 163:14-21.

89.    Hayward, Inglis, and other members of GORC received regular status updates concerning the scope and implementation of OMS via the Orange Book.  As described by Inglis, the purpose of the Orange Book was to provide members of GORC with key performance indicators concerning implementation of OMS:

> Q.    What was the purpose of the Orange Book?
>
> A.    The Orange Book actually started in the upstream [synonymous with "Exploration & Production"].  It was sort of under my leadership, and then it got introduced as something that would apply across the whole of the – of the group, but, in essence, it was to provide a – a performance monitoring in – performance monitoring information around safety and operational integrity.  So it had in it key performance indicators, indicators of progress on various initiatives, whether they be the six-point plan, the implementation of OMS.  So it was a – a compendium of all the information that you could use to assess progress on our safety and operation integrity agenda.

Inglis Dep. 286:24-287:15.

90.    Inglis testified that he monitored the implementation of OMS through the Orange Book:  "There was then a very rigorous process for [OMS'] implementation, as I've described to you. I monitored the implementation of that through the – the Orange Book and the three stages of [g]ap assessment, prioritization, and MOC [Management of Change]."  *Id.* at 379:11-16.

91.     Hayward further admitted that the Orange Book provided a clear indication of what areas of BP's operations had or had not implemented OMS:

Q.      And what other areas would not have had OMS fully implemented until the end of 2010, other than the Gulf of Mexico?

A.      I can't remember the list, but, you know, we have a list that's in many of these reports, that – that document – if you refer to the thing called the Orange Book, it's very clear which areas are complete, which areas are in – in transition.

Hayward Dep. 791:7-11.

### b.      BP's Safety, Ethics and Environment Assurance Committee (SEEAC)

92.     BP's SEEAC, a board-level committee, was created to ensure that BP publications concerning environmental, safety, and ethical matters were accurate.   SEEAC purportedly carried out that purpose by obtaining reports from Hayward, a Special Liaison to SEEAC, who regularly reported to SEEAC concerning issues within the purview of GORC, including the status of OMS implementation.   SEEAC also independently monitored progress in BP's process safety efforts.   Inglis also reported to SEEAC concerning matters relating to his Exploration and Production unit.   SEEAC met regularly (more than quarterly) – eight times in 2008, seven times in 2009, and nine times in 2010 – and was continuously updated with respect to BP's implementation of OMS.   Indeed, Hayward attended each of these meetings up until the time of the blowout.

93.     William Castell ("Castell"), the chairman of SEEAC, testified that "the duties and obligations [of SEEAC] are set out in [BP's] Annual Report."   BP's 2008 Annual Report, published on March 4, 2009, defined SEEAC responsibilities as including: "[r]eviewing material to be placed before shareholders that addresses environmental, safety and ethical performance and make [*sic*] recommendations to the Board about their adoption and publication."   It defined

"the main tasks and requirements for SEEAC" to include "monitoring and obtaining assurance that the management or mitigation of significant BP risks of a non-financial nature [was] appropriately addressed by the group chief executive."  Castell testified that non-financial risks include safety-related risks.

94.     The 2008 Annual Report also discussed the types of information received by SEEAC:  "[SEEAC] receives information on agenda items from both internal and external sources, including internal audit, the safety and operations function, the group compliance and ethics function, and Ernst & Young.  Like other board committees, SEEAC can access independent advice and counsel if it requires, on an unrestricted basis."

95.     Moreover, Castell testified that SEEAC members received the Orange Book on a quarterly basis, and that it contained detailed data concerning BP's safety performance:

Q.     Now, the Reports you get, that's the Orange Book; is that right?

A.     We receive an Orange Book on a quarterly basis, sir.

Q.     Yes.  And tell us what that is.  What is the Orange Book?

A.     The Orange Book is a compilation of Operations and Risk data which is – which is received by the Group Operations Risk Committee, which is the mechanisms of formal reporting to the GORC Committee as to the level of safety achieved, the lead and lag factors, the major incidents reported. These are all consolidated.  So on a quarterly basis, there is a consolidated document that refers to the last quarter's performance.

*       *       *

Q.     Is it metrics?

A.     It's metrics, and it's – well, it goes beyond metrics, sir.  There are Reports that highlight where there have been major incidents.  There are verbal Reports from Upstream and Downstream, and there are Reports on Audit, so not always metrics.  There are also, you know, comments on audits, audit closeouts, et cetera.

*       *       *

38

Q.    I'm trying to understand at what level the seriousness of an incident would come to your Committee, the SEEAC Committee.  How – how bad does it have to be before your Committee finds out about it?

*         *         *

A.    I think you've seen from the data, sir, that we have the data that comes to us.  When you say, "How bad does it have to be," the – the data in the Orange Book goes down to lost days of work.  So if they lost days at work, we can see it.

Castell Dep. 377:23-378:12, 378:15-22, 380:22-381:1, 381:4-8.

### 3.    Defendants Understood that BP's OMS Rollout in the Gulf of Mexico Had Not Been Completed by 2008, But in Fact Had Only Begun in Late 2009 and Had Not Been Completed Prior to the *Deepwater Horizon* Disaster

96.    Notwithstanding Defendants' representations that OMS was in place at BP's exploration and production projects in the Gulf of Mexico by year-end 2008, in fact the transition to OMS in the Gulf of Mexico was not complete in 2008 and was not even complete at the time of the *Deepwater Horizon* disaster on April 20, 2010.  BP has conceded that this representation was false when made.  *See* MTD Hr'g Tr. (Dkt. 304), No. 4:10-md-02185 (S.D. Tex.) at 58:15-2 ("The statement here that the Gulf of Mexico completed the transition to OMS in 2008, that that is a statement of specific fact . . . that the plaintiffs have alleged and that I will admit to the Court is not accurate.").  Hayward testified at his deposition in the MDL 2179 action that he knew that OMS was not fully implemented in the Gulf of Mexico as of April 2010:

Q.    Go back to an old familiar subject, the OMS.  Did you know in April of 2010, that the OMS had not been fully implemented in the Gulf of Mexico?

A.    I – yeah.  I believe I was aware that it had not been fully implemented.  It was in the process of being implemented as it was in other parts of BP.

Q.    But specifically with respect to the Gulf of Mexico, that's your answer?

A.    Yes.

Q.    Okay.  When did you come to learn that?

39

A.      I would have been aware of it prior to the – you know, in the course of doing my – my job.

Q.      Okay.

A.      Because we had a – as I've explained a number of times through this deposition, the Group Operations Risk Committee was looking at the progress of implementation.

Q.      So you were getting reports as to where it was implemented, where it was not yet implemented?

A.      And where it – where it was entrained, so to speak.

Hayward Dep. 662:25-663:20.

97.      Hayward further testified that BP did not even begin to implement OMS in the

Gulf of Mexico until the fall of 2009 and that he did not expect implementation to be complete

until the end of 2010:

Q.      [Y]ou said that you were on target to implement OMS in the Gulf of Mexico in 2009?

A.      I – my recollection is that we began the process of cutover to OMS in the Fall of 2009.

                            *        *        *

Q.      And your recollection also is that you would have completed that implementation in the Gulf of Mexico by the end of 2010?

A.      That's correct.

*Id.* at 789:11-14, 789:17-20.

98.      BP's failure to complete implementation of OMS in the Gulf of Mexico had

enormous repercussions.   Hayward testified that the *Deepwater Horizon* tragedy potentially

could have been avoided if OMS had been fully implemented in the Gulf of Mexico or

applicable to the *Deepwater Horizon*.

Q.      If OMS had been implemented in the Gulf of Mexico before April 20, 2010, is there not the potential for having avoided this terrible catastrophe?

*     *     *

A.     There is possible potential –

*     *     *

A.     Undoubtedly.

*Id.* at 793:25-794:8.

99.     Likewise, SEEAC Chairman Castell fully understood that implementation of OMS had not been completed in the Gulf of Mexico by 2008.  Castell testified, "I believe OMS started its integration in the Gulf in 2009.  I would be personally surprised – and I don't know, but I'd be surprised if it had been fully integrated with all the legacy systems [as of April 20, 2010]."  Castell Dep. 71:11-14.

100.     Indeed, according to CW2, BP's OMS lagged far behind its peers (*e.g.*, Chevron and Exxon) in 2009, and by 2010, the program was still in its pilot phase and yet to be fully implemented in the Gulf of Mexico.

> **4.**     **Defendants Knew that BP's Internal Cost-Cutting and Restructuring of its Gulf of Mexico Operations Had Impaired OMS Implementation and BP's Ability to Operate Safely**

101.     According to CW1, there was a company-wide failure to implement an OMS protocol that would have ensured that the individual decision makers at the rig level understood how cost-savings and corner-cutting could affect the process safety of the *Deepwater Horizon*.

102.     In the fourth quarter of 2009 and in January 2010, BP, as part of a global cost-cutting restructuring, reorganized the drilling operations unit for the Gulf of Mexico.  According to CW2, the global reorganization was attributable to decisions made by Inglis and Suttles.  A consequence of the restructuring was the termination or forced transfer of those chiefly responsible for BP's Gulf of Mexico Operations, including but not limited to safety processes and the implementation of BP's OMS in the Gulf of Mexico.  Indeed, the people charged with

41

implementing OMS in the Gulf of Mexico were transferred or terminated in Q4 2009 and Q1 2010.

103.    Further, as described below, the individuals brought in to implement BP's OMS and manage BP's Gulf of Mexico operations lacked the knowledge, experience, and expertise of those they were replacing.  In fact, in September 2009, a non-public BP rig audit of the *Deepwater Horizon* found that safety goals were not commonly known or properly communicated to employees and not all relevant rig personnel were knowledgeable about drilling and well operations practices.

104.    According to CW2, the restructuring of BP's Gulf of Mexico operations was undertaken despite concerns raised by CW2 and other senior BP employees to top-level management with direct reporting responsibilities to BP's board of directors.  These concerns related to BP's ability to operate safely in the Gulf.

105.    Ian Little was the Gulf of Mexico wells manager for BP.  Little was replaced by David Sims who, according to CW2, lacked Little's knowledge and expertise.  Despite this, Sims was required to make decisions regarding not only management of the well, but also the response to the April 20, 2010 Explosion.

106.    Prior to becoming Vice President of Drilling and Completions in December 2009, Harry Thierens served from 2006 to 2009 as the well director for the Gulf of Mexico.  He managed the engineering and operations group in the Gulf of Mexico.  Thierens was replaced by David Rich, who according to CW2, lacked the expertise of Thierens.

107.    Kevin Lacy was the Vice President of Drilling and Completions for BP until December 15, 2009 when he left the Company.  Lacy, who worked in exploration and production for thirty years, was replaced by Patrick O'Bryan.

108.    According to CW1 and CW2, O'Bryan lacked Lacy's experience and expertise. According to CW2, by 2009 and 2010, BP still had not implemented a robust operations management system to ensure offshore processes could be managed effectively for both exploration and risk.  Given the difficulties of Gulf of Mexico exploration, this invited disaster.

**B.    Defendants' Scienter with Respect To Their Misrepresentations And Omissions Concerning BP's Operational Safety And Deepwater Drilling Operations**

109.    Throughout the Relevant Period, Defendants were aware, or recklessly disregarded, that their statements to investors regarding BP's commitment to safety were not true and that their statements touting the importance of deepwater drilling in the Gulf of Mexico omitted material information regarding BP's highly risky and unsafe practices in its deepwater operations.  When they spoke, Defendants knew or recklessly disregarded that BP's process safety procedures did not adequately address the known risks of deepwater drilling – risks that materialized at the Macondo well when the *Deepwater Horizon* rig exploded and sank.

110.    The Presidential Commission found that there was no "comprehensive and systematic risk-analysis, peer-review, or management of change process" for any of the following key decisions, amongst others:

- Failing to wait for the correct amount of centralizers;

- Failing to wait for the foam stability test results and/or redesigning slurry;

- Failing to run a cement evaluation log;

- Failing to use the correct spacer to avoid disposal issues;

- Failing to recognize the dangers inherent in displacing the mud from the riser before the surface cement plug had been set;

- Failing to properly place the cement plug at the appropriate level and instead placing it 3,000 feet before the mud line;

- Failing to install additional physical barriers during the temporary abandonment procedure;

- Failing to perform further well integrity diagnostics in light of the troubling and unexplained negative pressure test failures; and

- Failing to monitor the mud pits and conducting other simultaneous operations during mud displacement.

111.    The Presidential Commission then concluded that:  "The evidence now available does not show that the BP team members (or other companies' personnel) responsible for these decisions conducted any sort of formal analysis to assess the relative riskiness of available alternatives."

**1.    Hayward Understood that a Deepwater Blowout was One of BP's Greatest Risks**

112.    Hayward understood that a deepwater blowout was the greatest risk facing BP in the Gulf of Mexico, and one of the largest risks facing BP as a whole.  As Hayward testified in his deposition in the MDL 2179 Action:

Q.    Well, what you did know, though, was that DEEP WATER blowout was the highest risk across the entire corporation and that it was the highest risk for your Exploration and Production Unit, wasn't it?

A.    It was certainly one of the highest risks for the corporation.  It was the highest risk in the Gulf of Mexico and one of the highest risks for the Ex – for the Exploration and Production Unit.

Hayward Dep. 196:10-18.

113.    Thus, not only did Hayward know that his misrepresentations concerning OMS implementation were false, but he also knew that those misrepresentations concerned the largest risk that BP faced in the Gulf of Mexico.

### 2.      Faulty Cementing Jobs and Other Stability Issues Were Known as the Most Frequent Causes of Well Control Problems

114.      As early as 2003, BP knew or recklessly disregarded risks associated with oil spills in deepwater drilling related to the failure of cementing at various stages of well development, from the cementing around well casings and annuluses to the cementing of plugs, or shoes, to block pressure during the process of "temporary well abandonment."

115.      BP was aware – though it failed to disclose its awareness to the investing public – that as early as 2003, MMS had determined that failed cement jobs were associated with 33 blowout or well-kick incidents in the Gulf of Mexico since 1973, some of which involved "well loss" and "rig and platform destruction by fire."   Indeed, an October 22, 2003 MMS alert noted that "*[a]nnular flow related to cementing surface casing has been identified as one of the most frequent causes of loss of control incidents in the Gulf of Mexico.*"

116.      Indeed, BP itself had experienced cementing failures and knew of similar failures on other companies' rigs prior to and during the Relevant Period.  Additionally, BP experienced, but did not disclose, its own problems with a faulty cement job on one of its deepwater wells in the Caspian Sea, off the coast of Azerbaijan, in September 2008.

117.      More specifically, on or around September 17, 2008, BP experienced a gas leak at one of its central production platforms in the Azeri-Chirag-Guneshi ("ACG") field in the Caspian Sea – which is BP's largest deepwater drilling operation in Azerbaijan. Shortly thereafter, another rig in the field, called *B-i 7*, suffered a blowout, causing gas, water, and mud to shoot onto the rig floor, raising the possibility of an explosion.  *B-i 7* was evacuated and its well was sealed, either by annular rams or because the well simply "bridged" (collapsed on itself or otherwise stopped flowing on its own).  BP was forced to shut down most of the field's operations, cutting daily production by over 600,000 barrels of oil per day ("BOPD").  In later

communications, BP told U.S. officials that it suspected that numerous wells had a "bad cement job."

118. BP made no announcement or disclosure of this incident at the time it occurred. In fact, BP's Form 20-F for 2008 merely mentioned a "subsurface gas release" on September 17, 2008 and notably omitted references to the blowout on *B-i 7*, the fact that gas alarms went off on the field's central production platform, and the possibility that cementing jobs on other wells were faulty as well. As noted by *The Wall Street Journal* on December 17, 2010: "BP had been 'exceptionally circumspect in disseminating information' about the [ACG gas] leak, both to the public and [to] its partners." Moreover, according to the same article, several of BP's partners "were upset with BP for allegedly withholding information from them about the incident."

### 3. Defendants Knew or Recklessly Disregarded that BOPs Were Known to Fail, Yet Did Not Adjust their Process Safety Procedures Accordingly

119. As early as 2000, and on a continuous basis throughout the Relevant Period, Defendants were aware of or recklessly disregarded the substantial and known risks associated with relying on a single blind shear ram in a BOP to prevent an uncontrolled oil or gas release. Indeed, Defendants were well aware that blind shear rams were highly untrustworthy and failed nearly 50% of the time.

120. A BOP is a large, five-story device typically set on the ocean floor at the so-called "mud line," beneath the riser connecting the rig to the sea floor and on top of the cement surface casing that seals around the "annulus," which runs down further into the earth toward the "pay sands" in which oil and gas are found.

121. More specifically, Defendants knew, or recklessly disregarded, that, in the event the BOP needed to be activated, the following should occur:

- Closure of the "variable rams," which would seal the area around the drill pipe in the well (or, with "annular rams" or "blind rams," if no pipe lay in the well), thereby sealing oil and gas in the annulus below the BOP; and then attempting to pump drilling mud into the annulus to outweigh and balance the pressure of rising oil and gas; or

- In a worse scenario, and if the method described above did not work, activate the BOP's "blind shear rams," which are intended to cut through drill pipe in the well and then seal the oil down in the annulus below the BOP; or

- In an emergency setting, set the BOP to activate all of its rams – variable, annular, and blind shear – and disconnect from the riser, preventing further gas or oil from rising to the rig above.

122.    As set forth below, as early as 2000, and on a continuous basis throughout the Relevant Period, Defendants knew, or were reckless in not knowing, that various components of BOPs in use (both on their own rigs and Transocean-owned rigs) had high probabilities of failure, especially in deepwater and ultra-deepwater settings, where drill piping is thicker and more difficult to cut and where hydrostatic pressures affect hydraulic systems which control the BOP rams.

123.    In July 2001, the analyst group SINTEF, the largest independent research organization in Scandinavia, provided the MMS with a report recommending that all deepwater and ultra-deepwater drilling rigs in operation in the Gulf of Mexico be equipped with not one, but two separate blind shear rams, because of the significant risk that one might fail.  The SINTEF report, while not publicly released, was shared with BP and other industry operators.

124.    In both December 2002 and September 2004, MMS provided BP and other industry operators several reports written by West Engineering Services revealing serious deficiencies with blind shear rams.  In particular, the reports mentioned:

- The incapacity of shears to cut through many newer types of drill pipe, which tend to be thicker than older pipes;

- The certainty with which the shears that close on the thick joints that connect the sections of pipe together (rather than simply closing on the pipe itself) fail; and

- The significantly lower capabilities of shears to cut pipe at extreme depths, for instance, in excess of 5,000 feet, because of the effect of hydrostatic pressure on the BOPs' hydraulic systems.

125.    These studies, although not known to the general public or Plaintiffs, were shared with and made available to industry members, including senior BP managers and directors involved in drilling operations, and were discussed at industry conferences during the Relevant Period, including, but not limited to, conferences held by the Society of Petroleum Engineers ("SPE") and the International Association of Drilling Contractors ("IADC") in New Orleans on February 2-4, 2010 and in Amsterdam in 2009.  Senior BP drilling managers routinely attended SPE and IADC conferences, including those noted above.

126.    In April 2000, an independent expert report by EQE International, a risk and insurance consulting group, conducted an extensive analysis of the BOP to be installed on the *Deepwater Horizon*.  The report, which was not publicly disclosed until June 20, 2010, identified a serious flaw in the BOP's design: notwithstanding extensive back-up systems, or so-called "redundancies," in the BOP's layout, there was one particular component in the unit's hydraulic system, a single "shuttle valve," which had no backup.  EQE noted the potential for a "single point failure" of the shuttle valve, explaining that if the shuttle valve failed, the remaining redundancies built into the BOP would be rendered irrelevant.

127.    Significantly, throughout the Relevant Period, BP actually utilized the services of West Engineering, the company that carried out the research for MMS on BOP reliability, to carry out specific studies on risk issues relating to BOP testing.  In both 2008 and early 2010, BP specifically requested, as a member of an industry group focused on deepwater drilling issues,

that West Engineering carry out research projects on BOP reliability and testing, and integrate past studies analyzing BOPs and their device failures.

128.     A July 2009 report also put BP on notice that BOPs were unreliable. BP's partner, Transocean, commissioned the report, which analyzed past BOP performance (including in the Gulf of Mexico) as part of a risk assessment for deepwater drilling in the Beaufort Sea, north of Alaska.  The report, written by the consultant group Det Norske Veritas, which was subsequently contracted by the United States government to perform an extensive investigation into the *Deepwater Horizon*'s BOP in the wake of the April 2010 blowout and explosion, found that, in practice, blind shear rams on offshore BOPs had a failure rate of 45 percent.  However, the existence of this report and its findings were not disclosed to the investing public or to Plaintiffs until June 20, 2010.

129.     BP exacerbated the risk of BOP failure by permitting rigs operating in the Gulf of Mexico to be equipped with just one single blind shear ram, rather than two.

130.     BP further exacerbated such risk by contracting with Transocean in 2004 to replace one of the variable bore rams on the *Deepwater Horizon*'s BOP with a test ram in order to speed up subsea testing procedures.  Installation of this test ram lowered the BOP's reliability even further.  Indeed, in an agreement between BP and Transocean executed in October 2004, Transocean noted BP's awareness that the removal of the variable bore ram would "reduce the built-in redundancy" of the BOP and raise the rig's "risk profile."  The existence of this agreement was not made public until June 20, 2010.

131.     Thus, despite all the knowledge and information about difficulties with cementing and BOPs, Defendants either knew, or recklessly disregarded, that BP failed to establish uniform

process safety features for rig operators to follow during deepwater drilling to address cementing issues and BOPs.

4. **BP Received No Less Than One Hundred Safety Warnings for its Safety Protocol Lapses in its North Sea Deepwater Drilling Operations**

132. Defendants knew of the significant risks in BP's deepwater drilling operations during the Relevant Period that were pervasive across the Company's deepwater operations. Yet, Defendants knew, or recklessly disregarded, that BP's process safety protocols failed to properly and sufficiently address these known risks.

133. Unknown to the investing public and Plaintiffs, the UK HSE levied extensive citations and fines on BP, sending no fewer than 100 letters or notices to BP between 2006 and 2010 citing BP for safety or environmental violations related to exploration or production rigs, pipeline or storage systems, or other facilities. Many of the communications related to deepwater rigs operated by BP in the North Sea around Scotland, including the *Schiehallion*, *Unity*, *Bruce*, *Hutton*, *Magnus*, *Clair*, and *Miller* vessels. Some of these rigs and the ships that serviced them were decades old, and the safety issues, in many cases, concerned a failure to properly maintain and inspect equipment.

134. According to UK HSE records, the *Schiehallion*, an aging floating production storage and offloading ("FPSO") ship in the far North Sea, experienced an engine room fire in 2005 and a "mooring chain failure" in 2006, resulting in special UK HSE inspections and meetings with BP officials, and notifications concerning various violations of safety and environmental violations during the Relevant Period.

135. In correspondence in 2006, the UK HSE strongly urged BP to dry-dock the *Schiehallion* for repairs. BP refused, arguing that it would instead prioritize efforts to improve the ship's condition through a focus on maintenance. The UK HSE, in a February 2, 2007 letter

to BP, strongly criticized BP's decision, noting several areas of maintenance backlog and numerous cases in which past UK HSE notices were not addressed, and listing various continuing operations which were not in compliance with "relevant statutory provisions" ("RSPs"):

> Finally, it is HSE's view that *the overall magnitude of the various categories of maintenance backlog [on the Schiehallion] is such that BP does not have sufficient control of the situation* . . . . [T]he situation means that there are concerns for BP's continued ability to comply with the fundamental duties under Sections 2 and 3 of the HASWA [Health and Safety at Work Act].   At the meeting of 29th January, we discussed with BP the issues associated with drydocking, shutting down production and prioritizing integrity management (*i.e.*, the latter being BP's current approach) as a means of addressing the overall maintenance backlog.  *We listened to BP's opinions on the issues associated with the various options, but remain unconvinced that BP's proposed course of actions to remain on station, with an increased focus on integrity, is compatible with achieving compliance with the RSPs given the historic susceptibility of the FPSO Schiehallion to events or conditions that exacerbate ongoing maintenance backlogs* (*e.g.*, 2005 Compressor Fire, 2006 Mooring Chain Failure).

136.   The February 2, 2007 UK HSE letter continued, laying out concerns prescient of the *Deepwater Horizon* incident:

> [UK HSE maintains] the view that *major accidents result when a series of failings with several critical risk control systems materialize concurrently* . . . .   *The number and relatedness of backlogs on the Schiehallion is such that it appears as though there is a significant risk of such a series of failings arising.*

137.   The February 2, 2007 UK HSE letter concluded with criticism of BP's larger problem with its lax safety culture and inability to avoid a major incident that echoed the MMS's findings about BP in 2002:  "BP's decisions on the *Schiehallion* have not in any way been informed by a systematic assessment [by independent safety inspectors] of the adequacy of the management system to achieve compliance with those RSPs . . . that are intended to avoid the failings that might align to cause major accidents."

138.   According to a 2009 UK HSE letter, BP again suffered a "significant Hydrocarbon Release" (*i.e.*, an oil spill or gas release) on the *Schiehallion* rig on August 4, 2008.

The UK HSE said the release was attributable to a "failure to comply" with BP's own process safety procedures.

139.    Several other UK HSE letters were sent to BP between 2007 and 2010 as well, outlining safety and maintenance problems on other rigs that could create a serious risk of hydrocarbon release.  For example:

a.    A March 5, 2009 UK HSE letter discussed inspections of BP's *Harding* rig, criticized BP's failure to inspect several "high risk" systems for corrosion, as requested in previous notices.  The inspector wrote:  "This lack of progress is unsatisfactory.  It is important that the condition of these systems is ascertained in a timely manner, in order to reduce the risk of loss of containment incidents" (*i.e.*, spills); and

b.    Additional letters to BP Exploration Operating Company Ltd. on March 25, 2008, March 5, 2009, and July 7, 2009, relating to the *Bruce*, *Magnus*, *Unity*, and *ETAP* platforms, criticized BP for failing to conduct maintenance programs compatible with the intended lifespan of its rigs – suggesting, in other words, that BP was running its own equipment into ruin.

### 5.    BP's Internal Reporting Structures Mandated that the CEO and Board Review Process Safety and Risk

140.    The Safety & Operations segment ("S&O") was a key component of OMS that BP utilized to achieve monitoring of process safety performance.  Before and during the Relevant Period, BP utilized the S&O function for a variety of reporting mechanisms, progress updates, and metrics, which allowed for executives and the Board to monitor process safety performance.

141.    The Orange Book was a reporting format conceived of by Inglis and Hayward, to relay key safety information to GORC.  Ellis Armstrong ("Armstrong"), CFO of BP E&P, was

involved in the process of creating the Orange Book.  Armstrong Dep. 85:21-22.  Armstrong testified that the purpose of the Orange Book was to cull safety metrics across BP and regional business units, including E&P in the Gulf of Mexico, that "had the same level of standing in the firm as financial information."  This information was reported on a quarterly basis to GORC and SEEAC in connection with the committees' safety monitoring roles.  Armstrong Dep. 86:4-11.

### 6. SEEAC Approved BP's Publications Regarding Safety

142.    As noted above, SEEAC responsibilities included:  "[r]eviewing material to be placed before shareholders which addresses environmental, safety and ethical performance and making recommendations to the Board about their adoption and publication."  Thus, SEEAC would have reviewed and approved various documents regarding safety, including BP's "Sustainability Reporting 2009 Safety" ("Sustainability Report"), published on April 15, 2010, before those documents were published to shareholders.

### 7. Defendants Consciously Limited the Scope of S&O Audits so as Not to Apply to the Majority of BP's Deepwater Drilling Fleet

143.    Contrary to BP's representations that OMS was a systematic management framework that provided superior monitoring of safety, Hayward and Inglis made the decision to exclude some of the most lucrative – and the riskiest – of all BP operations from S&O audits.

144.    These S&O audits were especially critical because they tested rig and rig personnel's compliance with safety standards and risk management practices, including requirements set by OMS.

145.    Hayward and Inglis made a conscious decision to exclude these risky BP operations, which were responsible for drilling the vast majority of BP's deepwater wells in the Gulf of Mexico, from the scope of the S&O audit function.  Had such operations not been purposefully excluded, GORC and SEEAC (which received all S&O audits) would have

received detailed information concerning the myriad process safety failures on the *Deepwater Horizon* (such as those identified throughout the Presidential Commission Report).

146.    The decision to exclude the Gulf of Mexico from BP's S&O audits belied BP's repeated public statements regarding a systematic framework for improving its process safety.

### C.    Defendants' Scienter Is Further Established By Their Disregard Of Safety And Operational Concerns

#### 1.    Defendants Knew of, or Recklessly Disregarded, Significant Process Safety Problems with Third-Party Rigs and, in Particular, Rigs Leased from Transocean

147.    During the Relevant Period, Defendants knew of, or recklessly disregarded, significant process safety problems with rigs operated or owned by third parties, including especially acute problems for Transocean-operated rigs.

148.    On July 21, 2007, BP experienced a high-potential incident in the Gulf of Mexico. The incident involved Transocean rig operators dragging the BOP along the sea floor, which almost severed underground pipelines.

149.    As a result of this incident, a joint safety improvement plan was to have been implemented to address rig-safety culture and joint standardization.

150.    Inglis himself expressed concerns that OMS standards were not being applied to contractor operated drilling rigs.  In a July 13, 2009 email to the Upstream Senior Leadership Team, Inglis stated:

> One of the emerging findings from our analysis of incidents is that conformance with Control of Work (CoW) practices, on many of our contractor operated drilling rigs, falls short of BP expectations.  I have asked Barbara [Yilmaz] to clarify the expectations we have of our contractors in the matter of CoW and the bridging requirements between contractor practice and BP's CoW Standard.

54

## 2.     Concerns about the Integrity of Safety Processes in Alaska

151.   On April 11 and 12, 2009, Marc Kovac, a BP mechanic, welder, and union representative, sent two emails to BP's Ombudsman's office – which was headed by the Honorable Stanley Sporkin (a retired federal judge) – copying numerous BP Exploration Alaska ("BPXA") offices raising serious concerns about the integrity of pipelines in Alaska, overstretched staff and contractors, and general problems with inspections of oil wells in the western part of BP's Prudhoe Bay facilities. The first email noted that "it's getting back to a very dangerous situation, too much overtime and too much responsibility and area to cover for each man. Anything can happen when [well] pads are not monitored. Anything can happen when workers work over 12 hours a day, every day. Things are not getting better." In a second email dated April 12, 2009, Kovac listed a host of specific examples of overstretched staff, concluding that the situation "sets us up for another major mishap. Who will they blame this time? This situation is not acceptable."

152.   Then, in June and August 2009, BP employees and representative members of the United Steelworkers met with BP management in Alaska about various safety and pipeline integrity issues and complaints about BP's culture making it difficult for employees to raise safety issues. Minutes released from the United Steelworkers revealed that union representatives raised detailed concerns to BP management about understaffing and excessive overtime (being required to work 16 to 18 hour shifts) and noted that these issues caused an "increased . . . risk for accidents."

153.   This concern was underscored in October 2009 by Phil Dziubinski, BPXA senior officer for HSSE. Dziubinski noted that a shift greater than 16 hours impeded workers' ability to make sound decisions, describing the impaired decision-making ability as akin to "intoxication." He noted these conditions were persistent in BP's operations before and throughout the Relevant

Period.  Further, he believed that the failure to abate such work conditions would require BP to affirmatively acknowledge to HSE Committees, the Board, the Ombudsman, and Congress that this situation put "production ahead of safety."  In late 2009, Dziubinski was asked to resign from his post in what he believes was retaliation for voicing his concerns.

154.    In the June and August 2009 meetings, union representatives also raised concerns about delayed replacement or repair of equipment and old, corroded pipelines, including gas leak detectors.  (Faulty gas leak detection devices were among the problems that led to the ignition of flammable gases during the blowout and subsequent explosion on the *Deepwater Horizon*.)  "We have several lines ready to leak," the representatives are noted as stating.  The minutes show union representatives urging BP not to simply "patch" pipelines:  "These lines should be replaced."

155.    In late 2009, another private employee "concern" was sent to the BP Ombudsman from an anonymous employee of BP-operated Alyeska, the BP-led consortium that operates the Trans-Alaska Pipeline.  The email was signed "Afraid-a-spill."  The email raised a litany of complaints about Alyeska's operations, including serious safety and pipeline integrity concerns.

156.    Unidentified executives, the email stated, "told employees not to speak up or go against" the Alyeska CEO, Kevin Hostetler.  The email stated that as a result of Hostetler's behavior, the work environment at Alyeska had degraded over several years to the point where "[p]eople are afraid to speak up on safety or integrity issues for fear of retaliation."  According to a subsequent investigation into the allegations by BP-retained lawyers with the law firm Morgan Lewis & Bockius, the subject of the email was communicated to BP senior leadership in early 2010, and Judge Sporkin, the Ombudsman, discussed it with BP leadership, which led to the firm

being hired to carry out a further investigation.  The results of the investigation still are not public.

157.    These were precisely the types of safety issues that BP publicly represented it would address after the Baker Report was released, and that BP represented were – purportedly – already being addressed and remedied throughout the Relevant Period.

### 3.    Regulators Repeatedly Informed BP of its Continuing Safety Deficiencies

158.    During the Relevant Period, Defendants knew, or recklessly disregarded, that the recommendations of the Baker Panel were not being adequately instituted throughout the Company, especially in terms of improving its process safety practices.  In particular, multiple regulators warned BP between 2008 and 2010 that the Company continued to operate unsafely.

159.    As described above, BP pled guilty to a violation of the United States Federal Water Pollution Control Act in connection with the Alaska pipeline oil spill, admitting that its "criminal negligence" had caused the corrosion and thus the spill.  BP was sentenced to three years of probation, and fined $22 million.  In late 2008, BP attempted to obtain an early release from probation in Alaska, arguing to its federal probation officer, Mary Frances Barnes ("Barnes"), that BP had made "significant progress" in relevant areas of maintenance and inspection.  Unbeknownst to investors, however, Barnes found continuing safety issues and incidents with BP operations and denied BP's request.  In September 2010, due to continuing complaints that she received about safety and pipeline integrity issues in 2008 through 2010, Barnes requested that the court revoke BP's probation and that additional fines and penalties be levied against the Company.

160.    Also unknown to investors during the Relevant Period, BP was potentially facing serious disciplinary action by the EPA's Suspension and Debarment Division ("SDD") in

connection with past and ongoing misconduct in Alaska, Texas, and other states. The SDD has the authority to prevent BP from being a party to any United States federal or state contract or grant funded with federal funds (known as "debarment"), which would materially affect BP's revenues.

161.    Beginning in early 2008 and continuing through early 2010, Jeanne Pascal, the EPA SDD Debarment Counsel for Region 10 (West Coast and Alaska) who handled EPA debarment oversight activities on the BP Group in the greater United States, communicated repeatedly by telephone and email with senior BP officials, including Suttles, BP General Counsel Jack Lynch ("Lynch"), and BP's counsel at Vinson & Elkins, Carol Dinkins, among others. The BP Ombudsman, Judge Sporkin, also raised Pascal's concerns with the President of BP America, McKay. In her communications, Pascal noted that her office was in receipt of information from BP employees and from EPA inspectors in Alaska and Texas demonstrating that BP was in a state of continuing non-compliance with numerous laws and civil settlement agreements; that BP was continuing to run many of its operations unsafely; and that BP was continuing to retaliate against workers and contractors who raised safety and environmental issues. Thus, on several occasions during the Relevant Period, Pascal stated that, because of the Company's continuing misconduct, the EPA was entitled to file a debarment complaint, to strip BP and its subsidiaries of the right to bid for United States government contracts, and to bid for United States government oil and gas concessions.

162.    BP was also informed of significant problems with its process safety with respect to refineries. For example, in May 2010, it was revealed that between June 2007 and February 2010, BP received a total of 862 citations for OSHA violations relating to its refineries in Texas City and Toledo, Ohio, of which 760 were classified as "egregious willful" and 69 were

classified as "willful."   BP's willful violations accounted for over 97 percent of the willful violations found by OSHA in United States refineries during the same period – BP's main competitors' citations, *combined*, numbered only 22.  *See* Center for Public Integrity, *OSHA Says BP Has "Systemic Safety Problem,"* May 16, 2010.

163.    Likewise, concerns about the risks of spills in BP's Alaska operations, and the inadequacy of BP's pipeline integrity and inspection programs, were not only being voiced internally or to the BP Ombudsman.  BP also received enforcement letters from the United States Department of Transportation's "Pipeline and Hazardous Materials Safety Administration" ("PHMSA").  PHMSA letters communicate regulatory violations, enforcement actions, orders to comply, and warnings relating to pipelines.   From 2008 through 2010, BP-related companies operating in the United States received 40 separate enforcement letters from PHMSA, a far higher number than those sent in the same period to peer companies Exxon Mobil, Conoco Philips, Chevron, or Shell.  (During the same period, Shell received only six PHMSA letters.)  One PHMSA letter was sent to BP on April 20, 2010, the very day the *Deepwater Horizon* blast occurred, communicating that PHMSA had found serious shortcomings with BP's pipeline inspection and anti-corrosion systems in Alaska, increasing the likelihood of a major spill.

164.    These were precisely the types of safety issues that BP publicly represented it would address after release of the Baker Report and that BP represented were – purportedly – already being addressed and remedied throughout the Relevant Period.

**D.    Defendants' Scienter Is Further Established By BP's Retaliation Against Individuals Who Raised Concerns About Operational Safety And Integrity**

165.    Throughout the Relevant Period, and contrary to BP's representations to its shareholders, BP engaged in continuous and systemic retaliation against employees who reported concerns about the safety and integrity of BP's operations.  These whistleblowers provide further

support of Defendants' knowledge or reckless disregard of the falsity and misleading nature of their Relevant Period statements.

### 1.     Whistleblower Retaliation in the Gulf of Mexico

166.     In August 2008, Kenneth Abbott ("Abbott"), a BP engineer working on design and blueprint management issues relating to the operations of BP's *Atlantis* rig (a major BP rig involved in drilling deepwater exploration and production wells in the Gulf of Mexico), began to raise concerns with BP managers about BP's practices and policies for managing and updating designs and blueprints for its infrastructure and equipment on the *Atlantis*.  Of particular concern was that designs for critical units on the rig were not updated to reflect changes made during repairs, maintenance, or other modifications.

167.     On or around August 15, 2008, BP manager Barry Duff ("Duff"), who worked with Abbott, wrote to BP managers and corroborated Abbott's concerns, stating that a lack of properly-reviewed and approved designs could result in "***catastrophic operator error[s]***" and that "currently there are hundreds if not thousands of subsea documents that have never been finalized," a situation which Duff referred to as "fundamentally wrong."

168.     Abbott continued to raise such concerns until he was fired in January 2009, in retaliation for his whistle-blowing.  Shortly thereafter, Abbott raised his concerns with BP's Ombudsman. Invited to testify before Congress to describe the circumstances that led him to initially report his concerns to senior BP management, Abbott testified, on June 17, 2010, that:

> *From my experience working in the industry for over 30 years, I have never seen these kinds of problems with other companies*.  Of course, everyone and every company will make mistakes occasionally.  *I have never seen another company with the kind of widespread disregard for proper engineering and safety procedures that I saw at BP* and that we hear from the news reports about BP Horizon, or BP Texas City, or the BP's Alaska pipeline spills.  *BP's own investigation of itself,* by former Secretary of State James Baker, *reported that BP has a culture which simply does not follow safety regulations.  From what I saw, that culture has not changed.*

169.    Among the documents sent to the BP Ombudsman, and forwarded to senior BP managers during the Ombudsman's investigation into Abbott's allegations in 2009 and early 2010, was an affidavit by a safety engineer in Houston, Texas, Mike Sawyer ("Sawyer"), who independently reviewed Abbott's allegations, internal BP emails, and applicable regulations.

170.    The Sawyer affidavit affirmed that a "large portion of [the *Atlantis*'] subsea safety critical drawings, documents, specifications, and certificates were not in final, 'as-built' status," noting that the "lack of 'as-built' design documents is a violation of Federal requirements under the Department of Interior MMS Safety and Environmental Management Systems as specified in 30 CFR Part 250 [including] 30 CFR 250.903 and 905." Further, the Sawyer affidavit specifically warned that:

- Time is of the essence in avoiding an Outer Continental Shelf (OCS) environmental disaster, *Atlantis* production should be shut in until resolution of its design short comings is complete and a thorough inspection confirms that critical breaches have been satisfactorily resolved . . . .   It is inconceivable that BP could justify the risk of commissioning *Atlantis* production without completed design documentation reflecting the latest approved design version . . . .

- The absence of a complete set of final, up-to-date, 'as-built' engineering documents, including appropriate engineering approval, introduces *substantial risk of large scale damage to the deepwater Gulf of Mexico (GOM) environment and harm to workers,* primarily because analyses and inspections based on *unverified design documents can not accurately assess risk or suitability for service . . . .*

- The wide spread pattern of unapproved design, testing, and inspection documentation on the Atlantis subsea project creates a risk of a catastrophic incident threatening the GOM deepwater environment and the safety of platform workers. *The extent of documentation discrepancies creates a substantial risk that a catastrophic event could occur at any time.*

171.    In April 2010, BP's Ombudsman wrote to Abbott and affirmed that his allegations had been substantiated.  More specifically, on April 13, 2010 Abbot received a letter from BP's Deputy Ombudsman, Billie Garde ("Garde"), stating that "[y]our concerns about the [*Atlantis*]

project not following the terms of its own Project Execution Plan were substantiated . . . . [BP] did not do a comprehensive documentation audit regarding the documentation issues on *Atlantis* . . . . The concerns that you expressed about the status of the drawings upgrade project were . . . of concern to others who raised the concern before you worked there, while you were there, and after you left."

172.    Indeed, the Presidential Commission Report found that a contributory factor to the *Deepwater Horizon* explosion, and to BP's problems in attempting to trigger the BOP, related to BP's practice of not updating designs and plans from their original schematics – much like the problems complained about with regard to the *Atlantis*.

173.    On the issue of retaliation, the Presidential Commission Report also noted that a survey conducted in March 2010 indicated that crew members working on the *Deepwater Horizon* feared retaliation. The survey, which included workers on the *Deepwater Horizon* and three other rigs, was conducted between March 12 and March 16, 2010 – *i.e.*, approximately one month prior to the *Deepwater Horizon* explosion. According to the Presidential Commission, the survey found that: "Some 46 percent of crew members surveyed felt that some of the workforce feared reprisals for reporting unsafe situations, and 15 percent felt that there were not always enough people available to carry out work safely."

### 2.    Whistleblower Retaliation in Alaska

174.    The BP Ombudsman conducted a robust investigation of Acuren, the company responsible for pipeline inspection and monitoring of BP's pipelines in Alaska, where BP contractor Marty Anderson ("Anderson") had worked until 2008 and who had begun to raise serious criticisms with his supervisors and BP intermediaries about BP's pipeline corrosion and inspection system in Alaska and Acuren's staffing for that program. According to communications in 2009 between the BP Ombudsman's office and Lynch, in 2007, Anderson

began to cite "a significant quality control breakdown" in Acuren's and BP's testing procedures, "inadequate record keeping," and "unqualified inspectors in the field performing inspections." BP's Ombudsman's office stated that "[t]he concerns were serious, and although people try to downplay the significance of the issues, they reveal a complete breakdown." According to the BP Ombudsman's office, the audit confirmed Anderson's claims.

175. The matters concerning Anderson and pipeline inspections were serious enough for the BP Ombudsman's office to raise them with BP and BP North America officials, including Rick Cape, BP's Vice President for Compliance and Ethics, specifically recommending to him that Anderson's concerns be reported to the BP Board of Directors and to Lynch. In addition, the Ombudsman himself, Judge Sporkin, communicated Anderson's concerns in 2008 with then-President of BP North America Bob Malone. Garde wrote to Lynch about it in September 2009, and Anderson himself met with Lynch on August 3, 2009. BP did not adequately address the continuing concerns that had been raised. An internal email dated July 15, 2010, from Christine Anastos, a BP Ombudsman Inspector, to other Ombudsman staff, stated that "many of the issues identified by Marty [Anderson] years ago appear to be persisting" [*i.e.*, into mid 2010] and "it is clear that, over time, root causes have not been identified and/or addressed . . . ."

176. A 2008 BP Ombudsman "Workforce Briefing," containing an assessment of Acuren's "Work Environment," reported that a survey of Acuren employees by the Ombudsman's office found significant problems with workers' perceptions of potential retaliation for reporting safety or environmental concerns. Among the "key insights" proffered by the presentation were: (1) that "[a]ctions and events in the past 18 months [*i.e.*, during the period BP vowed to improve safety practices in Alaska in the wake of the 2006 spills] have had a decidedly chilling impact on worker attitudes," and (2) that "[p]roduction is viewed by very

many workers as the primary focus" (*i.e.*, as opposed to safety).  The presentation also noted that the "actual or perceived presence of HIRD [Harassment, Intimidation, Retaliation, Discrimination] is high in the Acuren organization. . . ."  In fact, one in three employees believed "recent resignations" were due to HIRD, and 38% of employees – and 80% of the employees who worked on natural gas lines – indicated that their reason for not reporting safety concerns was that "nothing seems to happen to reported items."

177.    The Ombudsman also noted that about one in ten Acuren employees said that, in the last eighteen months, they had been asked to perform a job that was not in compliance with regulations or safety practices.  (The number was even higher for workers who monitor BP natural gas pipelines:  almost half of Acuren's workers indicated that they had been asked to perform "non-compliant work.").

178.    The 2008 presentation also included selected quotes from employees, including the following:

- "I've raised issues, now I'm labeled a troublemaker."

- "You get treated better when your supervisor doesn't hear from you."

- "[A] co-worker falsified production numbers and I brought it to my supervisor's attention with the result that I was ostracized, moved to a different shift, moved to the ghetto and told I should produce more in line with the guy who falsified the records."

- "Supervisors talk safety but when concerns are brought up they are viewed as irritating and just given lip service."

- "I have stopped jobs for safety reasons and they just hand it to the next guy till they find someone who will do it" [*i.e.*, the job that was stopped].

- "I was pressured to change my evaluation of some pipe which I deemed to be defective."

- "BP doesn't listen, they put too much emphasis on rules to look good but have no common sense when it comes to safety."

- "BP's support of safety comes off as lip service and seems to only be in place to lower their insurance rates. While superficially, BP delivers lip service about safety, their continually increasing demands accompanied by consistently decreasing resources create a 'results oriented' atmosphere where the ends justify the means."

- "BP creates the adverse and dysfunctional world we work in here. Many problems that occur are because they drive people too hard to perform with limited resources. . . ."

179.   Furthermore, BP Ombudsman records from 2010 include numerous other examples of serious issues raised by Acuren employees.  For instance, according to a June 7, 2010 *ProPublica* article, on December 9, 2009, a "Concerned Individual" at Acuren raised process safety concerns about other personnel "pencil whipping" test results (manipulating devices to change readings) and "falsified inspections."   This individual's name was Stuart Sneed.  Sneed, who worked on BP's Alaska pipeline, explained that BP stated that "it's your duty to come forward . . . but then when you do come forward, they screw you. They'll destroy your life. . . .  No one up there [in Alaska] is going to say anything if there is something they see is unsafe.  They are not going to say a word."

    **E.**    **Defendants' Scienter As To The Amount Of Oil Spilling From Macondo**

        **1.**    **Defendants' Publicly Stated Estimates Were Contradicted by Contemporaneous Internal BP Documents, Data, Estimates, and Calculations**

180.   Throughout the Relevant Period, BP, Rainey, Suttles, Hayward, McKay, and Dudley were aware or recklessly disregarded that their statements regarding estimates of the amount of oil spilling into the Gulf following the *Deepwater Horizon* explosion were not true and that their statements omitted material information concerning the true magnitude of the spill.

181.   For example, at a time when the publicly reported oil flow rate from the blown well was only 1,000 BOPD, an internal BP document dated April 26, 2010 revealed that BP had actually estimated that 5,000 BOPD were leaking into the Gulf (the following was linked to a

May 27, 2010 *The New York Times* article titled "Ruptured BP Well Tops Valdez as Worst U.S. Spill"):

> **2)  Estimated Present Volume Release Rate**
>
> *The following assumptions are used to make a release rate calculation. If any of them are changed, the answer could be significantly different.*
>
> The oil is leaking, in a vertical plume from a hole approximately 40 cm. in diameter.
>
> The velocity of the material in the plume is estimated by visual observation to be between 7 cm/sec and 30 cm/sec.
>
> The plume itself contains gas bubbles, oil droplets, and entrained seawater.
>
> Assuming that 50% of the plume volume is oil and a rise velocity of 15 cm/sec, the oil released from this source would be roughly 5000 bbl/day. (approximately 200,000 gal/day) Other sources would contribute additional oil.  This answer will be refined as additional information becomes available.

(emphasis in downloaded version).  As was later discovered, however, and as described in greater detail below, even the larger 5,000 BOPD figure was knowingly false.

182.    Another internal BP document provided to BP's senior management, dated April 27, 2010 and also linked to in the same article from *The New York Times*, revealed that BP's low estimate of the oil spill was 1,063 BOPD, its then "best" estimate was 5,758 BOPD, and its high estimate was 14,266 BOPD:

Using "Standard Guide for Visually Estimating Oil Spill Thickness on Water, ASTM F 2534 - 06."

**Oil on Water Estimate - Low**

| | sq mi | Cover Factor | gal/sq mi | gals | bbls |
|---|---|---|---|---|---|
| Sheen | 1500 | 0.5 | 50 | 37500 | 893 |
| Dull oil | 250 | 0.2 | 666 | 33300 | 793 |
| Dark oil | 9 | 0.15 | 3330 | 4495.5 | 107 |
| Total oil on water | | | | 75295 | 1793 |
| x 2 to compensate for evap and disp | | | | | 3586 |
| recovered | | | | | 200 |
| chemically dispersed | | | | | 1000 |
| Total emitted | | | | | 4786 |
| **Barrels emitted per day** | | | | | **1063** |

**Oil on Water Estimate - Best Guess**

| | sq mi | Cover Factor | gal/sq mi | gals | bbls |
|---|---|---|---|---|---|
| Sheen | 1500 | 0.66 | 333 | 329670 | 7849 |
| Dull oil | 250 | 0.35 | 1332 | 116550 | 2775 |
| Dark oil | 9 | 0.25 | 6660 | 14985 | 357 |
| Total oil on water | | | | 461205 | 10981 |
| x 2 to compensate for evap and disp | | | | | 21962 |
| recovered | | | | | 450 |
| chemically dispersed | | | | | 3500 |
| Total emitted | | | | | 25912 |
| **Barrels emitted per day** | | | | | **6758** |

**Oil on Water Estimate - High**

| | sq mi | Cover Factor | gal/sq mi | gals | bbls |
|---|---|---|---|---|---|
| Sheen | 1500 | 0.75 | 666 | 749250 | 17839 |
| Dull oil | 250 | 0.5 | 3330 | 416250 | 9911 |
| Dark oil | 9 | 0.35 | 13320 | 41958 | 999 |
| Total oil on water | | | | 1E+06 | 28749 |
| x 2 to compensate for evap and disp | | | | | 57498 |
| recovered | | | | | 700 |
| chemically dispersed | | | | | 8000 |
| Total emitted | | | | | 64198 |
| **Barrels emitted per day** | | | | | **14266** |

BP Confidential

BP-HZN-CEC020065

Page 1

183.    Suttles, as Chief Operating Officer for BP E&P and BP's officer in charge of co-managing the spill response with the Coast Guard, knew BP's estimated spill rate from the Macondo well, or was reckless in not knowing.  Indeed, as described below, he knew of at least six, and likely more, internal pieces of data, estimates, and calculations indicating that oil spill flow rate was vastly larger than the figure being publicly reported.  Nonetheless, as detailed in Section VIII.C.1-2, *infra*, Suttles repeatedly and publicly represented, on April 28, 2010 and in the days and weeks following, that only 1,000 – 5,000 BOPD was spilling from the Macondo well into the Gulf of Mexico.

184.    BP, Rainey, Suttles, Hayward, McKay, and Dudley made additional false and misleading statements and omissions, with scienter, throughout the rest of April and May 2010.  As described below, in each instance, they understated the flow rate, in the face of known facts to the contrary, including internal data, estimates, and calculations.  These allegations are set forth in greater detail in Section VIII.C, *infra*, which provides additional evidence as to the scienter of BP, Rainey, Suttles, Hayward, McKay, and Dudley.

185.    Indeed, when their representations concerning the oil spill rates were publicly challenged, Defendants insisted that their represented rates were correct and that alternative estimates were meritless.  For example:

a.    Steve Wereley, an associate professor of mechanical engineering at Purdue University who had been monitoring the *Deepwater Horizon* disaster, testified before the House Energy and Environment Subcommittee on May 19, 2010 that, *inter alia*:  (i) "there is scientifically no chance" that BP's 5,000 BOPD estimate was correct; (ii) his own review indicated that a 1.2-inch hole in the riser was, alone, spilling about 25,000 BOPD; and (iii) the

overall daily spill could amount to something "short of 70,000 barrels to as high as 115,000 barrels."

        b.    In response to Wereley's estimates, McKay publicly denied that BP was trying to obscure the size of the leak, and asserted that anyone actually working on the spill would have a hard time believing its size was anything close to 70,000 BOPD. *See, e.g.*, Bruce Alpert & Jonathan Tilove, "BP's Estimate of Volume of Gulf of Mexico Oil Leak is Dramatically Low, Purdue Expert Says," *Times-Picayune*, May 19, 2010.

      186.    As noted herein, roughly 60,000 BOPD leaked into the Gulf from the Macondo well.  Coupled with the internal BP data, estimates, and calculations received by the Defendants (as described below) and Wereley's estimates (and the information upon which Wereley based his work, to which BP had access), Defendants knew, or at a minimum were reckless in not knowing, that their statements minimizing the spill rate were false.  In making such statements, Defendants ignored, *inter alia*, contemporaneous reports provided to them from, among other sources, BP's own senior engineers, utterly undermining the veracity of their public statements as to the oil flow spill rate of the Macondo well.

      187.    The facts alleged herein were the basis upon which:  (1) BP pled guilty to, *inter alia*, felony obstruction of Congress and agreed to pay the then-highest criminal penalty in United States history – $4 billion; (2) Rainey has been criminally indicted; and (3) BP admitted its liability and settled the SEC's civil securities fraud case for the then-third-highest penalty in SEC history – $525 million.  Simply put, the facts alleged herein overwhelmingly indicate that BP and the Individual Defendants perpetrated, with scienter, a massive fraud on the investing public, including Plaintiffs.

### 2. Defendants Misrepresented the Scope of the Leak to Reduce the Amount BP Would Owe in Fines

188.   Civil fines under the United States Clean Water Act are based on the number of barrels spilled.   According to *The Wall Street Journal*, the final government estimate of the amount of oil spilled was between 53,000 and 62,000 BOPD, or a total of 4.9 million barrels. Such spill amounts translate to fines of between $5.4 billion and $21 billion, depending on whether investigators found BP grossly negligent.   In the face of such sizeable penalties, Defendants were motivated to lie about the amount of spilled oil to minimize the civil fines and penalties BP would owe under the Clean Water Act.   Defendants' 5,000 BOPD statements, if credited, would have reduced those fines by as much as 90%.

### 3. BP Pleads Guilty in Connection with a DOJ Criminal Investigation, and Admits Concealing Critical Spill Information from the Public

189.    On November 15, 2012, BP E&P agreed to plead guilty to 11 counts of felony manslaughter, felony obstruction of Congress, and criminal violations of the Clean Water and Migratory Bird Treaty Acts.   Further, BP agreed to pay a record *$4 billion* in criminal fines and penalties for its conduct regarding the *Deepwater Horizon* disaster and the ensuing coverup – the largest criminal fine in United States history.   As detailed below, as part of its guilty plea, BP admitted to publicly misrepresenting the oil spill rates during April and May 2010, while concealing information indicating to BP that the actual spill rate was much higher.

190.    Assistant Attorney General Lanny A. Breuer, of the DOJ's Criminal Division, asserted that while "[t]he explosion of the rig was a disaster that resulted from BP's culture of privileging profit over prudence,"  BP thereafter:

> made a tragic situation worse:  it began misleading Congress and the American people about how much oil was pouring out of the Macondo well.  As BP now admits, in responding to Congress, the company lied and withheld documents, in order to make it seem as though less damage was being done to the environment

than was actually occurring. Acknowledging those lies, BP has agreed to plead guilty to felony obstruction of Congress.

191. The DOJ's 14-count information (the "DOJ Information") details, *inter alia*, how BP, through Rainey, obstructed a Congressional inquiry into the amount of oil being discharged in the Gulf while the spill was ongoing. As part of the plea agreement, BP admitted that, through Rainey, it withheld documents and provided false and misleading information in response to the United States House of Representatives' request for flow-rate information. BP also admitted that Rainey manipulated internal estimates to understate the amount of oil flowing from the Macondo well and withheld data that contradicted BP's publicly stated estimate of 5,000 BOPD. Further, BP admitted that, while Rainey was preparing his manipulated estimates, BP's internal engineering response teams were using sophisticated methods that generated significantly higher estimates. All of this information was withheld from the Plaintiffs and the investing public.

192. Specifically, the DOJ's Information charged the following (as quoted from the DOJ Information at ¶¶ 27-49), to which BP admitted its guilt:

a. **Early Flow-Rate Estimates**

   i. The amount of oil leaking from the Macondo well was directly relevant to various efforts to stop the leak and also relevant to potential civil and criminal litigation, including the calculation of penalties.

   ii. On or about April 24, 2010, very soon after it was determined that the Macondo well was leaking oil and natural gas, Unified Command, with BP's input, issued a preliminary public estimate that the well was flowing at a rate of approximately 1,000 barrels of oil per day ("BOPD").

   iii. On or about April 26, 2010, a scientist at the National Oceanic and Atmospheric Administration ("NOAA") prepared a written flow-rate estimate of approximately 5,000 BOPD. The NOAA scientist's estimate, which was based in part on a very preliminary assessment of oil that had started to float to the surface of the Gulf, cautioned that the methodologies used were "highly unreliable" and that the estimate was accurate "to only an order of magnitude," such that the actual flow amount could exceed 5,000 BOPD by ten times. As a result of this NOAA estimate, on or about

April 28, 2010, Unified Command raised its public estimate to 5,000 BOPD.

b.   **Rainey's "Estimates"**

i.   After learning of NOAA's preliminary and heavily-qualified 5,000 BOPD estimate, Rainey, an executive who had no prior experience in spill estimation, surfed the Internet for information about how to conduct oil-spill-volume estimates based on observations of oil floating on the surface of a water body, known as "mass balance" estimates. Rainey's internet search led him to a website where he found a Wikipedia entry that described some generally accepted mass balance methodologies, including the American Society for Testing and Materials ("ASTM") method and the European "Bonn" method.

ii.   Between on or about April 26, 2010 and on or about April 30, 2010, despite having no experience performing mass balance estimates and despite knowing that BP had employees who were trained in generating such estimates, defendant BP, through Rainey, performed and caused to be performed daily estimates purportedly using the ASTM and Bonn methods.

iii.   Defendant BP's Bonn estimates, prepared by Rainey, resulted in "best guess" estimates significantly higher than 5,000 BOPD and "high end" estimates of up to 92,000 BOPD. Defendant BP, through Rainey, withheld these Bonn estimates from individuals working on flow rate within Unified Command and, later, also withheld them from Congress.

iv.   Defendant BP's "ASTM" estimates, prepared by Rainey, did not conform to ASTM standards but instead were manipulated to consistently arrive at or near a "best guess" of between 5,000 and 6,000 BOPD. In effect, defendant BP, through Rainey, conducted the estimates in a manner designed to reverse engineer results consistent with NOAA's preliminary 5,000 BOPD estimate. Defendant BP, through Rainey, labeled the estimates as "ASTM" estimates even though the estimates did not conform to the ASTM method.

v.   As described below, defendant BP, through Rainey and other BP executives, consistently maintained that 5,000 BOPD was the "best guess" estimate, without disclosing internal BP information suggesting the flow rate was considerably higher.

c.   **BP's Actual Estimates**

i.   In its engineering response to the Macondo oil spill, defendant BP did not rely internally on Rainey's contrived and inaccurate flow-rate numbers. Instead, defendant BP and its affiliated companies had numerous expert teams assessing the flow rate using sophisticated methodologies that

focused on the conditions at the seafloor where the oil and natural gas were gushing out.  These teams were generating flow-rate estimates much higher than Rainey's purported "best guess" of between 5,000 and 6,000 BOPD.

ii.    For example, on or about April 22, 2010, BP subsurface engineers, including Kurt Mix, separately charged, estimated "various release scenarios" with potential flow rates ranging from 64,000 to 146,000 BOPD (the "Subsurface Team Estimates").

iii.    Also, on or about May 11, 2010, a team of BP engineers working under the direction of an engineering supervisor ("Engineer 1") prepared a series of possible flow rates that ranged from 14,000 BOPD to 82,000 BOPD depending on potential flow paths and other known and unknown variables (the "Engineer 1 Slide Deck").

d.    **BP's Public Estimates Questioned**

i.    On or about May 13, 2010, a university professor with expertise in fluid mechanics measurement publicly estimated that the Macondo well was leaking oil at a rate of approximately 70,000 BOPD, based on a review of video footage of the leak that BP had recently released.

ii.    On or about May 14, 2010, defendant BP and its affiliated companies publicly rejected the university professor's work and continued defending 5,000 BOPD as the "best" estimate, even though 70,000 BOPD was within the range of Rainey's Bonn estimates and other internal BP engineering estimates, including the work of Engineer 1 described above.

iii.    On or about May 14, 2010, Engineer 1 sent an email to two executives at BP, including BP's then-Chief Executive Officer for Exploration and Production, expressing concern over BP's continued public embrace of the 5,000 BOPD number.  The email stated

> I just read an article on CNN (May 14, 2010 1:00 p.m.) stating that  a researcher at [a university] believes that the Macondo well is leaking up to 70,000bopd and that BP stands by a 5,000bopd figure.  With the data and knowledge we currently have available, we cannot definitively state the oil rate from this well.  We should be very cautious standing behind a 5,000bopd figure as our modeling shows that this well could be making anything up to ~ 100,000 bopd depending on a number of unknown variables, such as: flow path either through the annulus behind the production casing or through the production casing float shoe, the height

of reservoir exposed, if drill pipe is suspended in the BOP and sealed by VBR rams, reservoir skin damage, choking effects and etcetera. We can make the case for 5,000 bopd only based on certain assumptions and in the absence of other information, such as a well test.

iv.   Engineer 1's email caused concern within BP because it contradicted BP's public position regarding flow rate.

e.   **The Rainey Memo**

i.   On or about May 17, 2010, defendant BP, through Rainey, prepared a memorandum purporting to summarize the efforts that had been undertaken within Unified Command to estimate flow rate (the "Rainey Memo"). The Rainey Memo, which sought to justify BP's 5,000 BOPD estimate, was false and misleading in numerous respects, including:

1.   Defendant BP, through Rainey, omitted Rainey's Bonn estimates, which were significantly higher than 5,000 BOPD.

2.   Defendant BP, through Rainey, falsely labeled the estimates in the memorandum as "ASTM" calculations.

3.   Defendant BP, through Rainey, omitted that the estimates included in the memorandum were premised on data and other inputs defendant BP, through Rainey, knew were inaccurate.

4.   Defendant BP, through Rainey, omitted other documents relating to flow-rate estimates that contradicted defendant BP's 5,000 BOPD estimate, including, among others, the work performed by Engineer 1, the Subsurface Team Estimates, and a critique by another BP engineer ("Engineer 2") of the university professor's work that used different assumptions than those used by the professor and concluded that 15,000 BOPD was an appropriate assessment of the flow rate based on the same video footage of the spill.

5.   Defendant BP, through Rainey, falsely stated that Rainey's estimates ranging from 5,000 to 6,000 BOPD "played an important part in Unified Command's decision [on April 28, 2010] to raise the estimate of flow rate from 1,000-5,000 barrels per day." In fact, as defendant BP, through Rainey, well knew, defendant BP had not yet provided these purported "ASTM" estimates to Unified Command by the time that Unified Command raised its estimated flow rate to up to 5,000 BOPD.

73

f.    **The Flow Rate Technical Group**

    i.    On or about May 19, 2010, as a result of the growing concern that BP was understating the amount of oil spilling from the Macondo well, Unified Command announced the creation of the Flow Rate Technical Group ("FRTG"), made up of independent and government experts, to determine the flow rate.   Later, following independent analysis, the FRTG announced on or about August 2, 2010, its conclusion that the flow rate after the blowout had initially been approximately 62,000 BOPD—over twelve times BP's public estimate of 5,000 BOPD—and had been approximately 53,000 BOPD at the time the well was shut in on or about July 15, 2010.   The FRTG concluded that a total of approximately 4.9 million barrels of oil had been released during the course of the spill.

g.    **The Congressional Inquiry and Investigation**

    i.    The House Subcommittee on Energy and Environment (the "Subcommittee") was a subcommittee of the Committee on Energy and Commerce of the House of Representatives of the United States Congress. The Subcommittee had oversight authority over matters including the regulation of energy, drinking water and soil and water contamination. The Subcommittee's oversight authority included the authority to analyze the effectiveness of existing laws and to evaluate the need to propose new or additional legislation.   The Subcommittee was a "Committee" for purposes of Title 18, United States Code, § 1505.

    ii.    Following the *Deepwater Horizon* blowout, the Subcommittee commenced an inquiry and investigation of the blowout and oil spill, including the amount of oil flowing from the well.  Congress's inquiry and investigation included, among other things, requests for information from BP.

    iii.    On or about May 4, 2010, in response to a Congressional request for a briefing of members and staff of Congress, defendant BP, through Rainey, falsely informed the Subcommittee that 5,000 BOPD was the most accurate flow-rate estimate.  Defendant BP, through Rainey, further stated to Congress that, while defendant BP had calculated a hypothetical "worst case" scenario of 60,000 BOPD, the worst case scenario was not possible, in part because it assumed removal of the blowout preventer from the wellhead, which remained in place at that time.   During the May 4 briefing, defendant BP, through Rainey, did not disclose any information that contradicted defendant BP's purported "best guess" of 5,000 BOPD, including the Bonn estimates and other BP internal information of which defendant BP, through Rainey, was aware indicating that the actual flow – not a hypothetical worst case scenario assuming the non-existent condition of the blowout preventer being removed – was much higher than 5,000 BOPD.

74

iv.   On or about May 14, 2010, the then-Chairman of the Subcommittee ("the Subcommittee Chairman") sent a letter to BP accusing BP of understating the amount of oil leaking from the well.   The letter noted that BP had recently "reaffirmed the 5,000 barrels per day estimate" despite recent news reports that the "actual amount of oil being released into the Gulf of Mexico could be upwards of 70,000 barrels per day."   The letter further stated that Congress was concerned that an "underestimation of the flow may be impeding the ability to solve the leak and handle management of the disaster."   The Subcommittee requested answers to fifteen questions relating to flow rate and requested that BP "update [its] response or provide additional documents at such time as such information becomes available."   Among other things, the Subcommittee requested:

1.   "What is the BP method and scientific basis for the estimate of 5,000 barrels per day?   Was this estimate based solely on surface monitoring of the size of the spill?

2.   "All documents created since the incident that bear on, or relate to, in any way, estimates of the amount of oil being released"; and

3.   "BP's current estimate of the amount of oil flowing from the well, including the basis and methodology for that estimate, along with any uncertainty or error ranges for the estimate."

v.   On or about May 21, 2010, defendant BP, through Rainey, began working on a response to the May 14 Congressional request.   Rainey was the primary source of flow-rate information for defendant BP's eventual written response to Congress on or about May 24, 2010 (the "BP Response") that continued to embrace 5,000 BOPD as the "best guess" estimate.   During the preparation of the BP Response, defendant BP, through Rainey, continued to receive information that contradicted a "best guess" of 5,000 BOPD, including that the amount of oil actually being collected via a riser insertion tube tool (the "RITT") confirmed that the flow rate was in excess of 5,000 BOPD and an email that "everyone" within the FRTG at that time agreed that "5,000 barrels/day was too low."   Aware of this and other information contradicting the 5,000 BOPD estimate, defendant BP, through Rainey, withheld such information from other BP employees and from BP in-house and outside lawyers working on the BP Response.   Defendant BP, through Rainey, also prepared false and misleading responses to the Congressional request, and provided false and misleading information to others working on the BP Response.

vi.   On or about May 24, 2010, defendant BP, through Rainey, caused to be submitted to the Subcommittee the BP Response, which appended the false and misleading Rainey Memo and its attachments, which were selected by defendant BP, through Rainey.   As a result of defendant BP's actions, through Rainey, in withholding information and also providing

false and misleading information, the BP Response made false and misleading statements to Congress, withheld and concealed information, and otherwise impeded Congress's inquiry and investigation. For example:

1. The BP Response omitted all of Rainey's Bonn estimates, which contained estimates of oil spill up to 92,000 BOPD.

2. The BP Response omitted key parts of Engineer 1's work, including flow-rate estimates up to 82,000 BOPD.

3. The BP Response omitted Engineer 1's email expressing concern about BP's public defense of the 5,000 BOPD estimate.

4. The BP Response falsely labeled Rainey's estimates as having been calculated using the "ASTM" method, when, in fact, the estimates did not conform to that method.

5. The BP Response omitted that Rainey's purported "ASTM" estimates were premised on data and other inputs Rainey knew were inaccurate.

6. The BP Response omitted that Rainey had manipulated his purported "ASTM" estimates to arrive near 5,000 BOPD.

7. The BP Response omitted Engineer 2's conclusion that a proper assessment of the video footage relied upon by the university professor resulted in an estimate of 15,000 BOPD – three times higher than the 5,000 BOPD estimate contained in the BP Response that Rainey asserted was the best estimate.

8. The BP Response omitted the Subsurface Team Estimates ranging from 64,000 to 146,000 BOPD.

9. The BP Response falsely stated that Rainey's purported "ASTM" estimates played an important part in Unified Command's decision to raise its early estimate from 1,000 to 5,000.

10. The BP Response omitted data Rainey received on or about May 22, 2010, that the amount of oil actually being collected via the RITT confirmed that the flow rate was in excess of 5,000 BOPD.

11. The BP Response omitted a May 23, 2010 email from the head of the FRTG to Rainey and others stating, among other things, that "everyone is at least comfortable with saying that the 5,000 barrels/day was too low."

193.    BP E&P (referred to in the DOJ Information as "BP") pleaded guilty to making the following omissions and false and misleading statements in its May 24, 2010 response ("Markey Response") to the Committee on Energy and Commerce:

a.      BP, through a former vice president, withheld information and documents relating to multiple flow-rate estimates prepared by BP engineers that showed flow rates far higher than 5,000 BOPD, including as high as 96,000 BOPD.

b.      BP, through a former vice president, withheld information and documents relating to internal flow-rate estimates he prepared using the Bonn Agreement analysis, that showed flow rates far higher than 5,000 BOPD, and that went as high as 92,000 BOPD.

c.      BP, through a former vice president, falsely represented that the flow-rate estimates included in the Response were the product of the generally-accepted ASTM methodology.  At the time that this false representation was made, BP's former vice president knew that those estimates were the product of a methodology he devised after, among other things, a review of a Wikipedia entry about oil spill estimation.

d.      BP, through a former vice president, falsely represented that the flow-rate estimates included in the Markey Response had played "an important part" in Unified Command's decision on April 28, 2010, to raise its flow-rate estimate to 5,000 BOPD.  At the time this false representation was made, BP's former vice president knew that those flow-rate estimates had not played "an important part" in Unified Command's decision to raise its flow-rate estimate and had not even been distributed outside of BP prior to that decision.

e.      BP falsely suggested, in its May 24, 2010 letter, that the Unified Command's flow rate estimate of 5,000 barrels of oil per day ("BOPD") was the "most scientifically informed judgment" and that subsequent flow rate estimates had "yielded

consistent results."  In fact, as set forth above, BP had multiple internal documents with flow rate estimates that were significantly greater than 5,000 BOPD that it did not share with the Unified Command.

        f.     On or about June 25, 2010, in a BP letter to Congressman Markey, BP's former vice president inserted language that falsely stated that BP's worst case discharge estimate was raised from 60,000 BOPD to 100,000 BOPD after subsequent "pressure data was obtained from the BOP stack."  At the time this false representation was made, BP's former vice president knew that the 100,000 BOPD figure was not first derived after subsequent pressure data had been obtained, but instead, he had been aware of a 100,000 BOPD worst case discharge since as early as on or about April 21, 2010.

194.    A separate indictment was also unsealed on November 15, 2012, charging Rainey with obstructing a Congressional investigation and making false and misleading statements to law enforcement officials.  Simply put, he was charged with lying about the very facts at issue in this case to authorities attempting to manage the worst ecological disaster in United States history as it was unfolding.

195.    Additionally, on April 23, 2012, federal prosecutors filed criminal charges against BP engineer Kurt Mix for obstruction of justice in connection with a criminal investigation of the *Deepwater Horizon* disaster.  In a press release issued the next day, the DOJ reported that "Mix worked on internal BP efforts to estimate the amount of oil leaking from the well and was involved in various efforts to stop the leak.  Those efforts included, among others, Top Kill . . . ."  The DOJ's April 24, 2012 press release also stated the following:

> Mix allegedly deleted on his iPhone a text string containing more than 200 text messages with a BP supervisor.  The deleted texts, some of which were recovered forensically, included sensitive internal BP information collected in real-time as the Top Kill

> operation was occurring, which indicated that Top Kill was
> failing . . . .  Mix deleted a text he had sent on the evening of May
> 26, 2010, at the end of the first day of Top Kill.  In the text, Mix
> stated, among other things, "Too much flowrate – over 15,000."
> Before Top Kill commenced, Mix and other engineers had
> concluded internally that Top Kill was unlikely to succeed if the
> flow rate was greater than 15,000 barrels of oil per day (BOPD).
> At the time, BP's public estimate of the flow rate was 5,000 BOPD
> – three times lower than the minimum flow rate indicated in Mix's
> text.

196.    Additionally, on May 28, 2012, *The Wall Street Journal* reported that during the

DOJ's investigation into whether BP's representatives lied to Congress about the oil flow spill

rate of the Macondo well, federal investigators examined an email by a BP engineer warning not

to share data "outside the circle of trust."   In particular, the prosecutors uncovered a May 27,

2010 email written by a senior BP engineer, Rupen Doshi, in the midst of the first effort to stop

the leak, known as the "top kill," warning that "NO ONE is to get the data files from the Top Kill

method that is being pumped from yesterday or today except for Paul Tooms' group."   Doshi

was referring to Paul Tooms, then head of upstream engineering at BP.   "The purpose of the note

was meant to put a limit on the people outside the circle of trust getting the data," Tooms wrote

in an email later that day.

### 4.    BP Pleads Guilty in Connection with an SEC Investigation, and Admits Concealing Critical Spill Information from the Public

197.    The facts alleged in Sections VIII.C.1.c and VIII.C.2.h, *infra*, among others, gave

rise to the SEC's securities fraud complaint against BP, filed on November 15, 2012.  On that

same day, BP filed a Consent in the SEC action in which it agreed to entry of Final Judgment

and admitted that the allegations in the SEC's complaint were true.  In doing so, BP agreed to

pay a $525 million penalty, thereby incurring the then-third-largest civil fine *ever* imposed by the

SEC, and a permanent injunction barring BP from violating the federal securities laws.

198.    As described in greater detail in Sections VIII.C.1.c and VIII.C.2.h, *infra*, BP, Rainey, Suttles, Hayward, McKay, and Dudley all engaged in a massive fraud by knowingly fabricating and repeatedly asserting to the public an artificially low oil spill flow rate in April and May 2010, at times directly refuting scientists who dared challenge its veracity.  They did so despite internal knowledge from at least 16 different sources of data, estimates, and calculations – many of them created by BP's own senior engineers – indicating that the spill was greater by many orders of magnitude.  Each of those 16 sources was undisputedly known to BP and to at least one (and likely all) of the Individual Defendants.

199.    When announcing the settlement, SEC officials were unambiguously harsh in their criticism of BP's conduct in misleading investors.  For instance:

a.    Robert Khuzami, Director of the SEC's Division of Enforcement said in a press release:

> The oil spill was catastrophic for the environment, but by hiding its severity BP also harmed another constituency – its own shareholders and the investing public who are entitled to transparency, accuracy, and completeness of company information, particularly in times of crisis.  Good corporate citizenship and responsible crisis management means that a company can't hide critical information simply because it fears the backlash.

b.    Daniel M. Hawke, Director of the SEC's Philadelphia Regional Office and Chief of the Enforcement Division's Market Abuse Unit said in the same press release, "Without accurate critical flow rate data known only to BP, the company denied its shareholders and investors the opportunity to fairly assess BP's potential liabilities and true financial condition."

c.    At a news conference, Khuzami further reprimanded BP's executives, the Defendants in the instant action, for standing behind an oil flow estimate of 5,000 BOPD "despite an ever-growing body of evidence that this estimate was unreasonably low," until

"eventually, outside groups realized that the flow rate estimate was 10 times what BP had fraudulently communicated to investors." As Khuzami summarized:

> [T]he eyes of the world were on BP in the spring and summer of 2010. The company had an opportunity to provide fulsome, accurate disclosure about the facts needed by the public to make informed investment decisions. And, instead, BP chose to mislead the public.
>
> That is not what we expect from public companies and their management. In fact, it is exactly in times of crisis that the need for accurate information is most acute.

## VII.   MATERIALIZATION OF THE UNDISCLOSED RISKS: THE DRILLING OF THE MACONDO WELL, THE BLOWOUT, AND ITS AFTERMATH

### A.   BP's Systematic Failures Caused The Explosion On And The Sinking Of The *Deepwater Horizon* Rig

200.   The tragedy of the April 20, 2010 Explosion was avoidable, but BP's overarching culture of indefensible risk-taking prevailed. At every turn, BP's conduct evidenced a systematic departure from recognized industry safety practices. Thus, the Presidential Commission found that "the cumulative risk that resulted from these decisions and actions was both unreasonably large and avoidable[.]"

#### 1.   BP Acquires the Rights to the Macondo Well and Begins its Preparation to Drill Despite Having an Inadequate and Error-Filled Oil Spill Response Plan

201.   In March 2008, BP paid approximately $34 million to acquire the exclusive drilling rights from the MMS for the Mississippi Canyon Block 252, a nine-square-mile plot in the Gulf of Mexico that encompasses the Macondo well. Although the Mississippi Canyon area has many productive oil fields, BP knew little about the specific geology of Block 252 and Macondo, 47.6 miles off the coast of Louisiana, was BP's first well on the new lease. BP planned to drill to 20,200 feet in order to learn the geology of the area and to determine whether the oil and gas reservoir would warrant installing production equipment. It was believed that the well could hold as much as 50 million barrels (or 2.1 billion gallons) of producible oil.

202.    MMS required BP to prepare and file oil spill response plans demonstrating BP's specific strategy and ability to respond to an oil spill in the Gulf of Mexico.  MMS regulations required that an oil spill response plan include, *inter alia*:  (i) an emergency response action plan; (ii) disclosure of the equipment available to combat an oil spill; (iii) any oil spill response contractual agreements with third-parties; (iv) calculations of the worst-case discharge scenarios; (v) a plan for dispersant use in case of a spill; (vi) an in-situ oil burning plan; and (vii) information regarding oil spill response training and drills.  *See* 30 C.F.R. § 254.21.

203.    The first of these requirements, the "emergency response action plan," is the "core" of the overall operational response plan and required BP to disclose, among other things: (i) information regarding its oil spill response team; (ii) the types and characteristics of oil at the facility; (iii) procedures for early detection of a spill; and (iv) procedures to be followed in the event of an oil spill.  *See* 30 C.F.R. § 254.23.

204.    BP publicly filed its oil spill response plan for the Gulf of Mexico – entitled "Regional Oil Spill Response Plan – Gulf of Mexico" – with the MMS on December 1, 2000 and last revised the plan on June 30, 2009 ("BP's Regional OSRP for the GOM").  A regional oil spill response plan is designed to cover multiple facilities or leases of a lessee that have:  (i) similar modeled spill trajectories and worst case discharge scenarios; (ii) the potential to affect the same ecological or socioeconomic resources; and (iii) are located in close enough proximity to be served by the same response equipment and personnel.  BP's Regional OSRP for the GOM covers a massive area, including all United States interests in the Gulf of Mexico and encompassing the coastal waters of Texas, Louisiana, Alabama, Mississippi, and Florida.  BP has approximately 600 leases and operates roughly seventy oil wells in the Gulf of Mexico, and BP's Regional OSRP for the GOM applied to all of these wells.

205.    According to BP's Regional OSRP for the GOM, the "TOTAL WORST CASE DISCHARGE" scenarios in the Gulf of Mexico ranged from a release of 28,033 BOPD to 250,000 BOPD.  More specifically, BP's Regional OSRP for the GOM stated:  (i) an oil spill occurring less than ten miles from the shoreline could create a worst case discharge of 28,033 BOPD; (ii) an oil spill that occurred greater than ten miles from the shoreline could create a worst case discharge of 177,400 BOPD; and (iii) an oil spill caused by a mobile drilling rig drilling an exploratory well could create a worst case discharge of 250,000 BOPD.  BP's Regional OSRP for the GOM explicitly stated that BP and its subcontractors could recover approximately 491,721 BOPD (or more than 20.6 million gallons) in the event of an oil spill in the Gulf of Mexico.  Moreover, BP claimed and provided certified statements to the MMS that BP and its subcontractors "maintain the necessary spill containment and recovery equipment to respond effectively to spills."

206.    On March 10, 2009, the MMS deemed BP's initial exploration plan for Mississippi Canyon Block 252, including the area encompassing the Macondo well ("BP's IEP"), "submitted."[1]  In connection with BP's IEP, BP sought a permit from the MMS to drill to a total depth of 19,650 feet at the Macondo well.  Following the sinking of the *Deepwater Horizon,* a BP crewman admitted that this depth had been misrepresented to the MMS, and that BP had in fact drilled in excess of 22,000 feet, in violation of its permit.

207.    According to BP's IEP, the worst case scenario of an oil spill occurring in Mississippi Canyon Block 252 would be the release of approximately 162,000 BOPD.

---

[1]  BP's Regional OSRP for the GOM and BP's IEP are collectively referred to herein as "BP's Oil Spill Response Plan."

208.    In BP's IEP, BP claimed it would have no difficulty responding to a worst case scenario while drilling the Macondo well:

> Since BP . . . has the capability to respond to the appropriate worst-case scenario included in its regional OSRP . . . , and since the worst-case scenario determined for our [EP] does not replace the appropriate worst-case scenario in our regional OSRP, I hereby certify that BP . . . has the capability to respond, to the maximum extent practicable, to a worst-case discharge, or a substantial threat of such a discharge, resulting from the activities proposed in our [EP].

*        *        *

> [D]ue to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected.

209.    Because the worst case scenario discharge figures in BP's IEP – which BP calculated – fell below the threshold established in BP's Regional OSRP for the GOM, BP was not required to submit a site-specific drilling plan for the Macondo well itself.

210.    In October 2009, the semi-submersible Transocean rig *Marianas* began drilling the Macondo well.  However, operations were halted at approximately 4,000 feet below the sea floor due to damage caused to the rig by Hurricane Ida.

211.    The replacement rig, the *Deepwater Horizon*, arrived at the Macondo well on January 31, 2010.  Although the rig was in place on that date, several steps needed to occur prior to beginning any drilling operation, including connecting the rig's BOP to the wellhead.  BP completed these steps by February 10, 2010 and the *Deepwater Horizon* began drilling shortly thereafter.

212.    Once the rig was connected to the BOP via the riser, BP inserted the drill bit and drilling pipe through the riser and BOP in order to reach the wellbore in the ocean floor.  As drilling progressed, so-called "drilling mud" was pumped down through the drilling pipe and emerged through holes in the drill bit.

213.     Drilling mud, a blend of synthetic fluids, polymers and weighting agents, is a critical part of the drilling process.  Circulated down the drilling pipe and back up the wellbore to the rig, drilling mud clears the wellbore of broken rock and other debris (referred to as "cuttings"), cools the drill bit, and, critically, maintains stable pressure within the well, which is essential to the mechanical stability and integrity of the wellbore.  As such, drilling mud costs approximately $100 per barrel, and it accounts for as much as 10% of the total cost of drilling a deepwater well.

214.     When drilling a deepwater well like the Macondo – which lies approximately 5,000 feet (or nearly 1 mile) below the ocean's surface and extends another 13,000 feet below the ocean floor – controlling pressure is a paramount concern.  The inward or "pore" pressure (*i.e.*, the pressure exerted by the fluid in the surrounding rock formation on the wellbore) must be balanced with the outward or "fracture" pressure (*i.e.*, the pressure exerted by the drilling fluids in the wellbore on the surrounding rock formation).  Following proper safety procedures is critical because uncontrolled well pressure can cause an explosion.

215.     On April 9, 2010, the weight of the drilling mud being pumped into the Macondo well was too high and fractured the surrounding formation.  Consequently, drilling mud began to be lost because it was flowing into the cracks in the formation.  In an attempt to plug the fractures and stop the outflow of drilling mud, BP circulated 172 barrels of thick, viscous fluid, referred to as a "lost circulation pill," into the wellbore.  The lost circulation pill succeeded in staunching the outflow of drilling mud, but the episode underscored the sensitivity of the Macondo well.  As noted by the Presidential Commission:  "BP's on-shore engineering team realized the situation had become delicate.  They had to maintain the weight of the mud in the wellbore at approximately 14.0 pounds per gallon (ppg) in order to balance the pressure exerted

by the hydrocarbons in the pay zone." Thus, BP's engineers were on notice that they must be even more vigilant in monitoring and controlling the competing pressures within the wellbore.

### 2. BP Safety Failures in Casing and Cementing the Well

216. Once the initial drilling of the well was complete, BP then needed to (i) insert metal casing to seal off the walls of the wellbore, and (ii) cement such casing in place to provide structural integrity. To do so, after inserting metal casing throughout the length of the wellbore, cement would be pumped all the way down the well casing where, upon hitting bottom, it would be forced back up to fill and seal the "annular space" between the outside walls of the casing and the surrounding rock formation.

217. BP considered two casing methods: "long-string" casing and "liner/tie-back" casing. Long-string casing involves hanging a single continuous wall of steel from the wellhead on the ocean floor down to the bottom of the well over thirteen thousand feet below. Liner/tie-back casing entails hanging shorter segments of metal casing to one another in order to form a stronger and less flexible piece of metal.

218. A critical distinction between the two methods is that the long-string casing method provides two barriers against pressurized hydrocarbon flows into and up the annular space (once cementing is complete) whereas the liner/tie-back casing provides four barriers to annular flow. This means that the liner/tie-back method provides twice the safety precautions as compared with the long-string casing method.

219. BP knew that obtaining a reliable primary cement job with the long-string casing would be much more difficult. In fact, between April 14 and 15, 2010, the BP engineering team in Houston, Texas modeled the likely success of the cementing process using the two casing methods, and determined that *the long-string method would fail in effectively cementing the Macondo well.*

220.    In light of this determination, the engineering team elected to proceed with the liner/tie-back method.   However, according to the Presidential Commission, others at BP opposed this decision and, despite the conclusion that the long-string method could not be cemented reliably, mandated that *Deepwater Horizon* proceed with the long-string casing method.

221.    BP then had to thread the long-string casing through the center of the wellbore down to the bottom of the well.   In so doing, centering the casing within the wellbore is of vital importance to obtaining a secure cement job.   After the cement mixture flows down the casing and hits bottom, it is forced outside of the casing and ascends up to fill the annular space surrounding the casing.   If the space around the casing is uneven (*i.e.*, there is more space on one side than on the other), the cement begins to fill in the annular space in an uneven manner, leaving channels of drilling mud in the cement.   These channels are pathways through which highly pressurized hydrocarbons can flow.

222.    To ensure that the long-string casing will be centered, so-called "centralizers" are placed around the casing at regular intervals so as to hold the casing at the center of the wellbore. For the Macondo well, BP decided that it would use only six centralizers because that was the amount currently available on the rig.   It does not appear that BP's reasoning was based on any scientific or engineering calculations.   However, before BP could actually place the centralizers in the well, it needed Halliburton – who BP contracted for the cementing job – to verify that six centralizers would be sufficient.

223.    On or about April 15, 2010, Halliburton engineer Jesse Gagliano ("Gagliano") performed computer simulations to assess the likelihood of a satisfactory cement job using six centralizers.   Gagliano's calculations demonstrated a high likelihood of "channeling" (*i.e.*, the

above-described imperfect cementing process, leaving open channels in the annular space rather than filling it evenly with cement) – and therefore a cementing failure were BP to use only six centralizers.  Computer simulations showed that twenty-one centralizers were necessary – *i.e.*, almost four times as many as BP intended to use.

224.    After reviewing the modeling data himself, BP Drilling Team engineer Gregory Walz agreed with Gagliano's conclusions.  On April 16, 2010, Walz wrote to other BP engineers and stated, in part, that the operation needs "to honor the . . . modeling to be consistent with our previous decisions to go with the long string."  Walz proceeded to make arrangements to obtain the additional centralizers.

225.    However, BP Well Team Leader John Guide, who was also based in BP's Houston office, opposed using the additional centralizers because the installation would delay the team by approximately 10 hours and would therefore cost BP money.  Although BP ordered additional centralizers, when they arrived on the *Deepwater Horizon* it was determined that the centralizers were the wrong type.  Despite the serious threat of channeling identified in the modeling data, Guide's view prevailed and only six centralizers were used to center the more than 13,000 foot long-string casing in the wellbore.

226.    BP's culture of unreasonable, indefensible risk-taking is echoed in an April 16, 2010 email from Brett Cocales (a drilling operations engineer in BP's Houston office) in which he stated:

> Even if the hole is perfectly straight, a straight piece of pipe even in tension will not seek the perfect center of the hole unless it has something to centralize it.  *But, who cares, it's done, end of story, will probably be fine* and we'll get a good cement job.

227.    On April 17, 2010, after learning that BP would proceed with only six centralizers, Gagliano re-ran the computer simulations and modeling using seven centralizers.

The conclusion was the same:  the well would have "*a SEVERE gas flow problem*."   BP, however, continued to ignore its own expert's opinion.

228.   On April 18, 2010, BP began lowering the long-string casing into the wellbore. To enable the drilling mud located in the wellbore to flow smoothly and distribute evenly as the long-string casing is lowered, two trap doors within the long-string casing, referred to as the "float collar," are propped open with a tube called an "auto fill tube."

229.   On April 19, 2010, after the long-string casing reached the bottom of the wellbore, BP needed to dislodge the auto fill tube, converting the float collar from a two-way valve to a one-way valve.  Successfully converting the float collar ensures that the pumped cement will only flow downward through the casing, a critical step in the cementing process.

230.   Two events should have indicated to BP that the conversion of the float collar was not proceeding properly:

a.   First, the auto fill tube should have been dislodged once the flow through it reached six barrels of mud per minute (6 bpm), equivalent to 600 pounds of pressure per square inch (600 psi).  However, even as the crew pumped drilling mud down the casing and pressure began to climb beyond the 600 psi threshold which should have converted the float collar, the crew was unable to establish flow.  The pressure continued to rise, peaking at 3,142 psi (more than five times the pressure that should have been needed to convert the float collar) before suddenly dropping precipitously.  It appears that BP assumed that this meant the float collars had converted.  This is a scientifically indefensible position, however, because, as noted by the Presidential Commission:  "[t]he auto fill tube was designed to convert in response to *flow-induced* pressure.  Without the required rate of flow, an increase in *static* pressure, no matter how great, will not dislodge the tube."

b.      Second, after the tube was dislodged and the float collar converted to a one-way passage, the amount of pressure needed to circulate drilling mud from the rig, down the drilling pipe and up the annular space to the rig again should have been 570 psi.  Yet, as BP began the process of converting the float collars, the results differed considerably.  After the spike and sudden drop in pressure, the circulation pressure was only 340 psi.

231.    BP personnel on the rig erroneously ignored the mounting evidence that something was amiss, and proceeded to the next step in the well abandonment plan – mud circulation.

232.    Correct, customary, and typical mud circulation requires the complete circulation of drilling mud in the wellbore, referred to as "bottoms up" circulation.  The process, which requires about twelve hours, allows workers on the rig to test the mud for gas influxes, safely remove any gas pockets, and evacuate any debris or other foreign matter that could contaminate the cement.  Given the heightened challenges of cementing a long-string (as opposed to a liner/tie-back) casing, this step was critical.  In addition, "bottoms up" circulation would allow the BP crew to test the mud at the bottom of the well for hydrocarbons, the presence of which would indicate a leak in the cement job at the bottom of the well.

233.    In order to complete a "bottoms up" circulation, BP needed to circulate 2,760 barrels of drilling mud.  Instead, as noted by the Presidential Commission, BP circulated only 350 barrels of mud – eight times less than the amount required to properly complete the "bottoms up" circulation of the well.

234.    After conducting such mud circulation, cementing could begin.

235.    In cementing the Macondo well, BP used nitrogen foam, a cement with which it had little experience in the Gulf of Mexico.  In February 2010, Gagliano conducted tests

regarding the stability of the nitrogen foam cement.  The tests showed that the mixture was unstable and therefore represented an additional risk of well failure.  According to the Presidential Commission Report, these test results were communicated to BP personnel in Houston on March 8, 2010.  Nevertheless, the warnings were ignored and BP pumped nitrogen foam cement into the Macondo well.

236.  BP's internal guidelines dictated that the top of the annular cement should be 1,000 feet above the uppermost hydrocarbon zone.  However, for the Macondo well, BP injected just enough cement to extend the annular cement barrier half that distance, or only 500 feet above the uppermost hydrocarbon zone.  According to the Presidential Commission Report, this deviation reduced the safety margin for the procedure by 50% and meant that only sixty barrels of cement would be used to cement the well, which BP's own engineers recognized left absolutely no margin for error.  Also, according to the Presidential Commission Report, BP was keenly aware that it was pumping the cement at an unsafe rate (four barrels per minute rather than six barrels per minute), further impeding the efficiency with which cement would be displaced from the annular space, and reducing the safety margin even further.

237.  At 12:40 a.m. on April 20, 2010, the crew finished pumping the primary cement job.  A team of outside technicians was on hand to conduct the battery of tests needed including, but not limited to, the "cement log" – an acoustical test designed to evaluate and test the sufficiency of the cement job by identifying areas (if any) where the cement failed to channel up through the annular space in a uniform fashion.  If cement channeling is uneven, pockets form, creating the possibility that hydrocarbons will enter the wellbore where they can ascend (and expand) rapidly.

238.    The acoustical test was especially critical given BP's prior erroneous decisions regarding the construction of the Macondo well, which included, *inter alia*:

a.    using the difficult-to-cement long-string casing method;

b.    foregoing the "bottoms up" mud circulation;

c.    failing to use twenty one centralizers as the Company's expert recommended;

d.    ignoring scientifically accepted data pertaining to the float collar conversion;

e.    electing to use nitrogen foam cement deemed unstable in prior testing;

f.    pumping the cement at reckless rates; and

g.    halving the safety margin by setting the cement 500 (rather than 1,000) feet above the hydrocarbon bearing "pay zone."

239.    BP decided to forego the acoustical test and sent the team of technicians home by helicopter at 11:15 a.m. that morning.  Forgoing the acoustical test, contrary to industry practice and the recommended safe practices of the American Petroleum Institute, saved BP approximately 10 hours and $100,000.

### 3.    BP's Safety Failures in Conducting Final Well Integrity Tests, Capping the Well, and Monitoring the Well

240.    The *Deepwater Horizon* rig is a drilling rig as opposed to a production rig.  Once drilling operations are complete, the completed well is placed in "temporary abandonment" until the arrival of the production rig, which will connect to the well and begin pumping oil and gas from the site.  Placing the well into temporary abandonment means that the drilling rig will be removing its own BOP and riser from the wellhead.  There are several key features in the temporary abandonment process to ensure that the well is secure before the BOP and riser are

removed.  For one, a cement plug, which acts like a cap, is placed in the well, typically at or near the mudline.  Second, the area in the well *beneath* the cap is filled in with heavy drilling mud, which applies additional downward pressure on the hydrocarbon bearing zone.  If the cement plug is placed at a greater depth, this necessarily means that there will be less heavy drilling mud in the well underneath the cement plug.  Finally, the crew will install a "lockdown sleeve" at the wellhead.  Throughout this process, the well is monitored and a series of tests are performed to ensure that the well is secure – *i.e.*, that no hydrocarbons are leaking into the well.

241.    According to the Presidential Commission, neither the BP Well Site leaders, nor any of the rig's crew, had seen the temporary abandonment plan for the Macondo well prior to 10:43 a.m. the day the abandonment procedure began.  Indeed, the temporary abandonment plan had undergone numerous changes leading up to April 20, 2010, but, according to the Presidential Commission, "[i]t does not appear that the changes to the temporary abandonment procedures went through any sort of formal review at all."

242.    One of the key tests customarily and typically conducted to ensure that the completed well is secure is the "negative pressure test," which assesses whether hydrocarbons are flowing into the well.  To conduct this test, BP needed to simulate the pressure conditions that would exist in the well once it was placed into temporary abandonment.  As part of the negative pressure test, the crew removed 3,300 feet of mud from the wellbore.

243.    To remove the drilling mud from the wellbore (and later the riser), BP pumped "spacer" through the drilling pipe followed by seawater.  Spacer is a synthetic blend that acts as a barrier between the drilling mud and seawater.  Although the use of spacer is a common and accepted practice, BP's spacer concoction was mixed on board the rig from leftover chemicals,

enabling BP to save money and skirt environmental regulations. As explained by the Presidential Commission:

> While drilling crews routinely use water-based spacer fluids to separate oil-based drilling mud from seawater, the spacer BP chose to use during the negative pressure test was unusual. BP had directed . . . mud engineers on the rig to create a spacer out of two different lost-circulation materials left over on the rig - the heavy, viscous drilling fluids used to patch fractures in the formation . . . .
>
> *BP wanted to use these materials as spacer in order to avoid having to dispose of them onshore as hazardous waste pursuant to the Resource and Conservation Recovery Act*, exploiting an exception that allows companies to dump water-based "drilling fluids" overboard if they have been circulated down through a well. *At BP's direction, the [mud engineers] combined the materials to create an unusually large volume of spacer that had never previously been used by anyone on the rig or by BP as a spacer, nor been thoroughly tested for that purpose.*

244. Testimony before the Presidential Commission indicates that this concocted, untested spacer may have clogged the BOP's "kill line," as discussed below, interfering with the results of later testing designed to assess the integrity of the well.

245. After removing drilling mud from the wellbore, BP began a negative pressure test to determine whether the well was sealed such that gas or liquid could not permeate into the well. This negative pressure test is the *only* test that assesses the integrity of the cement job at the bottom of the well.

246. BP had no established procedure or protocol for conducting a negative pressure test.

247. To conduct the negative pressure test, the crew "bled off" pressure from the drilling pipe until it was 0 psi. The pipe was then sealed and monitored. For a successful negative pressure test, the pressure within the drilling pipe must remain at 0 psi for a certain period of time. The BP crew went through this process *three* times – bleeding down the pressure and then sealing the pipe – and all *three* times the pressure within the drill pipe jumped, reaching 1,400 psi on the third attempt. Thus, the pressure test failed three times, in identical fashion.

248.    The negative pressure test performed exactly as intended.  It gave the clear, unequivocal warning that the integrity of the well was compromised.  As the Presidential Commission noted, "based on available information, *the 1,400 psi reading on the drill pipe could only have been caused by a leak into the well*."  In May 2010, BP admitted in Congressional testimony that these pressure test results clearly signaled a "very large abnormality" in the well.

249.    Notwithstanding the unequivocal results of the negative pressure test and without communicating the results to safety experts in Houston, BP ignored these warnings and instead applied the same negative pressure test a fourth time – but this time applied it to the "kill line," one of the pipes used to circulate fluids into and out of the well, rather than to the main drill pipe.

250.    After conducting this fourth negative pressure test (this time on the kill line), BP achieved what it considered to be a successful test result, and thereafter continued with the temporary abandonment process.  During this last test, the crew was able to maintain 0 psi on the kill line, but the pressure on the drill pipe remained at 1400 psi.  The Presidential Commission Report found that "BP used a spacer that had not been used by anyone at BP or on the rig before, that was not fully tested, and that may have clogged the kill line," leading to the so-called successful test result.

251.    As part of the negative pressure testing of the well, the crew had already removed 3,300 feet of drilling mud below the sea floor from the well and replaced it with seawater.  This decision was driven by BP's choice to place the "cement plug" at a depth of 3,000 feet.  The cement plug is a 300 foot cap placed in the well as an additional safety measure to secure the well while in temporary abandonment.  Placing the cement plug 3,000 feet below the ocean floor is not in accordance with accepted industry practice for performing this function.  Indeed,

placing the cement plug 3,000 feet below the mud line was inconsistent with MMS regulations and required special dispensation.

252.    The associated risks were amplified by BP's decisions to:  (i) leave 3,300 feet of the well below the ocean floor filled with only seawater, rather than heavy drilling mud; and (ii) postpone placement of the cement plug in the well.  As a result, when BP later opened the annular preventers on the BOP – doughnut-shaped rubber and steel seals that fit around the drill pipe and thereby seal off the riser and rig above from the well and its contents below – to facilitate the removal of drilling mud from the riser, the only remaining barriers between the rig and the highly pressurized hydrocarbons in the well were the drilling mud remaining in the bottom section of the well and, beneath that, the cement job at the very bottom of the well.

253.    At this stage, there was nothing to prevent leaked hydrocarbons (if present in the wellbore) from traveling up the riser to the rig.  An influx of hydrocarbons is called a "kick" and is exceedingly dangerous due to the highly pressurized conditions.  One gallon of gas at the bottom of the well is capable of expanding to 1,000 gallons by the time it reaches the rig on the ocean's surface.  As the gas expands, it accelerates the kick.  It is therefore imperative that the well be monitored closely for any evidence of a mounting kick.

254.    At 8:02 p.m. on April 20, 2010, BP began to remove the drilling mud from the riser.  As operations proceeded, the drilling mud was returning to the rig, but BP failed to monitor the rate of return.  The returned mud should have been placed in a subset of the rig's mud pits, referred to as the "active mud pits," to facilitate monitoring.  Instead, the returned mud was being dispersed over a number of pits and mud from other operations was being routed to the active mud pits.  As a result, there was no way to know whether more mud was returning to

the rig than was being pumped into the well, a fact that would have evidenced that a kick was in progress.

255.    At 9:01 p.m. on April 20, 2010, pressure measurements in the well signaled the impending crisis.  Pressure in the well should have remained constant or decreased, because the pumping pressure remained constant.  However, the pressure in the drilling pipe slowly began to *increase*, signaling an influx of hydrocarbons into the well.

256.    The crew did not respond to the pressure reading until approximately 9:30 p.m., when driller Dewey Revette ordered a crew member to bleed pressure from the drilling pipe. Despite the strong evidence of a kick, BP and its crew took no steps to assess the cause of the pressure reading or to seal the well.  In addition, no employee in BP's Houston office was monitoring the pressure in the Macondo well.  As Fred Bartlit, a Presidential Commission investigator, made clear during a Commission presentation on November 9, 2010, drill pressure data was "available" in BP's office in Houston, but BP did not in fact monitor it the night of the *Deepwater Horizon* blowout.  "There was nobody in that B.P. Macondo well office that night," Bartlit said.  "Everybody had gone home."

257.    Sometime after 9:40 p.m. on April 20, 2010, drilling mud began spewing onto the rig floor and, a few minutes later, the crew began its initial attempt to activate the BOP.

### 4.    The BOP Failures and the Loss of the *Deepwater Horizon*

258.    The crew initially attempted to activate the rig's BOP annular preventer, a doughnut-shaped rubber and steel seal that fits around the drill pipe and seals the hydrocarbons from flooding the rig itself.  However, the annular preventer failed to stop the flow of oil, most likely because the device had been ruptured four weeks earlier when the drilling pipe was moved through the annular preventer while the preventer was in the closed position, sending a plume of drilling fluid filled with chunks of rubber to the surface.

259.    Well data indicates that at 9:38 p.m. on April 20, 2010, the first hydrocarbons passed through the BOP.

260.    At 9:46 p.m. the crew attempted to activate the BOP's variable bore ram, which (like the annular preventer) should have sealed off the area around the drilling pipe.  This effort also failed to stop the flow of hydrocarbons.

261.    At 9:49 p.m. the hydrocarbon-filled drilling mud that was continuing to spew onto the deck of the rig ignited, causing the first explosion aboard the *Deepwater Horizon*.  One eyewitness referred to "a cascade of liquid" pouring out twenty stories above the main deck of the rig.  Another described hearing an explosion that sounded like a "blown tire, times 100." Barrels filled with explosive materials were catching fire and launching into the sky like missiles.

262.    After the explosion, workers on the bridge did not immediately act to deploy the Emergency Disconnect System ("EDS"), which should have activated the BOP's blind shear ram.  The blind sheer ram – the last line of defense – is designed to seal a wellbore by cutting through the drilling pipe and slamming shut to seal and close off the well.  Andrea Fleytas ("Fleytas"), a Dynamic Positioning Operator for the *Deepwater Horizon* who was on the bridge at the time of the explosion, told *The New York Times* that it did not occur to her to use the EDS and, in fact, she had never been taught how to use it.  With respect to the EDS system, Fleytas stated, "I don't know of any procedures."

263.    Sometime after the explosion, BP's Subsea Supervisor, Christopher Pleasant, made his way to the bridge and attempted to activate the EDS.  However, the blind shear ram failed to respond.

264.    Despite the failure of the EDS, the BOP's "deadman switch" (an automatic response mechanism) should have triggered the blind sheer ram.  The deadman switch also failed to activate the blind shear ram.  Later inspections revealed that the device had a myriad of problems due to lack of inspection and poor maintenance, including low battery charges in the critical components responsible for deploying the blind shear ram and defective relays that supply the power to close the blind shear ram.

265.    At this point, the only option left to the crew to activate the BOP would have been an acoustical control signal that would trigger deployment of the blind sheer ram via an encoded pulse of sound transmitted by an underwater transducer.  However, BP had earlier decided not to install such an acoustic switch.  While an acoustic switch is not required in the United States, it is mandated in many places throughout the world.  In those foreign locations, BP uses rigs that do include such a safety device.

266.    Witnesses on a supply ship stood horrified as they watched the fire growing on the rig and crew members leaping from the main deck and jumping 100 feet into the sea.  With no way to bring the fires under control, crew members abandoned ship, struggling to fight their way to safety.  The *Deepwater Horizon* burned for thirty-six hours before finally tipping and sinking.  Eleven crew members were killed and seventeen more were injured.

### 5.    BP's Continuing Failures to Activate the BOP Following Abandonment of the *Deepwater Horizon*

267.    Beginning at 1:15 a.m. on April 21, 2010, BP and other personnel began attempts to activate the BOP with remotely operated vehicles ("ROVs").  Over the ensuing days, BP attempted to activate the blind shear ram on several occasions.  All efforts failed.

268.    First, the ROVs applied hydraulic pressure to a panel controlling the blind shear ram, a method of activating the ram, referred to as "hot stab."  It would take BP ten days to learn

that the method would necessarily fail because the targeted panel was actually attached to a useless test ram, which BP, as described above, had earlier swapped into the BOP in place of a blind shear ram.

269.    The ROVs also cut electrical wires in an attempt to simulate the above-described deadman switch, and attempted to activate the ram by triggering the autoshear (an automated disconnect that is triggered if the rig drifts too far from the well, threatening to break the riser). Still the ram did not deploy.

270.    At 10:22 a.m. on April 22, 2010, the *Deepwater Horizon* sank, further damaging the riser.

271.    On May 5, 2010, after learning that the attempts to activate the blind shear ram through the "hot stab" method were actually targeting a useless test ram, BP ceased its attempts to activate the BOP.

### B.    BP Was Wholly Unprepared To Contain The Macondo Oil Spill

#### 1.    BP Was Knowingly or Recklessly Unprepared to Manage and Respond to a Spill in the Gulf of Mexico

272.    In the wake of the *Deepwater Horizon* catastrophe, it has become evident that BP's Oil Spill Response Plan was materially false and misleading when filed.   Indeed, the Presidential Commission has described BP's Oil Spill Response Plan as outright "embarrassing." Indeed, Suttles admitted on May 10, 2010 that BP failed to have an oil spill response plan with "proven equipment and technology" in place that could contain the oil spill.   Similarly, in a November 9, 2010 interview with the *BBC*, Hayward ultimately confirmed that BP had failed to draw up sufficient emergency response plans, admitting that "*we were making it up day to day*."

273.    For example, since BP claimed that it was prepared to recover approximately 500,000 BOPD, and the worst-case scenario for the Macondo well was the release of only

162,000 BOPD, BP – per its representations – should have had no problems containing the oil spill.  However, as noted by the Presidential Commission:  "Despite [BP's claims that it 'could recover nearly 500,000 barrels of oil per day'], the oil-spill removal organizations were quickly outmatched."

274.    Furthermore, while BP's Regional OSRP for the GOM claimed that an oil spill occurring under three different scenarios – *i.e.*, less than ten miles from the shoreline, more than 10 miles from the shoreline, and from a mobile drilling rig drilling an exploratory well – could cause differences in the amount of oil spilled, BP consistently stated that the "shoreline impact" under each scenario would be identical.  This led the Presidential Commission to find that BP's Regional OSRP for the GOM "evidenced [a] serious [lack of] attention to detail."

275.    The Presidential Commission also noted several other errors in BP's Oil Spill Response Plan.  For instance, the Presidential Commission found that BP's Regional OSRP for the GOM was false when issued because "half of the 'Resource Identification' appendix (five pages) . . . was copied from material on [The National Oceanic and Atmospheric Administration ("NOAA")] websites, without any discernable effort to determine the applicability of that information to the Gulf of Mexico.  As a result, the BP Oil Response Plan described biological resources nonexistent in the Gulf – including sea lions, sea otters, and walruses."

276.    Likewise, BP's Regional OSRP for the GOM named Dr. Peter L. Lutz ("Lutz") from the University of Miami's School of Marine Sciences as a wildlife expert.  Lutz was a pioneer in whole-organism integrative physiology, but the Presidential Commission found that he "had died several years before BP submitted its plan."  Not only had Lutz been deceased since 2005, but he left the University of Miami almost twenty years earlier to chair the marine biology department at a different university.

277.    Similarly, BP's Regional OSRP for the GOM included incorrect contact information for the Marine Spill Response Corporation ("MSRC").    According to the Presidential Commission, the MSRC was "BP's main oil-spill removal organization in the Gulf," but, inexplicably, "a link in [BP's Regional OSRP for the GOM] that purported to go to the [MSRC] website actually led to a Japanese entertainment site."   Likewise, the names and phone numbers of several Texas A&M University marine specialists were incorrect and the listing of certain mammal stranding network offices in Louisiana and Florida were outdated and, in certain cases, had been closed.

278.    On June 8, 2010, journalist Tim Dickinson from *Rolling Stone* magazine published an article decrying BP's Oil Spill Response Plan.   The article's powerful message was clear:  "The effect of leaving BP in charge of capping the well, says a scientist involved in the government side of the [clean up] effort, has been 'like a drunk driver getting into a car wreck and then helping the police with the accident investigation'" or, in other words, allowing a fox to guard the hen house and hoping that it does not get hungry.   The article also stated:

> 'This response plan is not worth the paper it is written on,' said Rick Steiner, a retired professor of marine science at the University of Alaska, who helped lead the scientific response to the Valdez disaster.   'Incredibly, this voluminous document never once discusses how to stop a deepwater blowout.'

279.    Likewise, these gross deficiencies, errors, and misrepresentations, among others, caused the *Associated Press* to publish an article on June 10, 2010, entitled "BP Spill Response Plans Severely Flawed," which detailed the "glaring errors and omissions in BP's oil spill response plans."   The article stated:

> *BP PLC's 582-page regional spill plan for the Gulf, and its 52-page [IEP] vastly understate the dangers posed by an uncontrolled leak and vastly overstate the company's preparedness to deal with one,* according to an Associated Press analysis.

*    *    *

In the spill scenarios detailed in the documents, fish, marine mammals and birds escape serious harm; beaches remain pristine; water quality is only a temporary problem. And those are the projections for a leak about 10 times worse than what has been calculated for the ongoing disaster.

*       *       *

There are other wildly false assumptions. BP's proposed method to calculate spill volume judging by the darkness of the oil sheen is way off. The internationally accepted formula would produce estimates 100 times higher.

*       *       *

In early May, at least 80 Louisiana state prisoners were trained to clean birds by listening to a presentation and watching a video. It was a work force never envisioned in the plans, which contain no detailed references to how birds would be cleansed of oil.

*       *       *

Some examples of how BP's plans have fallen short:

*Beaches where oil washed up within weeks of a spill were supposed to be safe from contamination because BP promised it could marshal more than enough boats to scoop up all the oil before any deepwater spill could reach shore – a claim that in retrospect seems absurd.*

"The vessels in question maintain the necessary spill containment and recovery equipment to respond effectively," one of the documents says.

*BP asserts that the combined response could skim, suck up or otherwise remove 20 million gallons of oil each day from the water. But that is about how much has leaked in the past six weeks and the slick now covers about 3,300 square miles,* according to Hans Graber, director of the University of Miami's satellite sensing facility. Only a small fraction of the spill has been successfully skimmed. Plus, an undetermined portion has sunk to the bottom of the Gulf or is suspended somewhere in between.

The plan uses computer modeling to project a 21 percent chance of oil reaching the Louisiana coast within a month of a spill. In reality, an oily sheen reached the Mississippi River delta just nine days after the April 20 explosion. Heavy globs soon followed. Other locales where oil washed up within weeks of the explosion were characterized in BP's regional plan as safely out of the way of any oil danger.

BP's site plan regarding birds, sea turtles or endangered marine mammals ('no adverse impacts') also have proved far too optimistic.

While the exact toll on the Gulf's wildlife may never be known, the effects clearly have been devastating.

More than 400 oiled birds have been treated, while dozens have been found dead and covered in crude, mainly in Louisiana but also in Mississippi, Alabama and Florida.  More than 200 lifeless turtles, several dolphins and countless fish also have washed ashore.

The response plans anticipate nothing on this scale.  There weren't supposed to be any coastline problems because the site was far offshore.

"Due to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected," the site plan says.

*       *       *

Perhaps the starkest example of BP's planning failures:  The company has insisted that the size of the leak doesn't matter because it has been reacting to a worst-case scenario all along.

Yet each step of the way, as the estimated size of the daily leak has grown from 42,000 gallons to 210,000 gallons to perhaps 1.8 million gallons, BP has been forced to scramble to create potential solutions on the fly, to add more boats, more boom, more skimmers, more workers.  And containment domes, top kills, top hats.

While a disaster as devastating as a major oil spill will create unforeseen problems, BP's plans do not anticipate even the most obvious issues, and use mountains of words to dismiss problems that have proven overwhelming.

## 2.      BP's Failed Use of Unprecedented Amounts of Dispersant

280.    BP's extensive and potentially problematic use of dispersants further demonstrated its lack of preparedness to respond to the spill.

281.    On April 22, 2010, BP began spraying massive amounts of dispersants – namely "Corexit" – on the oil that had reached the surface of the Gulf of Mexico.  Dispersants such as Corexit are not intended to remove oil from the water; rather, energy from wind and waves naturally disperses oil – and dispersants may accelerate the process by allowing the oil to mix with water more easily, dispersing the oil vertically and horizontally in the water column.

282.    However, dispersants pose several serious health and environmental threats.  For example, dispersants – including Corexit – decrease the amount of oil on the surface of the water, but *increase* the amount of oil in the water column.  Corexit therefore enables the oil to spread over a wider area, significantly increasing the exposure of marine life to toxic chemicals and oil.  In addition, chemically dispersed oil can be toxic not just in the short term, but also over the long term.  Accordingly, the decision to engage in the wide-spread use of dispersants must be carefully considered, particularly given the fact that studies have found that dispersants may not increase biodegradation rates and might even *inhibit* biodegradation.

283.    Furthermore, Corexit is a chemical dispersant that contains 2-butoxy ethanol.  According to the New Jersey Department of Health, 2-butoxy ethanol "may be a carcinogen in humans.  There may be no safe level of exposure to a carcinogen, so all contact should be reduced to the lowest possible level."   BP's OSRP for the GOM makes no mention of this serious side effect.

284.    Between April 22, 2010 and April 26, 2010, BP and its subcontractors applied 14,654 gallons of Corexit to the surface of the Gulf of Mexico.  Then, from April 27, 2010 to May 3, 2010, BP and its subcontractors applied another 141,358 gallons of Corexit to the surface of the Gulf of Mexico.  The following week, they applied an additional 168,988 gallons of Corexit to the surface of the Gulf of Mexico.  The Presidential Commission found that BP's extreme use of Corexit was "novel" and had never been used in these "unprecedented volumes."  The Presidential Commission stated that while oil spill "responders had often deployed dispersants to respond to spills" it had "never" been done "in such volumes; during the Exxon Valdez spill, responders sprayed about 5,500 gallons [of dispersants], and that use was controversial."

285.    As the volume of dispersants sprayed on the surface grew dramatically, BP then raised the idea of applying dispersants directly at the well.  Once again, however, the Presidential Commission found that oil spill responders "had never before applied dispersants in the deep sea" and "responders were concerned about the absence of information of the effects of dispersants in the deepwater environment.  No federal agency had studied subsea dispersant use and private studies had been extremely limited."

286.    Because no federal agency had ever allowed the subsea release of dispersants in a deepwater environment, on May 10, 2010, the Coast Guard and EPA prohibited its use "until initial testing demonstrates the effectiveness of subsurface dispersant application."  Then, during a May 24, 2010 press conference, EPA Administrator Lisa Jackson announced that the government was instructing BP to "take immediate steps to significantly scale back the overall use of dispersants" and expressed EPA's belief that BP "can reduce the amount of dispersant applied by as much as half, and I think probably 75 percent, maybe more."  Based on the unknown and highly risky side effects of dispersants, on May 26, 2010, the Coast Guard and EPA issued a joint letter and directive stating, in part, as follows:

> Reduction in Use of Dispersants.  BP shall implement measures to limit the total amount of surface and subsurface dispersant applied each day to the minimum amount possible.  *BP shall establish an overall goal of reducing dispersant application by 75%* from the maximum daily amount used as follows:
>
> a.    Surface Application.  *BP shall eliminate the surface application of dispersants.*  In rare cases when there may have to be an exemption, BP must make a request in writing to the [Federal On Scene Coordinator ("FOSC")] providing justification which will include the volume, weather conditions, mechanical or means for removal that were considered and the reason they were not used, and other relevant information to justify the use of surface application.  The FOSC must approve the request and volume of dispersant prior to initiating surface application.
>
> b.    Subsurface Application.  *BP shall be limited to a maximum subsurface application of dispersant of not more than 15,000 gallons in a single calendar day.*  Application of dispersant in amounts greater than specified

in this Addendum 3 shall be in such amounts, on such day(s) and for such application (surface or subsurface) only as specifically approved in writing by the FOSC.

287.    "Despite this directive," as the Presidential Commission noted, "surface use of dispersants continued."  While BP did seek exemptions from the directive, the "EPA expressed frustration that BP sought regular exemptions, and it repeatedly asked for more robust explanations of why BP could not use mechanical recovery methods, such as skimming and burning, instead of dispersants."  On July 14, 2010, the EPA ultimately prohibited the use of dispersants altogether.

### 3.    BP's Failed Use of a Cofferdam

288.    Knowing that dispersants would be unable to significantly lessen the environmental catastrophe, BP began to theorize other ways that it might be able to contain and/or recover the spewing oil.  BP's new idea – noticeably absent from BP's Oil Spill Response Plan – was to place a large containment dome (or "cofferdam") over the larger of the two leaks, with a pipe at the top channeling oil and gas to a ship on the surface of the Gulf of Mexico, the *Discoverer Enterprise*.  BP had several cofferdams already, but those had been designed, and had only been utilized, in shallow water scenarios and had never been tested in a similar deepwater environment.  Thus, BP was forced to quickly attempt to modify one of its existing cofferdams for these new and unintended purposes.  The modification of the preexisting cofferdam was complete on or about May 4, 2010.  BP began its attempt to place the 98-ton dome on the sea floor late in the evening of May 6, 2010.

289.    It was essentially guaranteed that the *ad hoc* modifications that were hurriedly made to the cofferdam would be unsuccessful.  In his book on the *Deepwater Horizon* incident published in late 2010, *Disaster on the Horizon*, former drilling engineer Bob Cavnar ("Cavnar") described the initial containment dome effort as the "silliest contraption" that BP built in the

aftermath of the incident, and explained that BP's efforts to construct and lower it down to the leaking BOP "never made much sense . . . they were more for show – to look like they were doing something while they were trying to come up with a real plan."  Cavnar stated in an interview that the cofferdam was "destined to fail" due to the "scientific certainty" that gas hydrates would immediately form in the device and clog it, and describes in his book the results of its deployment as "almost instantaneous failure."

290.    Likewise, the Presidential Commission noted:

BP's Suttles publicly cautioned that previous successful uses had been in much shallower water.  BP recognized that chief among potential problems was the risk that methane gas escaping from the well would come into contact with cold sea water and form slushy hydrates, essentially clogging the cofferdam with hydrocarbon ice.  Notwithstanding the uncertainty, BP, in a presentation to the leadership of the Department of Interior, described the probability of the containment dome's success as "Medium/High."   Others in the oil and gas industry were not so optimistic.  Many experts believed the cofferdam effort was very likely to fail because of the hydrates.

291.    Not surprisingly, the effort did fail.  Hydrates accumulated during the installation of the dome, yet BP only had a plan to deal with hydrates once the cofferdam was in place.  Thus, when crews started to maneuver the cofferdam into position on May 7, 2010, hydrates formed before they could even place the dome over the leak, immediately clogging the opening through which oil was to be funneled.  This error in planning almost led to another catastrophe.  As noted by the Presidential Commission:

Because hydrocarbons are lighter than water, the containment dome became buoyant as it filled with oil and gas while BP tried to lower it.  BP engineers told [the Company's Vice President overseeing the project Richard] Lynch that they had "lost the cofferdam" as the dome, full of flammable material, floated up toward the ships on the ocean surface.  Averting a potential disaster, the engineers were able to regain control of the dome and move it to safety on the sea floor.  In the wake of the cofferdam's failure, one high-level government official recalled Andy Inglis, BP's Chief Executive Officer of Exploration and Production, saying with disgust, "If we had tried to make a hydrate collection contraption, we couldn't have done a better job."

292.    In the days after the failure of the cofferdam, BP temporarily utilized a device known as a "riser insertion tube" to collect some of the oil.  However, BP abandoned the effort after only a few days because of the relatively minor amount of oil the device actually managed to collect.

### 4.    BP's Failed "Top Kill" and "Junk Shot" Efforts

293.    Following the failure of the cofferdam experiment, BP tried to stop the flowing oil by embarking on so-called "top kill" and "junk shot" efforts.  Both methods are industry techniques that have been historically applied to stop the flow of oil from a blown-out well.

294.    BP, like the rest of the oil industry, was well aware of the *Ixtoc I* oil spill of 1979, in which a rig exploded, caught fire, sank, killed workers, and released millions of gallons of oil into the Gulf of Mexico.  In the *Ixtoc* spill, the same two techniques were attempted and it took approximately 290 days to bring that well under control.  BP's Oil Spill Response Plan made no mention of having to rely on either of these methods let alone provide any qualification as to how effective each method might be in a similar circumstance.  Further, the Presidential Commission noted that neither technique "had ever been used in deepwater."  In the end, both efforts failed to control the proliferation of oil from the Macondo well.

295.    A top kill – also known as a momentum or dynamic kill – involves pumping heavy mud into the top of the well through the BOP's choke and kill lines, at rates and pressures high enough to force escaping oil back down the well and into the reservoir.  A junk shot complements a top kill and involves pumping material (including pieces of tire rubber and golf balls) into the bottom of a BOP through the choke and kill lines.  That material is supposed to get caught on obstructions within the BOP and impede the flow of oil and gas.  By slowing or stopping the flow of oil, a successful junk shot makes it easier to execute a top kill.

296.     BP's top kill and junk shot plan began on the afternoon of May 26, 2010.  In this regard, the Presidential Commission concluded, in relevant part, as follows:

> As with the cofferdam, BP struggled with public communications surrounding the top kill.  At the time, both industry and government officials were highly uncertain about the operation's probability of success.  One MMS employee estimated that probability as less than 50 percent, while a BP contractor said that he only gave the top kill a "tiny" chance to succeed.  But BP's Hayward told reporters, "We rate the probability of success between 60 and 70 percent."

297.     During three separate attempts over the next three days, BP pumped mud at rates exceeding 100,000 barrels per day and fired numerous shots of "junk" into the BOP.  After the third unsuccessful attempt, BP acknowledged that the plan was a failure.  BP's explanation of the failed attempts focused on the well's 16-inch casing, the outermost barrier between the well and the surrounding rock for more than 1,000 vertical feet.  That casing was fabricated with three sets of weak points, or "rupture disks."  During the well's production phase, the hot oil coursing through the production casing, which is inside the 16-inch casing, would lead to a buildup of pressure in the well.  If the pressure buildup was too high, it could cause the collapse of one of the two casings.  The disks were designed to rupture and relieve this potential buildup of pressure before a casing collapsed.  According to BP, pressures created by the initial blowout could have caused the rupture of disks to collapse inward, compromising the well's integrity.

298.     The Presidential Commission, however, disagreed with BP's explanation and found, in part, that the "[c]ollapse of the rupture disks was only one of BP's possible explanations for the unsuccessful top kill.  But the company presented it to the government as the most likely scenario."  Indeed, the United States government noted that it "did not fully accept BP's analysis of what happened" and, in contrast, believed that "the top kill likely failed because the rate at which oil was flowing from the well was many times greater than the then-current 5,000 barrels-per day estimate.  Because BP did not pump mud into the well at a rate high

enough to counter the actual flow, oil and gas from the well pushed mud back up the BOP and out of the riser."

### 5.  BP's "Top Hat" Fails to Collect the "Vast Majority" of the Oil

299.    In the aftermath of the failed top kill and junk shot plan, BP began shifting its main focus to collecting the oil rather than killing the well itself.   On May 29, 2010, BP announced that it would attempt to cut off the portion of the riser still attached to the top of the BOP and install a collection device – or "top hat," which would then be connected via a new riser to the *Discoverer Enterprise* vessel.   As before, BP's Oil Spill Response Plan failed to mention the top hat technique as a potential remedy in the event of an oil spill.   BP began installing the top hat on June 1, 2010 and had it in place by 11:30 p.m. on June 3, 2010.   By June 8, 2010 – 49 days after the explosion occurred – the *Discoverer Enterprise* was collecting about 15,000 barrels of oil per day – or approximately 25% of the oil being released.

300.    BP also developed a system to bring oil and gas to the surface through the choke line on the BOP.   More specifically, BP outfitted a vessel called the *Q4000* with collection equipment, including an oil and gas burner imported from France.   This vessel and resource was also never mentioned in BP's Oil Spill Response Plan.

301.    While BP was able to slowly start collecting some of the oil, BP was once again, in the words of the Presidential Commission, "overly optimistic about the percentage of the oil it could remove or collect."   Indeed, the Presidential Commission found, in part, as follows:

> On June 1, Suttles said that he expected the top hat, when connected to the *Discoverer Enterprise*, to be able to collect the "vast majority" of the oil. Within days, it became apparent that the top hat and *Discoverer Enterprise* were inadequate.  On June 6, Hayward told the BBC that, with the *Q4000* in place, "we would very much hope to be containing the vast majority of the oil."  But when the *Q4000* came online in mid-June, the two vessels' joint capacity of 25,000 barrels per day was still insufficient.

302.    In the wake of the failure to contain most of the oil using the top hat, the Coast Guard continued questioning BP's response to the spill.   As noted by the Presidential Commission:

> BP's Lynch said that the speed at which the company brought capacity online was limited solely by the availability of dynamically positioned production vessels.[2] One senior Coast Guard official challenged BP's definition of availability:  he suggested that BP did not consider options such as procuring ships on charter with other companies until the government pushed it to do so.   Obtaining another production vessel might have enabled BP to collect oil through the BOP's kill line at a rate comparable to that of the *Q4000*.

### 6.    Macondo Is Finally Capped

303.    Following the limited success of the top hat procedure, BP began presenting its final well-control plans to government experts.   According to the Presidential Commission Report:

> [Government] science advisors would question BP's assumptions, forcing it to evaluate worst-case scenarios and explain how it was mitigating risk.   The government saw its pushback as essential because BP would not, on its own, consider the full range of possibilities.   According to one senior government official, before the increased supervision, BP "hoped for the best, planned for the best, expected the best."   [Paul] Tooms, BP's Vice President of Engineering, believed that the government science advisors unnecessarily slowed the containment effort, arguing that scientists consider risk differently than engineers and that BP had expertise in managing risk.   BP, however, was not in the best position to tout that expertise: its well had just blown out.

304.    By late June, BP was working towards deploying a "capping stack," yet another *post hoc* measure nowhere reflected in BP's OSRP for the GOM.   The capping stack was essentially a smaller version of a BOP, designed to sit atop the BOP and stop the flow of oil and gas.

---

[2]  Dynamically positioned vessels have computer-controlled systems that maintain the vessel's exact position and direction, despite external factors such as wind, waves, and current.

305.    On July 9, 2010, Coast Guard Admiral Thad Allen ("Admiral Allen") authorized BP to install the capping stack, but not to close it.  Sealing the capping stack would increase the pressure in the well.  There was a concern that if one or more of the rupture disks had in fact ruptured, the increased pressure could force hydrocarbons into the surrounding formation, leading to uncontrolled eruptions from the ocean floor at other locations.

306.    The installation of the capping stack was completed on July 12, 2010.  The next day, experts conducted a "well integrity test" to determine if the well had been compromised and to see whether oil could flow into the rock formation.   According to the Presidential Commission, "[t]he test was to last from 6 to 48 hours, and BP had to monitor pressure, sonar, acoustic, and visual data continuously, as recommended by the [United States government's] Well Integrity Team."

307.    On July 15, 2010, after a 24-hour delay to repair a leak, BP shut the capping stack and began the well integrity test.  For the first time in 87 days – and after approximately 5 million barrels of oil had already seeped into the Gulf of Mexico – the well had finally stopped spewing oil.  Unfortunately, by that time, the vast environmental damage had already occurred and, as noted by *The New York Times* on August 6, 2010, "BP's containment efforts had captured only approximately 16 percent of the spill."

308.    Meanwhile, on July 19, 2010, BP publicly raised the possibility of actually killing the well through a procedure called a "static kill."  Like the top kill, the static kill involved pumping heavy drilling mud into the well in an effort to push oil and gas back into the reservoir.  However, because the oil and gas were already static, the pumping rates required for the static kill to succeed were far lower than the top kill.  The United States government approved the static kill procedure on August 2, 2010.  By 11:00 p.m. on August 3, 2010, the static kill

appeared to have worked.  On August 8, 2010, Admiral Allen reported that the cement had been pressure-tested and was holding.

309.     In mid-September 2010, the first relief well – which BP had begun to drill in early May – finally intercepted the Macondo well, allowing BP to pump in cement and permanently seal the reservoir.  Thus, on September 19, 2010 – 152 days after the blowout, and after 206 million gallons of crude oil had spilled into the Gulf of Mexico – the United States government finally announced that "the Macondo 252 well is effectively dead."

## VIII.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

310.     All of the misrepresentations alleged herein were sustained in whole or in part by the Court's Order dated December 5, 2013.  *See In re BP plc Sec. Litig.*, Civil Action No. 4:10-md-02185 (S.D. Tex.) (ECF No. 706); *Alameda Cnty. Emp. Ret. Ass'n v. BP plc, et al.*, Civil Action No. 4:12-cv-1256 (S.D. Tex.) (ECF No. 100).

311.     Whenever any of the following false and misleading statements is attributed to any one or more of the Individual Defendants, it is attributable also to Defendant BP, as well as to BP subsidiaries – Defendants BP America and/or BP E&P (whichever employed the Individual Defendant speaking).

### A.     Defendants' False And Misleading Statements And Omissions Concerning BP's Progress On Implementing Claimed Safety Improvements, Including OMS Scope And Implementation

312.     Before the start of the Relevant Period, BP experienced a series of high-profile safety lapses that resulted in the loss of life, damage to the environment, harm to BP's reputation, and significant costs to BP in the form of criminal guilty pleas and fines, civil settlements, and remediation expenses.  In particular, the 2005 Texas City refinery explosion and the 2006 Alaska oil spills were extremely damaging to BP and left BP investors and the market concerned about the Company's ability to operate safely and without catastrophic failures.

313.     Responding to these concerns, BP sought to assure investors that it was a company committed to ensuring safe operations through the implementation of the Baker Panel recommendations and, in particular, its process safety system, OMS.   BP reaffirmed this commitment at nearly every opportunity throughout the Relevant Period.  In fact, in May 2009, Hayward lamented that he had "got so bored with saying 'safety, people, and performance,'" but nevertheless continued  this refrain because he was "determined that [he was] not going to say anything else."  This public commitment to right BP's past wrongs was touted as a sea change in BP's operations.

314.     Specifically, Defendants, as detailed below, represented:  (1) that BP had made concrete, purported progress on the safety reforms proposed in the Baker Report; and (2) that OMS, the cornerstone of such purported progress and safety reforms (a) would apply to all of BP's operations, including the Gulf of Mexico, and (b) had in fact been implemented by year-end 2008 in BP's Gulf of Mexico operations.  BP's Gulf of Mexico operations were one of BP's most important assets.   Indeed, throughout the Relevant Period, BP consistently touted its operations in the deepwater Gulf of Mexico, a region that had become one of the most important areas of production for the Company and which BP hailed as a "profit centre" and a "high margin" production area.

315.     In fact, however, BP had continued to operate deepwater drilling operations, including in the Gulf of Mexico, in the same unsafe manner as before, largely untouched by any progress on process safety reforms or, indeed, by BP's OMS.  This created undisclosed risks of a catastrophic system failure, which was ultimately realized when the *Deepwater Horizon* exploded and oil began to spew from the Macondo well.  The explosion and its aftermath revealed, among other things, that BP never committed to developing effective safety protocols

and systems through OMS on rigs that BP did not fully-own, had not completed OMS in the Gulf of Mexico as it had claimed, and did not have procedures in place that would guide its employees through best practices to avoid an otherwise preventable spill or to contain a spill, should one occur.

### 1.    The November 8, 2007 False and Misleading Statements

316.    On November 8, 2007, Hayward spoke at the Houston Forum about BP's implementation of the Baker Panel recommendations.  During his presentation, Hayward stated, in part, as follows:

> *We continue to implement the roadmap provided to ourselves and the industry by the excellent work of the Baker Panel*.  BP remains absolutely committed to taking these lessons and becoming a world leader in process safety.

317.    The foregoing misrepresentation, which caused BP securities to trade at artificially inflated prices, was materially false or misleading when made, and was known by Hayward to be false at that time, or was made with reckless disregard for the truth, for the following reasons, among others:  Hayward misled investors about BP's implementation of the Baker Panel's recommendations because he falsely represented BP's intention to implement the policies, procedures, and recommendations detailed in the Baker Report.

### 2.    The February 22, 2008 False and Misleading Statements

318.    On February 22, 2008, BP released its 2007 Annual Review, which BP made available to the investing public on its official website.  The 2007 Annual Review contained the "Group chief executive's review."   In his Executive Review, Hayward stated that, under his leadership, safety was BP's top priority.  For example, Hayward stated, in part, as follows: [w]hen I took over as group chief executive, the immediate task was to restore the integrity and the efficiency of BP's operations.  *I set out three priorities: safety, people and performance."*

319.    The foregoing misrepresentation, which caused BP Shares to trade at artificially inflated prices, was materially false or misleading when made, and was known by Hayward to be false at that time, or was made with reckless disregard for the truth, for the following reason, among others:  Hayward misled investors with regard to BP's efforts to "restore the integrity and the efficiency of BP's operations," which supposedly was to be achieved by implementing the Baker Panel's recommendations.   Defendants' repeated statements falsely represented BP's intention to implement the policies, procedures, and recommendations detailed in the Baker Report.

### 3.    The February 27, 2008 False and Misleading Statements

320.    On February 27, 2008, BP conducted its 2008 Strategy Presentation during a conference call with investors and analysts, in which Hayward participated, and, represented:

> Notwithstanding this track record *our intense focus on process safety continues. We are making good progress in addressing the recommendations of the Baker Panel and have begun to implement a new Operating Management System across all of BP's operations.*  Integrity related incidents have fallen significantly over the last three years and oil spills of more than one barrel continue a strong downward trend.
>
> Safe and reliable operations remain our number one priority.

321.    The foregoing misrepresentations, which caused BP Shares to trade at artificially inflated prices, were each materially false or misleading when made, and were known by Hayward to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

a.    Hayward misled investors with regard to BP's implementation of the Baker Panel's recommendations because Defendants' repeated statements falsely represented BP's intention to implement and actual progress in implementing the policies, procedures, and recommendations detailed in the Baker Report; and

b.      Hayward misrepresented that BP was implementing OMS "across all of BP's operations" when, in fact, OMS applied only to rigs that BP fully owned, but not to BP's operations where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of Mexico.

### 4.      The March 4, 2008 False and Misleading Statements

322.    On March 4, 2008, BP filed its 2007 Annual Report with the SEC on Form 20-F, signed by Defendant Hayward.  In the 2007 Annual Report, BP stated:

> *Throughout 2007, BP continued to progress the process safety enhancement programme initiated in response to the March 2005 incident at the Texas City refinery.  We worked to implement the recommendation of the BP US Refineries Independent Safety Review Panel (the panel), which issued its report on the incident in January 2007 (see* [www.bp.com/bakerpanelreport](www.bp.com/bakerpanelreport)*).  We have made material progress throughout the group across all of the panel's 10 recommendations.*

323.    The foregoing misrepresentations, which caused BP Shares to trade at artificially inflated prices, were each materially false or misleading when made, and were known by BP and Hayward to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

a.      Hayward misled investors with regard to BP's implementation of the Baker Panel's recommendations because Defendants' repeated statements falsely represented BP's intention to implement and actual progress in implementing the policies, procedures, and recommendations detailed in the Baker Report; and

b.      Hayward misrepresented that BP had made "material progress throughout the group" with respect to all of the Baker Panel recommendations when, in fact, BP was applying and implementing OMS only to rigs that BP fully owned, but not to BP's operations where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of Mexico.

### 5.    The April 17, 2008 False and Misleading Statements

324.    On April 17, 2008, Hayward and BP Chairman Peter Sutherland delivered speeches at BP's 2008 Annual General Meeting.  BP posted transcripts of their speeches on its publicly-accessible website.  In his speech, Hayward again asserted that safety was of the utmost importance at BP and distinguished BP from other oil companies based on its deepwater operations.  In particular, Hayward stated:

> When I took over as chief executive last May, I said that we would focus on three basic priorities:  safety, people, and performance.  Everyone at BP understands those priorities.  And while I am in this role they will remain the priorities.

> Safety is our number one priority and in 2007 our overall safety record continued to improve.  Over the last eight years our safety performance according to the standard industry measure has improved threefold and is now among the best in our industry.

> *Our intense focus on process safety continues.  We are making good progress in addressing the recommendations of the Baker Panel and have begun to implement a new Operating Management System across all of BP's operations.*  This is aimed at ensuring that our operations across the world look and feel the same everywhere – and perform to the same high standard.

325.    On April 17, 2008, BP filed with the SEC on Form 6-K an "Address to Shareholders at The Annual General Meeting of BP plc on April 17, 2008," which contained the misleading statements set forth above.

326.    The foregoing misrepresentations, which caused BP Shares to trade at artificially inflated prices, were each materially false or misleading when made, and were known by Hayward to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

a.    Hayward misled investors with regard to BP's implementation of the Baker Panel's recommendations because Defendants' repeated statements falsely represented

BP's intention to implement and actual progress in implementing the policies, procedures, and recommendations detailed in the Baker Report; and

       b.     Hayward misrepresented that BP was implementing OMS "across all of BP's operations" when, in fact, OMS applied only to rigs that BP fully owned, but not to BP's operations where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of Mexico.

### 6.     The December 17, 2008 False and Misleading Statements

327.    On December 17, 2008, Hayward gave a speech at the HRH Prince Of Wales's 3rd Annual Accounting for Sustainability Forum.  BP posted a transcript of the speech on its accessible website. In his speech, Hayward claimed that BP was continuing to improve its process safety practices, representing:

> BP had a number of high-profile safety lapses in recent years, notably at our Texas City refinery, where there was tragic and unacceptable loss of life.

> These lapses exposed shortcomings – but they also gave us a huge opportunity to learn and improve the way we operate.  *We opened ourselves up to scrutiny – and we listened more to our front-line operations people – who, of course, really know what is going on on the ground.  And we have continuously reported progress against a response plan and against an independent external report.*

> *One of the many consequences for us has been to develop and to embed a new Operating Management System right across BP* – and we operate in 100 countries – so that is no mean feat.

328.    The foregoing misrepresentations, of consistent progress in safety processes, a potent OMS, and thus, safe, reliable, and responsible deep sea drilling operations, which caused BP Shares to trade at artificially inflated prices, were each materially false or misleading when made or included material omissions, and were known by Hayward to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

a.     An internal BP strategy document issued in December 2008 warned BP executives of "major" process-safety concerns in the Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents and therefore, increased the likelihood and severity of "process-safety related incidents"; and

b.     Hayward misled investors with regard to BP's implementation of the Baker Panel's recommendations because Defendants' repeated statements falsely represented BP's intention to implement and actual progress in implementing the policies, procedures, and recommendations detailed in the Baker Report.

### 7.     The February 24, 2009 False and Misleading Statements

329.     On February 24, 2009, BP issued its 2008 Annual Review, which the Company made available to the investing public and Plaintiffs on its website.  The 2008 Annual Review repeatedly assured investors of BP's supposed continuing commitment to safety.  For example, the 2008 Annual Review contained the "Group chief executive's review," in which Hayward asserted that safety was BP's "number one priority" and discussed the "safe and reliable" Gulf of Mexico operations.  Specifically, Hayward stated:

Q:  At the start of the year what priorities did you set out for BP?

Safety, people and performance, and these remain our priorities.  Our number one priority was to do everything possible to achieve safe, compliant and reliable operations.  Good policies and processes are essential but, ultimately, safety is about how people think and act.  That's critical at the front line but it is also true for the entire group.  Safety must inform every decision and every action.  *The BP operating management system (OMS) turns the principle of safe and reliable operations into reality by governing how every BP project, site, operation and facility is managed.*

\*        \*        \*

Q:  How did Exploration and Production perform?

It was an excellent year, with major projects such as Thunder Horse in the Gulf of Mexico and Deepwater Gunashli in Azerbaijan coming onstream.  That, together

with safe and reliable performance from our existing operations, contributed to underlying production growth – in contrast to the falling output of our major competitors – and more than compensated for the effects of Hurricanes Ike and Gustav and other operational issues.

330.     The foregoing misrepresentations, which caused BP Shares to trade at artificially inflated prices, were each materially false or misleading when made, and were known by BP and Hayward to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

a.     Hayward misrepresented that OMS governed "how every BP project, site, operation and facility is managed" when, in fact, OMS applied only to rigs that BP fully owned, but not to BP's operations where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of Mexico; and

b.     An internal BP strategy document issued in December 2008 warned GORC members, including Hayward, that there were "major" process-safety concerns in the Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents and therefore increased the likelihood and severity of "process-safety related incidents."

### 8.     The March 4, 2009 False and Misleading Statements

331.     On March 4, 2009, BP filed its 2008 Annual Report with the SEC on Form 20-F, signed by Hayward.   In the 2008 Annual Report, BP misrepresented the scope and implementation of its OMS, BP's marquee process safety initiative, and made numerous false statements about its supposed safe practices and the quality of its deepwater Gulf of Mexico operations.   Specifically, BP misrepresented that eight sites, including the Gulf of Mexico, had "completed the transition to OMS in 2008."

332.     The Form 20-F stated, in part, as follows:

We continue to implement our new *operating management system (OMS), a framework for operations across BP that is integral to improving safety and operating performance in every site.*

When fully implemented, OMS will be the single framework within which we will operate, consolidating BP's requirements relating to process safety, environmental performance, legal compliance in operations, and personal, marine and driving safety. . . .  The OMS establishes a set of requirements, and provides sites with a systematic way to improve operating performance on a continuous basis.   BP businesses implementing OMS must work to integrate group requirements within their local system to meet legal obligations, address local stakeholder needs, reduce risk and improve efficiency and reliability.  A number of mandatory operating and engineering technical requirements have been defined within the OMS, to address process safety and related risks.

All operated businesses plan to transition to OMS by the end of 2010.  *Eight sites completed the transition to OMS in 2008;* two petrochemicals plants, Cooper River and Decatur, two refineries, Lingen and Gelsenkirchen and four Exploration and Production sites, North America Gas, *the Gulf of Mexico,* Colombia and the Endicott field in Alaska. . . .   For the sites already involved, implementing OMS has involved detailed planning, including gap assessments supported by external facilitators.  A core aspect of OMS implementation is that each site produces its own 'local OMS', which takes account of relevant risks at the site and details the site's approach to managing those risks.  As part of its transition to OMS, a site issues its local OMS handbook, and this summarizes its approach to risk management.  Each site also develops a plan to close gaps that is reviewed annually.  The transition to OMS, at local and group level, has been handled in a formal and systematic way, to ensure the change is managed safely and comprehensively.

Experience so far has supported our expectation that having one integrated and coherent system brings benefits of simplification and clarity, and that the process of change is supporting our renewed commitment to safe operations.

\* \* \*

- Executive management has taken a range of actions to demonstrate their leadership and commitment to safety.  The group chief executive has consistently emphasized that safety, people, and performance are our top priority, a belief made clear in his 2007 announcement of a forward agenda for simplification and cultural change in BP.  Safety performance has been scrutinized by the Group Operations Risk Committee (the GORC), chaired by the group chief executive and tasked with assuring the group chief executive that group operational risks are identified and managed appropriately. . . .

333.   The foregoing misrepresentations, which caused BP Shares to trade at artificially inflated prices, were each materially false or misleading when made, and were known by BP and Hayward to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

a.   Hayward signed the certification statement for the foregoing statement and, as the Chairman of GORC, was ultimately responsible and charged with oversight and implementation of OMS;

b.   Hayward testified that he knew OMS was not implemented in the Gulf of Mexico in 2008, that he knew the Gulf of Mexico would not "beg[i]n the process of cutover to OMS" until Fall 2009, and that OMS had not even been implemented in the Gulf of Mexico as of April 2010.  Other BP personnel, including GORC member John Baxter, testified that OMS had not even been implemented in the Gulf of Mexico as of April 2010;

c.   BP conceded the falsity of this statement at the hearing on Defendants' motions to dismiss the Class Complaint on November 4, 2011;

d.   Approximately one month prior to publication of BP's 2008 Annual Report, Hayward received a report directly from Inglis confirming that the Gulf of Mexico had not completed the transition to OMS by the conclusion of 2008;

e.   An internal BP strategy document issued in December 2008 warned GORC members, including Hayward, that there were "major" process-safety concerns in the Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents and therefore increased the likelihood and severity of "process-safety related incidents";

f.   Hayward testified that he knew that process safety was an integral part of OMS, and that the purpose of OMS was to prevent major accidents, such as the blowout that

124

occurred on the *Deepwater Horizon* on April 20, 2010.  He also testified that he knew that the risk of a deepwater blowout was "one of the highest risks" facing BP, and the "highest risk in the Gulf of Mexico."  Moreover, Hayward testified that, had OMS been implemented in the Gulf of Mexico, OMS "undoubtedly" had the potential to avoid the *Deepwater Horizon* disaster;

g.  Hayward misrepresented that OMS was a "common" system that applied as a "single operating framework" to "all BP operations" and would be "adopted by all operating sites," when, in fact, OMS applied only to rigs that BP fully owned, but not to BP's operations where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of Mexico;

h.  According to CW2, by 2009 and 2010, BP's OMS lagged far behind the safety programs of its industry peers, was still in its pilot phase, and had yet to be fully implemented in the Gulf of Mexico (and was not implemented on the *Deepwater Horizon*). Moreover, employees in key positions in Gulf of Mexico operations had no knowledge of OMS requirements; and

i.  Defendants failed to disclose or indicate the following:  (1) BP had inadequate safety procedures in place for its Gulf of Mexico operations; (2) BP conducted its operations in the Gulf of Mexico without any legitimate oil spill response plan; (3) BP understated the risks of its Gulf of Mexico operations while overstating its ability to extract oil from the Gulf of Mexico; and (4) BP lacked adequate internal safety and risk management controls.

### 9.  The April 16, 2009 False and Misleading Statements

334.  On April 16, 2009, BP issued its 2008 Sustainability Review, which BP made available to the investing public on its website, containing a "Group Chief executive's review" with remarks by Hayward, who stated:

> You can see a similar balanced approach in our new *operating management system (OMS), which is to be implemented at each BP site.* It covers everything from compliance and risk management through to governance and measuring results.

335.   The foregoing misrepresentation, which caused BP Shares to trade at artificially inflated prices, was materially false and misleading when made, and was known by Hayward to be false at that time, or was made with reckless disregard for the truth, for the following reason, among others:   Hayward misrepresented that BP was implementing OMS "at each BP site" when, in fact, OMS applied only to rigs that BP fully owned, but not to BP's operations where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of Mexico.

### 10.      The February 26, 2010 False and Misleading Statements

336.   On February 26, 2010, BP issued its 2009 Annual Review, which the Company made available to the investing public on its website and subsequently filed with the SEC on Form 20-F.   In the 2009 Annual Review, BP made misrepresentations concerning the scope of OMS.   Specifically, in a section entitled "Sustaining momentum and growth," BP acknowledged that its safety protocols were material to investors by including a separate section on safety entitled "Safety, reliability, compliance and continuous improvement," and stated:

> Safe, reliable and compliant operations remain the group's first priority. A key enabler for this is the BP *operating management system (OMS), which provides a common framework for all BP operations,* designed to achieve consistency and continuous improvement in safety and efficiency.   Alongside mandatory practices to address particular risks, *OMS enables each site to focus on the most important risks in its own operations and sets out procedures on how to manage them in accordance with the group-wide framework.*

337.   The foregoing misrepresentations, which caused BP Shares to trade at artificially inflated prices, that BP's OMS "provides a common framework for *all* BP operations" and "enables *each site* to focus on the most important risks in its own operations and sets out

procedures on how to manage them in accordance with the group-wide framework" were each materially false or misleading when made, and/or failed to disclose material facts necessary to make the statements not misleading, for the following reasons, among others:

a.     Because the 2009 Annual Review was "material to be placed before shareholders which addresses environmental, safety and ethical performance," SEEAC was required to review the 2009 Annual Review and make recommendations to the board concerning its adoption and publication;

b.     Hayward testified that he knew OMS was not fully implemented in the Gulf of Mexico in 2008 or at the time of the *Deepwater Horizon* disaster.  Other BP personnel, including GORC member John Baxter, testified that OMS was not implemented in the Gulf of Mexico as of April 2010;

c.     BP conceded the falsity of such statements on November 4, 2011, *see* MTD Tr. at 58:15-21;

d.     As of the date of this statement, OMS applied to only one drilling rig out of the seven drilling rigs in the Gulf of Mexico, the BP-owned *Thunder Horse*.  Moreover, Hayward and Inglis knew, or were reckless in not knowing, that contracted drilling rigs without OMS accounted for the majority of deepwater wells drilled in the Gulf of Mexico – which were the chief economic driver for BP E&P – during the Relevant Period;

e.     Hayward and Inglis (and other GORC members) made the decision not to apply key elements of OMS, including Safety and Operations Audits and Major Accident Risk analysis, to Gulf of Mexico joint ventures and Gulf of Mexico exploration, including the *Deepwater Horizon*, *see* Armstrong Dep. 207:20-208:18;

f.      According to CW2, by 2009 and 2010, BP's OMS lagged far behind the safety programs of its industry peers, was still in its pilot phase, and had yet to be fully implemented in the Gulf of Mexico (and was not implemented on the *Deepwater Horizon*). Moreover, employees in key positions in Gulf of Mexico operations had no knowledge of OMS requirements;

g.      Key personnel in the Gulf of Mexico (David Sims, David Rich, Patrick O'Bryan) lacked the knowledge, experience and expertise of those they were replacing (Ian Little, Harry Thierens, and Kevin Lacy), and as such BP's OMS implementation in the Gulf of Mexico was disorganized and incomplete; and

h.      A 2009 rig audit of the *Deepwater Horizon* revealed that not all relevant personnel on the rig were knowledgeable about drilling and well operation practices and rig crew members were not knowledgeable about well operation practices, including containing a blowout.

**11.      The March 5, 2010 False and Misleading Statements**

338.    On March 5, 2010, BP filed its 2009 Annual Report with the SEC on Form 20-F, which was signed by Hayward.  In its 2009 Annual Report, BP continued to tout its position as the largest producer of oil in deepwater Gulf of Mexico while delivering safety in its operations. In addition, the Form 20-F stated:

> Safe, reliable and compliant operations remain the group's first priority.  A key enabler for this is the *BP operating management system (OMS), which provides a common framework for all BP operations, designed to achieve consistency and continuous improvement in safety and efficiency.*
>
> *           *           *
>
> This performance follows several years of intense focus on training and procedures across BP.  *BP's operating management system (OMS), which provides a single operating framework for all BP operations,* is a key part of

continuing to drive a rigorous approach to safe operations.  2009 marked an important year in the continuing implementation of OMS.

*       *       *

Our OMS covers all areas from process safety, to personal health, to environmental performance.

*       *       *

*Following the tragic incident at the Texas City refinery in 2005 the [Safety, Ethics, and Environment Assurance] committee has observed a number of key developments, including:*  the establishment of a safety & operations (S&O) function with the highest calibre of staff; *development of a group-wide operating management system (OMS) which is being progressively adopted by all operating sites;* the establishment of training programmes in conjunction with MIT that are teaching project management and operational excellence; the dissemination of standard engineering practices throughout the group; and the formation of a highly experienced S&O audit team formed to assess the safety and efficiency of operations and recommend improvements.  Throughout this time the group chief executive has made safety the number one priority.

339.    The foregoing misrepresentations, which caused BP Shares to trade at artificially inflated prices, were each materially false or misleading when made, and were known by Hayward to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

        a.    Hayward falsely claimed that BP had undertaken a series of "key developments" since the Texas City refinery disaster and misled investors with regard to BP's implementation of the Baker Panel's recommendations because Defendants' repeated statements falsely represented BP's intent to improve and actual progress in improving its process safety since the Texas City disaster; and

        b.    Hayward misrepresented that OMS was a "common" system that applied as a "single operating framework" to "all BP operations" and would be "adopted by all operating sites," when, in fact, OMS applied only to rigs that BP fully owned, but not to BP's operations

129

where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of Mexico.

### 12.     The March 22, 2010 False and Misleading Statements

340.     On March 22, 2010, Inglis delivered a speech at the Howard Weil Energy Conference in New Orleans, Louisiana, in which he discussed BP's nearby deepwater Gulf of Mexico operations.  BP posted a transcript of the speech on its website.  During the presentation, Inglis stated:

> We are currently planning to make final investment decisions for 24 new major projects in the next two years.  Each project has been high-graded though our project selection and progression process.  They are concentrated in the Gulf of Mexico, the North Sea, Azerbaijan and Angola – high margin production areas that improve the portfolio and enable profitable growth.
>
> \*        \*        \*
>
> *Safety and operational integrity underpins everything we do, and we are now in the final phase of rolling out our operating management system that provides a single, consistent framework for our operations, covering all areas from personal and process safety to environmental performance.*  And I am pleased to say that in 2009 we saw continuing improvement in all aspects.

341.     The foregoing misrepresentation, which caused BP securities to trade at artificially inflated prices, was materially false and misleading when made, and was known by Inglis to be false at that time, or was made with reckless disregard for the truth, for the following reasons, among others:

a.     Inglis was a member of GORC, and as such, was charged with oversight and implementation of OMS with respect to exploration and production activities in the deepwater Gulf of Mexico.  Moreover, Inglis received the quarterly Orange Book that contained detailed reports concerning the scope of OMS and revealed that the status of its implementation across BP's various business units, including BP E&P in the Gulf of Mexico, was incomplete;

b.      Inglis made these statements about the importance of deepwater drilling in the Gulf of Mexico as part of BP's asset portfolio during the Howard Weil Energy Conference, which bills itself as "one of the premier investor conferences in the energy industry."  *See* http://howardweil.com/energy-conference.aspx.  However, as of the date of Inglis' statement, OMS applied to only one drilling rig out of the seven drilling rigs in Gulf of Mexico, the BP-owned *Thunder Horse*.  Moreover, as BP E&P CEO, Inglis knew, or was reckless in not knowing, that over half of the deepwater wells drilled in the Gulf of Mexico – which were the chief economic driver for BP E&P – were drilled by contracted rigs that did not apply OMS, including the *Deepwater Horizon*, *see* Armstrong Dep. 247:7-248:21;

c.      Inglis (and other GORC members) made the decision to not apply key elements of OMS, including Safety and Operations Audits and Major Accident Risk analysis, to Gulf of Mexico joint ventures and Gulf of Mexico exploration, including the *Deepwater Horizon*, *see* Armstrong Dep. 207:20-208:18;

d.      Inglis testified that "[o]ne of the purposes of OMS would be to prevent loss of primary containment."  Inglis Dep. 242:23-243:9.  Moreover, on July 13, 2009, Inglis sent an email to the Upstream Senior Leadership Team that expressed concern over contractor operated rigs – *e.g.*, the *Deepwater Horizon* – not conforming to BP's Control of Work practices;

e.      BP had only begun to implement its OMS in a pilot stage in the Gulf of Mexico when BP, in part due to a re-organization led by Inglis, terminated and/or displaced the key employees responsible for the implementation of OMS.  According to CW2 it was not true that BP was in the final stages of rolling out OMS in the Gulf of Mexico in 2010, and employees in key positions, including Wells Team Leaders and Well Site Leaders in Gulf of Mexico operations, had no knowledge of OMS requirements;

f.     Key personnel in the Gulf of Mexico (David Sims, David Rich, Patrick O'Bryan) lacked the knowledge, experience and expertise of those they were replacing (Ian Little, Harry Thierens, and Kevin Lacy), and BP's OMS implementation in the Gulf of Mexico was disorganized and incomplete;

g.     According to CW1, there was a company failure to implement an appropriate OMS protocol which would have ensured that the individual decision makers at the rig level understood how cost-savings and corner-cutting could affect the process safety of the *Deepwater Horizon*; and

h.     According to CW2, by 2009 and 2010, BP's OMS lagged far behind the safety programs of its industry peers, was still in its pilot phase, and had yet to be fully implemented in the Gulf of Mexico (and was not implemented on the *Deepwater Horizon*).

### 13.    The March 23, 2010 False and Misleading Statements

342.    On March 23, 2010, Hayward delivered a speech at the Peterson Institute for International Economics in Washington, D.C. in which he discussed BP's changes to its safety program following the Texas City refinery explosion. BP posted a transcript of the speech on its website. Specifically, Hayward stated:

> Five years ago on this day, fifteen people died and many more were injured, when an explosion tore through our Texas City refinery.
>
> *That tragic accident has changed in a profound and fundamental way our approach to safety and operations integrity – providing a safe working environment is a paramount responsibility, and our first and foremost priority.*

343.    The foregoing misrepresentation, which caused BP Shares to trade at artificially inflated prices, was materially false or misleading when made, and was known by Hayward to be false at that time, or was made with reckless disregard for the truth, for the following reason, among others: Hayward misrepresented that BP had changed its approach to safety "in a

profound and fundamental way" in response to the Texas City disaster, when, in fact, Defendants' repeated statements falsely represented BP's intention to implement and actual progress in implementing the policies, procedures, and recommendations detailed in the Baker Report that were to achieve process safety reforms following the Texas City disaster.

### 14. The April 15, 2010 False and Misleading Statements

344.    On April 15, 2010, BP issued its 2009 Sustainability Review, which the Company made available to the investing public on its website.  The 2009 Sustainability Review included a Q&A session with Hayward in a section entitled "Group Chief Executive's Review."  There, Hayward reemphasized the misrepresentation contained in BP's 2008 Annual Report (which he signed), that eight sites (including the Gulf of Mexico) completed the transition to OMS in 2008:

- Group Chief Executive's Review

*Question:*  What progress has BP made on safety during 2009?

*Answer:*  Safety is fundamental to our success as a company and 2009 was important because of the progress we made in implementing our operating management system (OMS).  The OMS contains rigorous and tested processes for reducing risks and driving continuous improvement.  I see it as the foundation for a safe, responsible and high-performing BP.  *Having been initially introduced at eight sites in 2008,* the OMS rollout extended to 70 sites by the end of 2009, including all our operated refineries and petrochemicals plants.  *This means implementation is 80% complete.*

345.    The foregoing misrepresentations, which caused BP securities to trade at artificially inflated prices, were each materially false or misleading when made, and were known by BP and Hayward to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

    a.      Hayward, as Chairman of GORC, was ultimately responsible for and charged with oversight and implementation of OMS;

b.      Hayward testified that he knew OMS was not implemented in the Gulf of Mexico in 2008, that he knew the Gulf of Mexico had not "beg[u]n the process of cutover to OMS" until Fall 2009, and that OMS had not been implemented in the Gulf of Mexico as of April 2010.  Other BP personnel, including GORC member John Baxter, testified that OMS was not implemented in the Gulf of Mexico as of April 2010;

c.      Hayward made this statement, which reemphasized and confirmed the earlier statement made in the 2008 Form 20-F that eight sites, including the Gulf of Mexico, had completed the transition to OMS, despite knowledge that the Gulf of Mexico had not completed the transition to OMS in 2008;

d.      Hayward misrepresented that OMS was a "common" system that applied as a "single operating framework" to "all BP operations" and would be "adopted by all operating sites," when, in fact, OMS applied only to rigs that BP fully owned, but not to BP's operations where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of Mexico.  Moreover, Hayward was aware of or reckless in disregarding, that OMS was never meant to apply, and in fact, never did apply, to contracted third-party rigs, which accounted for the majority of BP's deepwater wells drilled in the Gulf of Mexico during the Relevant Period;

e.      Approximately one month prior to publication of BP's 2008 Annual Report, Hayward received a report directly from Inglis confirming that the Gulf of Mexico had not completed the transition to OMS by the conclusion of 2008;

f.      As members of GORC, Hayward and Inglis received documents that put them on notice that the Gulf of Mexico had not completed the transition to OMS;

g.      An internal BP strategy document issued in December 2008 warned GORC members, including Hayward, that there were "major" process-safety concerns in the

Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents and therefore increased the likelihood and severity of "process-safety related incidents";

h.      Hayward testified that he knew that process safety was an integral part of OMS, and that the purpose of OMS was to prevent major accidents, such as the blowout that occurred on the *Deepwater Horizon* on April 20, 2010.  He also testified that he knew that the risk of a deepwater blowout was "one of the highest risks" facing BP, and the "highest risk in the Gulf of Mexico."  Moreover, Hayward testified that, had OMS been implemented in the Gulf of Mexico, BP "undoubtedly" had the potential to avoid the *Deepwater Horizon* disaster;

i.      According to CW2, by 2009 and 2010, BP's OMS lagged far behind the safety programs of its industry peers, was still in its pilot phase, and had yet to be fully implemented in the Gulf of Mexico (and was not implemented on the *Deepwater Horizon*). Moreover, employees in key positions in Gulf of Mexico operations had no knowledge of OMS requirements;

j.      According to CW1 there was a company-wide failure to implement an appropriate Operations Management Safety protocol which would have ensured that the individual decision makers at the rig level understood how cost-savings and corner-cutting could affect the process safety of the *Deepwater Horizon*; and

k.      Defendants failed to disclose or indicate the following:  (1) BP had inadequate safety procedures in place for its Gulf of Mexico operations; (2) BP conducted its operations in the Gulf of Mexico without any legitimate oil spill response plan; (3) BP understated the risks of its Gulf of Mexico operations while overstating its ability to extract oil from the Gulf of Mexico; and (4) BP lacked adequate internal safety and risk management controls.

**B.**     **Defendants' Misrepresentations And Omissions Concerning BP's Ability To Respond To A Deepwater Oil Spill**

346.     Defendants misrepresented BP's ability to prevent and respond to a deepwater oil spill, including, as detailed below, in March and June 2009 filings with the MMS.  The falsity of these statements was revealed between April and July 2010, when BP proved incapable of mitigating or stopping the oil spill from the Macondo well, notwithstanding that the amount of oil spilling from Macondo was only 25% to 33% of the amounts that BP claimed it could adequately respond to and counteract.

### 1.     The March 10, 2009 False and Misleading Statements

347.     On March 10, 2009, BP's IEP, which discusses BP's purported safety protocol for the Mississippi Canyon Block 252, was "deemed submitted" by the MMS.  The document was initially received by the MMS on February 23, 2009 and was available to the public and BP's investors no later than March 10, 2009.  The document falsely stated, in part, that:

> *I hereby certify that BP Exploration & Production Inc. has the capability to respond, to the maximum extent practicable, to a worst-case discharge,* or a substantial threat of such a discharge, resulting from the activities proposed in our Exploration Plan.

*          *          *

> An accidental oil spill that might occur as a result of the proposed operation in Mississippi Canyon Block 252 has the potential to cause some detrimental effects to fisheries.  However, it is unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities.  If such a spill were to occur in open waters of the OCS proximate to mobile adult finfish or shellfish, the effects would likely be sublethal and the extent of damage would be reduced to the capability of adult fish and shellfish to avoid a spill, to metabolize hydrocarbons, and to excrete both metabolites and parent compounds.  No adverse activities to fisheries are anticipated as a result of the proposed activities.

*          *          *

> *In the event of an unanticipated blowout resulting in an oil spill, it is unlikely to have an impact based on the industry wide standards for using proven equipment and technology for such responses, implementation of BP's Regional Oil Spill*

136

*Response Plan which address available equipment and personnel, techniques for containment and recovery and removal of the oil spill.*

348.   In addition, the IEP stated that:

An accidental oil spill from the proposed activities could cause impacts to beaches.   However, *due to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected.*   Both the historical spill data and the combined trajectory/risk calculations referenced in the publication OCS EIS/EA MMS 2002-052 indicate *there is little risk of contact or impact to the coastline and associated environmental resources.*

349.   The IEP also contained identical statements to the statement in the immediately preceding paragraph, except that they pertained to wetlands, coastal wildlife, refuges, and wilderness areas.

350.   Section 7.1 of the IEP also falsely estimated a worst-case discharge scenario of 162,000 BOPD, an amount it falsely asserted BP could handle.

351.   Additionally, before BP could begin operations at the Macondo site, federal regulations required BP to submit its IEP demonstrating that it had planned and prepared to conduct its proposed activities in a manner that was safe, conformed to applicable regulations and sound conservation practices, and would not cause undue or serious harm or damage to human or marine health, or the coastal environment.  30 C.F.R. §§ 250.201, 250.202.  BP did not have such a plan or a means of conducting their proposed activities.

352.   Further, federal regulations required that the IEP be accompanied by "oil and hazardous substance spills information" and "environmental impact analysis information."  30 C.F.R. §§ 250.2 12, 250.219, 250.227.

353.   Among the information required to accompany the IEP was a "blowout scenario," described as follows:

A scenario for the potential blowout of the proposed well in your EP that you expect will have the highest volume of liquid hydrocarbons.   Include the

estimated flow rate, total volume, and maximum duration of the potential blowout. Also, discuss the potential for the well to bridge over, the likelihood for surface intervention to stop the blowout, the availability of a rig to drill a relief well, and rig package constraints. Estimate the time it would take to drill a relief well. 30 C.F.R. § 250.213(g).

354.    The oil and hazardous spills information accompanying the IEP was also required to include an oil spill response plan providing the calculated volume of BP's worst-case discharge scenario, *see* 30 C.F.R. § 254.26(a), and a comparison of the appropriate worst-case discharge scenario in its approved regional oil spill response plan with the worst-case discharge scenario that could result from its proposed exploration activities; and a description of the worst-case discharge scenario that could result from its proposed exploration activities, *see* 30 C.F.R. §§ 254.26(b), (c), (d), and (e); 30 C.F.R. § 250.2 19.

355.    Federal regulations required BP to conduct all of its lease and unit activities according to its approved IEP, or suffer civil penalties or the forfeiture or cancellation of its lease. *See* 30 C.F.R. § 250.280.

356.    The misrepresentations above, which caused BP Shares to trade at artificially inflated prices, were each materially false or misleading when made, and were known by BP to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

        a.    As explained by a group of eight United States Senators in a May 17, 2010 letter to United States Attorney General Eric H. Holder, Jr., there was no "proven equipment and technology" to respond to the spill. The Senators wrote that "[m]uch of the response and implementation of spill control technologies appears to be taking place on an ad hoc basis." Indeed, BP acknowledged on May 10, 2010 that "[a]ll of the techniques being attempted or

evaluated to contain the flow of oil on the seabed involve significant uncertainties because they have not been tested in these conditions before";

      b.    BP falsely represented that the IEP was based on an analysis of the Mississippi Canyon Block 252 site when, in fact, the IEP was boilerplate language copied from one or more exploration plans that MMS had previously approved for other distinct drilling sites;

      c.    BP misrepresented that it was prepared to stop a blowout at Mississippi Canyon Block 252 or contain the resulting oil spill when, in fact, BP was wholly unprepared;

      d.    In connection with the IEP, BP sought a permit from the MMS to drill to a total depth of 19,650 feet at the Macondo well.  Following the sinking of the *Deepwater Horizon,* a BP crewman admitted that this depth had been misrepresented to the MMS, and that BP had in fact drilled in excess of 22,000 feet, in violation of its permit;

      e.    BP misrepresented that an oil spill would not adversely impact beaches, wetlands, and other environmentally sensitive areas;

      f.    BP concealed from the investing public and Plaintiffs its failure to have sufficient internal safety and risk management processes to satisfy the above referenced regulation.  In fact, Suttles acknowledged on May 10, 2010, that BP did not actually have a response plan with "proven equipment and technology" in place that could contain the *Deepwater Horizon* spill.  Later, Hayward admitted that "BP's contingency plans were inadequate," and that the company had been 'making it up day to day."  Hayward further admitted that it was "an entirely fair criticism" to blame BP for the disorganized and poor cleanup effort because "*[w]hat's undoubtedly true is that we did not have the tools you'd want in your tool kit*" to stop the leak from the Macondo well in the Gulf of Mexico in the aftermath of the explosion;

g.      On May 12, 2010, McKay admitted in testimony to the House Subcommittee on Oversight and Investigations, Committee on Energy and Commerce, that BP did not have the capability and technology to respond to the *Deepwater Horizon* oil spill:

> Mr. McKay:  We are using the best technology at scale. This is the largest effort that has ever been put together. So we believe we are using the best technology and if we have any other ideas.
>
> Mrs. Capps:  But you never had any until it happened.
>
> Mr. McKay:  Well, we have been drilling with the Coast Guard for years.
>
> Mrs. Capps:  Did you develop technologies for dealing with this?
>
> Mr. McKay:  Not individual technologies for this, no.
>
> Mrs. Capps:  I rest my case

h.      The Presidential Commission concluded, "there was nothing to suggest that BP's engineering team conducted a formal, disciplined analysis of the combined impact of [] risk factors on the prospects of a successful cement job"; and

i.      In deposition testimony, Inglis confirmed that BP never invested a dollar in developing methods to contain an oil spill.  Inglis Dep. 162:9-162:21.

### 2.      The June 30, 2009 False and Misleading Statements

357.    On June 30, 2009, BP publicly filed its revised oil spill response plan for the Gulf of Mexico – entitled "Regional Oil Spill Response Plan – Gulf of Mexico" or BP's Regional OSRP for the GOM.

358.    According to BP's Regional OSRP for the GOM, the "*TOTAL WORST CASE DISCHARGE" scenarios in the Gulf of Mexico ranged from a release of 28,033 to 250,000 BOPD.*  More specifically, BP's Regional OSRP for the GOM stated:  (i) an oil spill occurring less than ten miles from the shoreline could create a worst case discharge of 28,033 BOPD; (ii)

an oil spill occurring more than ten miles from the shoreline could create a worst case discharge of 177,400 BOPD; and (iii) an oil spill caused by a mobile drilling rig that is drilling an exploratory well could create a worst case discharge of 250,000 BOPD.  BP's Regional OSRP for the GOM explicitly states that BP and its subcontractors *could recover approximately 491,721 BOPD* (or more than 20.6 million gallons) in the event of an oil spill in the Gulf of Mexico.  BP further claimed and provided certified statements to the MMS that BP and its subcontractors "*maintain the necessary spill containment and recovery equipment to respond effectively to spills.*"

359.    These misrepresentations, which caused BP Shares to trade at artificially inflated prices, that BP and its subcontractors "maintain the necessary spill containment and recovery equipment to respond effectively to spills" and that nearly 500,000 BOPD could be recovered were each materially false or misleading when made, and were known by BP to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

a.    BP's Oil Spill Response Plan contained numerous errors, gross deficiencies and was wholly inadequate to respond to a deepwater oil spill; and

b.    Hayward confirmed that BP had failed to draw up sufficient emergency response plans, admitting that during the spill "*we were making it up day to day.*"  In addition, Suttles admitted that BP failed to have an oil spill response plan with "proven equipment and technology" in place that could contain the oil spill.

### C.    Defendants' Misrepresentations And Omissions Concerning The Amount Of Oil Spilling From The Macondo Well

360.    During April and May 2010, Defendants conducted a coordinated and very public campaign, detailed below, to instill and perpetuate the belief among regulators, the public and the market that the amount of oil spilling from the blown-out Macondo well was approximately

1,000 to 5,000 BOPD.  However, even as they made such statements, Defendants knew them to be without basis and to be contradicted by numerous internal data, estimates, figures, and calculations – of which Defendants were then aware but concealed from the public.

**1.      Defendants Represent the Spill Rate to be 1,000-5,000 BOPD**

a.      **The April 28-29, 2010 False and Misleading Statements**

361.    Beginning on April 26, 2010, Rainey, who had been assigned to the Unified Command, undertook the task of creating a BP flow rate estimate, despite lacking prior experience calculating oil spill flow rates.   Initially consulting the online encyclopedia "Wikipedia," Rainey created or caused to be created several spreadsheets purporting to show a "best guess" of flow rate at 5,000 to 6,000 barrels per day.   Ultimately, Rainey developed his own methodology for estimating flow rates, which did not comport with industry standards, and applied it in a manner rife with mathematical and procedural inaccuracies.   None of the infirmities and inaccuracies in Rainey's work was contemporaneously known by Plaintiffs or investors at large.   Each time, Rainey's "analysis" yielded BP's desired result, which was a "best guess" of a flow rate close to 5,000 barrels per day.   Unbeknownst to Plaintiffs and other investors, Rainey's flawed spreadsheets also showed a high flow rate of approximately 14,000 barrels per day.

362.    On April 28, 2010, NOAA's representative on the Unified Command expressed a concern that the flow rate was higher than the 1,000 BOPD that previously had been publicly reported by the Unified Command.   Upon hearing this concern, a senior member of the Unified Command approached Suttles and asked for BP's flow rate estimate so that the Unified Command could update the publicly disclosed flow rate estimate.   Suttles responded that BP's internal flow rate was between 1,000 and 5,000 BOPD, with 2,500 BOPD being the most likely number.   No document exists to support this statement by Suttles.   On April 28, 2010, after the

markets closed, in reliance upon Suttles' representation, Coast Guard leader Rear Admiral Landry announced during a joint press conference with BP that NOAA had increased its estimate of the oil flow rate from 1,000 BOPD to 5,000 BOPD.

363.    During the joint press conference, Suttles again reiterated that BP's best estimate was that *1,000 barrels of oil per day were flowing from the Macondo well*.  In addition, Suttles stated:

> Late this afternoon, while monitoring the blowout preventer area, which we have done continuously since the event began, we discovered a new point of leak.  This leak is just beyond the top of the blowout preventer in the pipe work called the riser.  Given the location, *we do not believe this changes the amount currently estimated to be released.*

364.    The following day, April 29, 2010, Department of Homeland Security Secretary Janet Napolitano announced that "today I will be designating that this is a spill of national significance."

365.    On the same day, April 29, 2010, Suttles conducted several media interviews to discuss the oil flow rate from the Macondo well.  For example:

(a)    During an interview with CBS's "The Early Show," Suttles stated:  "*I think that somewhere between one and five thousand barrels a day is probably the best estimate we have today*."

(b)    Similarly, during an interview on ABC's "Good Morning America," Suttles, stated:  "I think *between one and 5,000 barrels a day is a reasonable estimate*."

(c)    Likewise, on NBC's "Today Show," Suttles stated:  "I actually don't think there's a difference between NOAA's view and our view.  I would say *the range is 1,000 to 5,000 barrels a day*."

366.    On the news that spill estimates had increased to 5,000 BOPD and Secretary Napolitano's designation of the spill as one of "national significance," BP ADSs fell from $57.34

per ADS on April 28, 2010 to close at $52.56 per ADS on April 29, 2010, a decline of $4.78 per ADS, or more than 8%. BP's ordinary shares suffered a similar decline, dropping from 625.00 pence to 584.20 pence, a decline of 40.80 pence, or more than 6%.

367.    Although the price of BP Shares fell in response to this news, the price of BP's Shares was still artificially inflated due to the false and misleading statements made by Suttles on April 28 and 29, 2010, as well as those made by BP, Suttles, Rainey, McKay, Hayward, and Dudley in the days and weeks ahead (as detailed below).

### b.    The April 29-30, 2010 False and Misleading Statements

368.    On April 29, 2010, BP filed a Form 6-K with the SEC addressing the *Deepwater Horizon* explosion and sinking and containing quotes from Hayward. In it, BP stated: "Efforts continue to stem the flow of oil from the well, *currently estimated at up to 5,000 barrels a day*."

369.    On April 30, 2010, BP filed a Form 6-K with the SEC addressing its response effort, which contained quotes from Hayward. In it, BP stated: "Efforts to stem the flow of oil from the well, *currently estimated at up to 5,000 barrels a day*, are continuing with six remotely-operated vehicles (ROVs) continuing to attempt to activate the blow out preventer (BOP) on the sea bed."

370.    On April 30, 2010, BP published a press release on its website that stated the same 5,000 BOPD oil flow estimate as articulated in its Form 6-K filed with the SEC that day.

### c.    Additional Reasons Why the April 28-30, 2010 Statements Were False, Misleading, and Made with Scienter

371.    Each of the misrepresentations in Sections VIII.C.1.a-b, *supra*, were materially false or misleading when made, and were known by Suttles (Section VIII.C.1.a) and BP (Sections VIII.C.1.a-b) to be false at that time, or were made with reckless disregard for the truth, because they falsely represented that the amount spilling from the Macondo well was

between 1,000 and 5,000 BOPD.  Indeed, as discussed herein, BP agreed on November 15, 2012 to the pay the third-largest penalty in SEC history, $525 million, to settle securities fraud charges arising, in part, from the misrepresentations described in Sections VIII.C.1.a-b, *supra*.

372.    Notwithstanding Suttles' and BP's misrepresentations on April 28-30, 2012 that the oil flow rate was between 1,000 and 5,000 BOPD, Defendants failed to disclose that BP's then-existing, internal "best estimate" of the amount of oil flowing from the well, unbeknownst to the investment markets, was in actuality many multiples greater.

373.    When the statements set forth in Sections VIII.C.1.a-b were made, and caused BP Shares to trade at artificially inflated prices, BP and Suttles knew them to be false or were severely reckless in not knowing them to be false.  BP admitted in its November 15, 2012 Consent with the SEC that by April 28, 2010, BP possessed at least four internal pieces of data, estimates, or calculations and one external calculation that showed potential flow rates significantly higher than 5,000 BOPD, namely:

a.    By April 22, 2010, a BP engineer had modeled possible oil flow path scenarios within the well, with corresponding rates between 64,000 and 146,000 BOPD.

b.    On or before April 24, 2010, BP was aware of an estimate that showed that immediately following the explosion, oil was flowing through the still-attached riser at a rate of 100,000 BOPD.

c.    By April 25, 2010, BP engineers were told of an external analysis of the oil on the water that reached the conclusion that the flow rate could be as high as 10,000 BOPD.

d.    On April 27, 2010, a BP engineer estimated the oil flow rate to be approximately 5,000 to 22,000 BOPD on the basis of temperature readings along the riser pipe, among other factors.

e.     By April 28, 2010, Rainey's own spreadsheets showed a flow rate ranging as high as 14,000 BOPD.

374.   In addition, by April 28, 2010, BP had learned that there was also oil leaking from the "kink," the place where the riser pipe had bent before it came to rest on the ocean floor.  This fact represented a totally separate leak point, the flow from which would necessarily add to the total being calculated and reported.

375.   Given that BP possessed data, estimates, and calculations significantly higher than 5,000 BOPD, for BP and Suttles to publicly state that the flow rate had been estimated by BP as ranging "up to 5,000" BOPD was knowingly and materially false and misleading.  Moreover, failing to disclose even the existence of data, estimates, and calculations showing a higher flow rate constituted a material omission of information.

376.   Further, Rainey's deposition testimony in the MDL 2179 action indicated that one internal estimate of the amount of oil flowing from the well was as high as 92,000 BOPD.  These figures were provided to BP's senior management in two internal BP documents dated April 26, 2010 and April 27, 2010 – *i.e.*, *before* Suttles made his public misrepresentations.  In a hearing before the House of Representatives on May 26, 2010, Representative Edward Markey expressed outrage over Suttles' misrepresentations, stating:

> Yesterday, BP provided me with an internal document dated April 27, 2010, and cited as BP Confidential that shows a low estimate, a best guess, and a high estimate of the amount of oil that was leaking.  According to this BP document, the company's low estimate of the leak on April 27 [, 2010] was 1,063 barrels per day.  Its best guess was 5,758 barrels per day.  Its high estimate was 14,266 barrels per day.

> *         *         *

> BP has also turned over another document dated April 26 [, 2010] which includes a 5,000 barrel per day figure as well.  So when BP was citing the 1,000-barrel per day figure to the American people on April 28th, their own internal documents from the day before show that their best guess was a leak of 5,768 barrels per day

and their high estimate was more than 14,000 barrels that were spilling into the Gulf every day.

### 2. Defendants Represent the Spill Rate to be 5,000 BOPD

#### a. The May 4-5, 2010 False and Misleading Statements

377.    On May 4, 2010, BP filed a Form 6-K with the SEC, which contained quotes from Hayward and in which BP stated:   "[C]urrent estimates by the [NOAA] suggest *some 5,000 barrels (210,000 U.S. gallons) of oil per day* are escaping from the well."

378.    The foregoing misrepresentation, which caused BP Shares to trade at artificially inflated prices, was materially false or misleading when made, and was known by BP to be false at that time, or was made with reckless disregard for the truth.  BP omitted from this Form 6-K the material fact that, by that date, its own engineers and scientists had generated or received numerous pieces of data, estimates, and calculations regarding the oil flow rate estimates that far exceeded the 5,000 BOPD figure, as set forth in Sections VIII.C.1.c and VIII.C.2.h.  For the same reasons, BP also failed to disclose that, based on its internal data, estimates, and calculations, it was not accurate to continue to assert that 5,000 BOPD was the best estimate of the amount of oil flowing into the Gulf of Mexico.  Likewise, for the same reasons, it was misleading to use the NOAA's 5,000 BOPD as the "best estimate" as the basis of any public disclosure when BP itself had its own, higher range of flow rate estimates.

#### b. The May 5, 2010 False and Misleading Statements

379.    On May 5, 2010, Hayward conducted an interview with journalists from the *Houston Chronicle*, at BP's offices in Houston.  In reference to the oil flow rate at the Macondo well, Hayward stated, "*A guesstimate is a guesstimate.  And the guesstimate remains 5,000 barrels a day.*"

380.   The foregoing misrepresentation, which caused BP Shares to trade at artificially inflated prices, was materially false or misleading when made, and was known by Hayward to be false at that time, or was made with reckless disregard for the truth.  Hayward omitted from this statement the material fact that, by that date, BP's own engineers and scientists had generated or received numerous pieces of data, estimates, and calculations regarding the oil flow rate that far exceeded the 5,000 BOPD figure, as set forth in Sections VIII.C.1.c and VIII.C.2.h.  For the same reasons, Hayward also failed to disclose that, based on the internal data, estimates, and calculations, it was not accurate to continue to assert that 5,000 BOPD was the best estimate of the amount of oil flowing into the Gulf of Mexico.

### c.    The May 10, 2010 False and Misleading Statements

381.   On May 10, 2010, McKay appeared before the Committee on Transportation and Infrastructure and, in response to a question about whether "5,000 barrels per day [was] the most accurate" figure for the amount of oil leaking into the Gulf, stated:

> [McKay] *That is our best estimate*.  Obviously, it's continually being looked at. As you may know, we've gotten this riser insertion tube to work, and we're getting increased volumes at the surface where we can actually measure.  And then, I believe there is a new small task force that has been put together under direction of Unified Command to get all the experts together in a room and try to understand, with the latest available data, is there a more accurate estimate?  But we do recognize there is a range of uncertainty around the current estimate.

The following exchange occurred later during this same hearing:

> [Rep. LAURA A. RICHARDSON]: . . .  Why is there a disagreement between the total amount of oil that is leaking?  BP has said 5,000, other reports are saying otherwise.  Why do you think there is a disagreement, and do you stand by your point that it is only 5,000?

> Mr. McKay.  I think there are a range of estimates and it is impossible to measure. That is the reality.  What we have been doing with government officials, government experts, industry experts, is trying to come up with the best estimate, and that has been done essentially by understanding what is happening at the surface and trying to understand volume there, adding to it what we believe the oil properties, how it would disperse in a water column as it moves to the surface.

And those two added together is the estimated volume.  It has been clear from day one there is a large uncertainty range around that.

Mr. Richardson.  Is it possible it could possibly be the larger number that has been reported?

Mr. McKay.  It is theoretically possible.  *I don't think anyone believes it is quite that high that has been working on this.  I believe the uncertainty range is around that 5,000 number, and it could be higher.  But if the number you are talking about is 70,000 barrels a day, I don't know this, but I don't think people that are working with it believe that that is a possibility.*

382.    The foregoing statements, which caused BP Shares to trade at artificially inflated prices, were materially false and misleading because Defendants knew or recklessly disregarded the truth.  McKay omitted from this statement the material fact that, by that date, BP's own engineers and scientists had generated or received numerous pieces of data, estimates, and calculations regarding the oil flow rate estimates that far exceeded the 5,000 BOPD figure, as set forth in Sections VIII.C.1.c and VIII.C.2.h.  For the same reasons, McKay also failed to disclose that, based on BP's internal data, estimates, and calculations, it was not accurate to continue to assert that 5,000 BOPD was the best estimate of the amount of oil flowing into the Gulf of Mexico.  In reality, BP's own internal estimates were significantly closer to the 70,000 BOPD McKay dismissed as a number someone working on the spill response would not believe.

### d.        The May 14, 2010 False and Misleading Statements

383.    On May 14, 2010, Suttles appeared on ABC's "Good Morning America," during which he stated:  "[O]urselves and the people from NOAA and others believe that *something around 5,000, that's actually barrels a day, is the best estimate*."

384.    Also on May 14, 2010, Suttles appeared on NBC's "Today Show," where he was asked whether BP had "underplayed" the size of the leak and "is it possible that you are actually leaking more than 5,000 barrels a day?  Yes or no."  In response, Suttles replied in part:  "I don't think it is wildly different than that number . . . it could be a bit above or below."

385.   Additionally on May 14, 2010, on *CNN.com*, BP publicly reasserted the 5,000 BOPD number and directly rejected a Purdue University professor's estimate that the flow rate was up to 70,000 BOPD.  Specifically, Dudley, who at the time was BP's Managing Director and one of its top officials coordinating the Company's oil spill response, called the 70,000 BOPD figure "*not accurate at all*" and said it "*isn't anywhere I think within the realm of possibility*." As discussed below, Dudley essentially disavowed this statement altogether as having been false just two weeks later, on May 30, 2010.

386.   The foregoing misrepresentations, which caused BP Shares to trade at artificially inflated prices, were materially false or misleading when made, and were known by BP and Suttles to be false at that time, or were made with reckless disregard for the truth.  Suttles omitted from his statements the material fact that, by that date, BP's own engineers and scientists had generated or received numerous pieces of data, estimates, and calculations regarding the oil flow rate estimates that far exceeded the 5,000 BOPD figure, as set forth in Sections VIII.C.1.c and VIII.C.2.h.  For the same reasons, BP and Suttles also failed to disclose that, based on BP's internal data, estimates and calculations, it was not accurate to continue to assert that 5,000 BOPD was the best estimate of the amount of oil flowing into the Gulf of Mexico.  Likewise, for the same reasons, it was misleading to use the NOAA's 5,000 BOPD estimate as the basis of any public disclosure when BP itself had its own, higher range of flow rate estimates.

387.   Indeed, as BP admitted in its November 15, 2012 Consent with the SEC, a BP senior engineer performed work that resulted in an estimated range of flow rates between 14,000 and 96,000 BOPD, which he shared internally with BP executives during the second week of May 2010.  That same engineer read a news article on *CNN.com* stating that BP had publicly reasserted the 5,000 BOPD flow rate while refuting the Purdue University professor's figure of

70,000 BOPD, and after doing so, wrote an email to a senior executive of BP E&P and a junior

executive tasked to support him, stating:

> I just read an article on CNN (May 14, 2010 1:00 pm) stating that a researcher at
> Purdue believes that the Macondo well is leaking up to 70,000 bopd and that BP
> stands by a 5,000 bopd figure.  With the data and knowledge we currently have
> available we cannot definitively state the oil rate from this well.  *We should be
> very cautious standing behind a 5,000 bopd figure as our modeling shows that
> this well could be making anything up to ~100,000 bopd* depending on a number
> of unknown variables . . . .  We can make the case for 5,000 bopd only based on
> certain assumptions and in the absence of other information.

This email failed to spur any discussion within BP as to whether it should update or correct its

prior disclosures about the 5,000 BOPD figure.

### e.    The May 17, 2010 False and Misleading Statements

388.    On May 17, 2010, at a Unified Command press briefing, Suttles was asked if BP

was "certain how much is actually leaking and that it is about that 5,000 barrel figure we used to

hear before?"  In response, he stated:  "*[T]hat's our best estimate today*.  Clearly people are

constantly asking that question."

389.    The foregoing misrepresentation, which caused BP Shares to trade at artificially

inflated prices, was materially false or misleading when made, and was known by Suttles to be

false at that time, or was made with reckless disregard for the truth.  Suttles omitted from his

statement the material fact that, by that date, BP's own engineers and scientists had generated or

received numerous pieces of data, estimates, and calculations regarding the oil flow rate that far

exceeded the 5,000 BOPD figure, as set forth in VIII.C.1.c and VIII.C.2.h.  For the same reasons,

Suttles also failed to disclose that, based on BP's internal data, estimates, and calculations, it was

not accurate to continue to assert that 5,000 BOPD was the best estimate of the amount of oil

flowing into the Gulf of Mexico.

**f.    The May 21, 2010 False and Misleading Statements**

390.    On May 21, 2010, Suttles appeared once again on ABC's "Good Morning America," where he was asked point-blank as to whether he and BP were being truthful in their oil flow estimates.  Specifically, this exchange occurred:

> Q:  People have really had enough of this.  You know, initially, you were saying 5,000 barrels were leaking.  Now we can see for ourselves that it's far more than that.  Could be – approaching 100,000.  Did you deliberately underestimate the size of the spill and mislead the public?
>
> Suttles:  Robin, you know, from the beginning, we've, we, we've worked with the government on this estimate.  In fact, I should actually point out that the 5,000 barrels a day . . . .  That was not just BP's estimate.  That was the estimate of the Unified Command, including NOAA and the Coast Guard.  *And that's the best estimate we have.*  We can't put a meter on this thing.  We can see what you can see.  We can see what's on the surface . . . .

391.    Also on May 21, 2010, Suttles appeared at a Unified Command press briefing, where in response to a question he stated:

> [W]e have done analysis since the beginning about what we believe the rate is and we've talked about that on numerous times.  And we've said since quite early on in this that *our best estimate was around 5,000 barrels a day* . . . .  *So at the moment, that's our best estimate*.

392.    The foregoing misrepresentations, which caused BP Shares to trade at artificially inflated prices, were materially false or misleading when made, and were known by Suttles to be false at that time, or were made with reckless disregard for the truth.  Suttles omitted from his statements the material fact that, by that date, BP's own engineers and scientists had generated or received numerous pieces of data, estimates, and calculations regarding the oil flow rate estimates that far exceeded the 5,000 BOPD figure, as set forth in Sections VIII.C.1.c and VIII.C.2.h.  For the same reasons, Suttles also failed to disclose that, based on BP's internal data, estimates, and calculations it was not accurate to continue to assert that 5,000 BOPD was the best estimate of the amount of oil flowing into the Gulf of Mexico.  Likewise, for the same reasons, it

was utterly misleading to use NOAA's 5,000 BOPD as the basis of any public disclosure, or to reference the Unified Command, NOAA, and the Coast Guard as evidence of the validity of such a statement, when BP itself had its own, higher range of flow rate estimates.

g.    **The May 22, 2010 False and Misleading Statements**

393.    On May 22, 2010, Suttles was interviewed on NPR's "Weekend Edition." During the course of the interview, Suttles made repeated misrepresentations about the oil flow rate from the Macondo well, including among others:

Q:  And how much oil is billowing into the Gulf right now?

Suttles:  Well, Scott, I precisely don't know.  We've been trying to estimate the flow since very early on in the spill, and when I say we, it's actually BP, NOAA, the Coast Guard and others.  We can monitor what comes out of that pipe, but that's visual.  It's very difficult to measure that.  There's no meter.  But what we can also do is actually look at the expression of it on the surface, 'cause we can use aerial techniques to try to map how much oil is there and then see how much we collect or burn and the other techniques and look at the difference.  *And those are the techniques we use to give an estimate, and 5,000 barrels a day was the best estimate we could do* . . . .

Q:  Now . . . there's independent scientists who've made their own estimates at NPR's request, and they've come up with a substantially higher figure than 5,000. They say as much as 70,000 barrels a day.

Suttles:  *I've heard those [70,000 BOPD] estimates and seen them and I don't believe it's possible that it's anywhere near that number* . . . since I can't meter it, I can't actually say it couldn't be.  But *all of our techniques say that that's highly unlikely.*  And I think some of the reasons these estimates may not be able to accurately calculate is there's a large volume of gas coming out of the end of that pipe with the oil.  And in addition to that, we, particularly over the last few days, when we've had good weather, we've actually seen the size of the spill and the amount of the oil on the surface go down.  *So those are the things that lead me to believe that those estimates are way too high.*

Q:  What I'm trying to understand is if, and I will split the difference, but let's say that it's 30,000 barrels a day that are spilling – if you try to top kill . . . do you risk using a technique that could make the spill even worse?

Suttles:  No, I don't believe that's the case, Scott, and *we don't think the rate's anywhere near that high.*

394.    The foregoing misrepresentations, which caused BP Shares to trade at artificially inflated prices, were materially false or misleading when made, and were known by Suttles to be false at that time, or were made with reckless disregard for the truth.  Suttles omitted from his statements the material fact that, by that date, BP's own engineers and scientists had generated or received numerous pieces of data, estimates, and calculations regarding the oil flow rate estimates that far exceeded the 5,000 BOPD figure, as set forth in Sections VIII.C.1.c and VIII.C.2.h.  For the same reasons, Suttles also failed to disclose that, based on BP's internal data, estimates, and calculations it was not accurate to continue to assert that 5,000 BOPD was the best estimate of the amount of oil flowing into the Gulf of Mexico.  Likewise, for the same reasons, it was misleading to reference NOAA and the Coast Guard's role in estimating the oil flow rate as evidence of the validity of Suttles' statements reaffirming the 5,000 BOPD figure and refuting the 30,000 and 70,000 BOPD figures, when BP itself had its own, higher range of flow rate estimates.

> **h.    Additional Reasons Why Defendants' 5,000 BOPD Representations Were False, Misleading, and Made with Scienter**

395.    Each of the misrepresentations in Sections VIII.C.1-2, *supra*, were materially false or misleading when made, and were known by the speaking Defendant(s) and those Defendant(s) to whom each such statement was attributable to be false at that time, or were made with reckless disregard for the truth, because they falsely represented that the amount spilling from the Macondo well was approximately 5,000 BOPD and/or rejected the idea that the flow rate could be higher.  Indeed, as discussed herein, BP agreed on November 15, 2012 to the pay the third-largest penalty in SEC history, $525 million, to settle securities fraud charges arising, in part, from the misrepresentations described in Sections VIII.C.1-2, *supra*.

396.    In contrast to the misrepresentations in Sections VIII.C.1-2, *supra*, Defendants failed to disclose that the Company's then-existing, internal "best estimate" of the amount of oil flowing from the Macondo well, unbeknownst to the investment markets and Plaintiffs, was in actuality many multiples greater.  When the statements set forth in Sections VIII.C.1-2, which caused BP Shares to trade at artificially inflated prices, were made, the speaking Defendant(s) and those Defendant(s) to whom each such statement was attributable knew them to be false or were severely reckless in not knowing them to be false.  In addition to the *five* pieces of data, estimates, or calculations that BP possessed by April 28, 2010 showing flow rates significantly higher than 5,000 BOPD (as detailed in Section VIII.C.1.c, *supra*), BP admitted in its November 15, 2012 Consent with the SEC that between April 30, 2010 and May 24, 2010, BP generated or was aware of *eleven* additional pieces of data, estimates, and calculations – of which Suttles received at least six, Rainey received at least four, and Hayward all eleven – showing a range of flow rates *significantly higher than 5,000 barrels per day*, namely:

a.      On April 30, 2010, an analysis performed by a BP engineer yielded a range of possible flow rates *from 5,000 to 40,000 BOPD*.

b.      In early May 2010, a video analysis by a BP engineer resulted in an estimate of *20,000 BOPD*, attributable to just the riser pipe.

c.      On May 9, 2010, modeling done by a BP contractor led to a range of possible flow rates *from 37,000 to 87,000 BOPD*.

d.      On May 10, 2010, a video analysis done by a BP contractor led to the conclusion that for just oil leaking from the riser pipe, it could not be "ruled out" that the flow rate was "in the order of *40,000 bopd*."

e.      On or about May 10 and May 11, 2010, reservoir modeling done by a BP engineer yielded a range of potential flow rate estimates *from 14,000 bopd to 96,000 BOPD*. This senior engineer shared his work internally with senior BP executives during the second week of May 2010.  As described above, on May 15, 2010, he expressed concerns in an email to a senior and a junior executive at BP E&P regarding BP's public statements reaffirming the 5,000 BOPD figure and refuting a professor's calculated estimate of 70,000 BOPD.  In the email, this engineer stated that the flow rate could be anything up to 100,000 BOPD.

f.      From May 14 to May 15, 2010, a critique was authored by a BP engineer of a Purdue University professor's analysis estimating a flow rate of 70,000 BOPD.  The critique identified what the BP engineer stated were potential errors made by that professor that, when corrected for, yielded a revised estimate of 15,000 BOPD, just attributable to the riser pipe, from which the BP engineer stated that a further reduction appropriately could be made.

g.      On May 16, 2010, a reservoir-depletion/pressure-drop analysis done by a BP engineer yielded a *flow rate calculation of 86,600 BOPD*, based on the then-estimated pressure.

h.      From May 19 to May 20, 2010, a collection of a portion of the oil from the riser pipe with the Riser Insertion Tube Tool ("RITT") showed average collection rates of approximately 5,000 BOPD for a 12-hour period, capturing only a portion of the oil leaking from the riser, therefore indicating that the total amount of oil leaking was in excess of 5,000 BOPD.

i.      On May 22, 2010, an external surface expression analysis showed a range of estimated flow rate from 6,154 to 11,609 BOPD.

j.      On May 23, 2010, an analysis created by a BP engineer of the flow rate attributable only to the flow coming from the "kink" in the riser pipe showed an estimate of 11,600 BOPD.

k.      On May 24, 2010, the RITT collected approximately 6,100 barrels of oil during the 24-hour period from midnight to midnight, despite the fact that it was not collecting all of the oil flowing from the well, therefore indicating again that the total amount of oil leaking was in excess of 5,000 BOPD.

397.    On May 27, 2010 the Flow Rate Technical Group ("FRTG"), a group of scientists and engineers from federal agencies and universities charged with creating an estimate of the oil flow rate from the Macondo well, issued its first public report and statement, setting forth a flow rate estimate of 11,000 to 25,000 BOPD.

398.    The same day, in a May 27, 2010 news conference, President Obama remarked that BP had failed to be fully forthcoming in describing the rate of the oil leak:

> *I think it is a legitimate concern to question whether BP's interests in being fully forthcoming about the extent of the damage is aligned with the public interest*. I mean, their interests may be to minimize the damage, and to the extent that they have better information than anybody else, to not be fully forthcoming. So my attitude is *we have to verify whatever it is they say about the damage*.
>
> This is an area, by the way, where I do think our efforts fell short. And I'm not contradicting my prior point that people were working as hard as they could and doing the best that they could on this front. But I do believe that *when the initial estimates came that there were – it was 5,000 barrels spilling into the ocean per day,* that was based on satellite imagery and satellite data that would give a rough calculation. *At that point, BP already had a camera down there, but wasn't fully forthcoming in terms of what did those pictures look like.*

399.    It is not surprising that BP, Suttles, and Rainey continuously misrepresented the known amounts of oil that were being released from the well.  As noted in a June 8, 2010 *Rolling Stone* article: "*For BP, the motive [to downplay the amount of oil seeping into the Gulf of*

*Mexico] is financial . . . [T]he company could owe fines of as much as $4,300 for every barrel [of oil] spilled*, in addition to royalties for the oil it is squandering."

400.   Additionally, information regarding the oil flow rate was material to BP's investors, because the amount of oil spilled would inform any consideration of the costs of offshore and onshore oil spill response, claims for natural resource damage under the Oil Pollution Act of 1990 [33 U.S.C. § 2701 *et seq.*], penalties for strict liability under the Clean Water Act [33 U.S.C. § 1251 *et seq.*], as well as other potential liabilities arising from claims, lawsuits, and enforcement actions related to the explosion and sinking of the *Deepwater Horizon* rig and the resultant oil spill.

## IX.   DEFENDANTS' CONDUCT CAUSED PLAINTIFFS' LOSSES

401.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs.

402.   Throughout the Relevant Period, the market prices of BP Shares (including those purchased by Plaintiffs) were artificially inflated as a direct result of Defendants' materially false and misleading statements and omissions.

403.   Prior to the *Deepwater Horizon* incident, securities analysts touted BP's renewed dedication to safety and BP's operations in the Gulf of Mexico as one of the main focuses for BP's future results:

a.   A February 28, 2008 report from JP Morgan stated:   "Safety and operations:   although BP has already made significant progress in this area through the implementation of the Baker panel recommendation and their 'sixpoint plan,' safety and operations remain one of BP's main priorities."

b.     An October 9, 2009 report from Bank of America stated:  "We believe that the focus of results will center around . . . the ongoing exploration effort in the Gulf of Mexico (GoM) . . ."

c.     A February 1, 2010 report from Dolmen Stockbrokers stated:  "we also foresee better production figures as a consequence of early restoration of operations at the company's US refineries and the ramping up of production in the Gulf of Mexico."

d.     A March 3, 2010 report from Bank of America stated:  "the development of recent deepwater discoveries in the GoM (*e.g.*, Tiber field) along with further growth from TNKBP is [sic] set to be the key drivers."

e.     A March 3, 2010 report from JP Morgan described BP's Gulf of Mexico projects as "high margin."

f.     A March 12, 2010 report from Bank of America stated:  "whilst BP has limited experience in Brazil, we would argue that their knowledge of the GoM – particularly in the Lower Tertiary area – is second to none and are clearly taking a positive view here."

404.    When the truth became known, the prices of BP Shares declined precipitously as the artificial inflation was removed from the prices of those securities, causing Plaintiffs substantial damage.

405.    The relevant truth about BP's operations slowly emerged following the April 20, 2010 explosion on the *Deepwater Horizon*, and BP's failed efforts to control the resulting oil spill.  Immediately prior to the explosion, BP's ADS traded at approximately $60.48 per share, and its ordinary shares traded at 655.40 pence per share on the LSE.  Following the explosion, BP ADS and ordinary shares began a nearly continuous decline as the artificial inflation created

by Defendants' false and misleading statements and material omissions dissipated from the price of the securities.

406.    Specifically, on April 26, 2010, government officials announced that attempts to stop the spill had failed and that oil was flowing into the Gulf of Mexico.  This news caused the price of BP Shares to plummet.  Specifically, BP's ADSs declined from a close of $59.88 per share on Friday, April 23, 2010 to a close of $57.91 per share on Monday, April 26, 2010, a decline of $1.97 per share, while BP's ordinary shares declined from a close of 639.70 pence per share on April 23, 2010, to a close of 626.80 pence per share on Monday, April 26, 2010, a decline of 12.90 pence per share.  These declines are directly related to the market absorbing information revealing risks BP concealed throughout the Relevant Period, specifically, that BP conducted its operations in the Gulf of Mexico without a legitimate spill response plan and that BP's statements about reforming its safety profile were false.

407.    After the market closed on April 28, 2010, the NOAA held a press conference during which it increased its estimate of the amount of oil spewing into the Gulf of Mexico from 1,000 to 5,000 BOPD – five times greater than that previously estimated by BP.  On April 29, 2010, Homeland Security Secretary Janet Napolitano declared the spill a crisis of "national significance."  This news caused the price of BP Shares to fall again.  Specifically, BP ADSs fell from a close of $57.34 per share on April 28, 2010 to a close of $52.56 per share on April 29, 2010, a decline of $4.78 per share, or more than 8%, while BP ordinary shares declined from 625.00 pence per share on April 28, 2010, to a close of 584.20 pence per share on April 29, 2010, a decline of 40.80 pence per share.  These declines were directly related to the market absorbing information revealing risks Defendants concealed throughout the Relevant Period, specifically, that BP conducted its operations in the Gulf without a legitimate spill response plan,

that the Company's statements about reforming its safety profile were false, and the amount of oil believed to be spilling into the Gulf of Mexico on a daily basis.

408.    On April 30, 2010, when it was reported that the oil slick caused by the disaster reached Louisiana's coastline, BP ADSs declined from $60.45 to a close of $52.15 per share, a decline of over $8.00 per share since April 20, 2010.  BP's ordinary shares declined from 655.40 pence per share to a close of 575.50 pence per share, a decline of nearly 80.00 pence per share over the same period.  These declines are directly related to the market absorbing information revealing risks Defendants concealed throughout the Relevant Period, specifically, that BP conducted its operations in the Gulf without a legitimate spill response plan and that BP's statements about reforming its safety profile were false.

409.    In the days and weeks that followed, additional news and information emerged on a seemingly continuous basis further revealing BP's reckless disregard for conducting its operations in a safe manner and the lack of any legitimate spill response plan by BP.  These revelations caused BP's ADSs and ordinary shares to plummet further.

410.    On May 3, 2010, BP claimed responsibility for the cleanup efforts related to the spill, and Hayward stated:  "This is not our accident, but it's our responsibility."  The Company's ADSs declined from a close of $52.15 per share on Friday, April 30, 2010 to a close of $50.19 per share on Monday, May 3, 2010, a decline of $1.96 per share, or 3.8%.  The Company's ordinary shares did not trade on May 3, due to a holiday, but closed at 575.50 pence per share on April 30, 2010, and opened at 546.00 pence per share on May 4, 2010, a decline of 29.50 pence per share, or 5.1%.  These declines are directly related to the market absorbing information revealing risks concealed by Defendants throughout the Relevant Period, specifically, that BP

conducted its operations in the Gulf without a legitimate spill response plan and that BP's statements about reforming its safety profile were false.

411.    On May 6, 2010, BP commenced its attempt to contain the spill with a large dome-like structure, to be placed over the Macondo well.  On May 8, 2010, BP disclosed that the containment dome efforts had failed.  At this time, tar had begun to wash up on the Alabama coast.  On May 10, 2010, BP released a statement updating the public on the Gulf of Mexico oil spill response and revealed that oil spill costs to date had reached $350 million.  In reaction to this news, BP's ADSs declined from a close of $49.06 per share on Friday, May 7, 2010 to a close of $48.75 per share on Monday, May 10, 2010, a decline of $0.31 per share.  BP's ordinary shares declined from a close of 553.90 pence per share to a close of 549.20 pence per share, a decline of 4.7 pence per share.  These declines are directly related to the market absorbing information revealing risks concealed by Defendants throughout the Relevant Period, specifically, that BP conducted its operations in the Gulf of Mexico without a legitimate spill response plan and that BP's statements about reforming its safety profile were false.

412.    On May 12, 2010, *Bloomberg* published an article entitled "BP Tells Congress Gulf Well Failed Tests Before Blast."  The article stated:

> A Gulf of Mexico oil well failed a pressure test hours before a drilling rig exploded last month, an executive for well owner BP Plc told the U.S. House Energy Committee that's investigating the incident.

> Such pressure tests are aimed at ensuring the integrity of cement poured into the well to keep out natural gas, said Committee Chairman Henry Waxman, a California Democrat, citing a report to the panel from James Dupree, BP senior vice president for the Gulf.  The tests before the April 20 blast showed "discrepancies" in pressure levels, Waxman said.

*       *       *

> "BP, one of the largest oil companies, assured Congress and the public that it could operate safely in deep water and that a major oil spill was next to impossible," Waxman said.  "We now know those assurances were wrong."

\*       \*       \*

'Serious Questions'

"BP promised to make safety its number one priority," Stupak said. "This hearing will raise serious questions about whether BP and its partners fulfilled this commitment. The safety of its entire operations rested on the performance of a leaking and apparently defective blowout preventer."

413.     These revelations caused BP ADSs to decline from a close of $48.74 per share on May 11, 2010, to a close of $48.50 per share on May 12, 2010, a decline of $0.24 per share and approximately $12.00 per share since April 20, 2010. Similarly, BP's ordinary shares declined from a close of 545.50 pence per share to a close of 541.60 pence per share, a decline of 3.90 pence per share and 113.80 pence per share since April 20, 2010.

414.     On May 13, 2010, *The Wall Street Journal* published an article entitled, "Red Flags Were Ignored Aboard Doomed Rig." The article stated:

Managers at oil giant BP PLC decided to forge ahead in finishing work on the doomed *Deepwater Horizon* rig despite some tests suggesting that highly combustible gas had seeped into the well, according to testimony released by congressional investigators and documents seen by *The Wall Street Journal*.

415.     On May 13, 2010, as a result of these continuing revelations about BP's operations, BP ADSs declined from a close of $48.50 per share on May 12, 2010 to a close of $48.10 per share on May 13, 2010, a decline of $0.40 per share. BP's ordinary shares increased on this date, but in an amount that was restrained by this disclosure. This decline is directly related to the market learning of BP's process safety deficiencies.

416.     On May 14, 2010, *The Wall Street Journal* published an article entitled "BP Wasn't Prepared for Leak, CEO Says." The article stated:

BP has been particularly vulnerable to criticism because among the large oil companies it is by far the biggest player in deepwater oil exploration. Some in the industry have said a company with such a strong focus on deepwater drilling should have had much better contingency plans for dealing with an underwater oil leak at this depth.

Mr. Hayward, speaking to a small group of journalists Wednesday night in Houston, admitted the oil giant had not had the technology available to stop the leak. He also said in hindsight it was "probably true" that BP should have done more to prepare for such an emergency of this kind.

"It's clear that we will find things we can do differently, capability that we could have available to deploy instantly, rather than be creating it as we go," he said.

417.    On May 14, 2010, due to these revelations, BP ADSs declined from a close of $48.10 per share on May 13, 2010, to a close of $46.87 per share on May 14, 2010, a decline of $1.23 per ADS.  BP's ordinary shares declined from a close of 547.60 pence per share on May 13, 2010 to a close of 530.20 pence per share on May 14, 2010, a decline of 17.40 pence.  The decline is directly related to the market absorbing information revealing risks concealed by Defendants throughout the Relevant Period, specifically, that BP conducted its operations in the Gulf of Mexico without a legitimate spill response plan and that BP's statements about reforming its safety profile were false.

418.    On May 24, 2010, BP announced that the costs for addressing the Gulf oil spill had more than doubled, from $350 million to $760 million.  Additionally, BP announced that it was recovering less oil than it expected.  Finally, pressure on BP continued to grow because the United States government threatened to take over the oil spill response effort because of BP's lack of progress.  On this news, BP ADSs declined from a close of $43.86 per share on Friday, May 21, 2010 to a close of $41.86 per share on Monday, May 24, 2010, a decline of $2.00 per share.  BP ordinary shares declined from a close of 506.70 pence per share to close at 493.00 pence per share.

419.    On May 26, 2010, BP began its "top kill" efforts, the goal being to put heavy kill mud into the well so that it reduced the pressure and then the flow from the well.

420.    However, on Saturday, May 29, 2010, while trading markets were closed, BP revealed that the "top kill" procedure it had begun a few days earlier had failed.  The failure of

the "top kill" indicated that BP would be unable to stop the oil spill and would have to rely on efforts to try to contain the spill while it completed the relief wells.  The failed attempt to kill the well by using the "top kill" and "junk shot" efforts shocked investors.  As noted by *ABC News* on Saturday, May 29, 2010:  "We begin tonight with breaking news from the Gulf.  After so much talk that Top Kill was the best bet to plug the oil spill in the Gulf, BP announced just a short time ago that the effort has failed . . . .  That live picture so many Americans have been keeping track of [*i.e.*, the oil spewing from the Macondo well], us included, confirms that the oil is still gushing into the Gulf.  This is another crushing blow when it comes on what is now day 40 of this crisis."  Similarly, on the same day, *Agence France Presse* reported that:  "The announcement [that the top kill and junk shot plans failed] is a stunning setback for efforts to halt what has become the worst oil spill in US history. . . ."  Moreover, *The Business Insider* made clear that the failure of the top kill would lead to BP's securities being "*slaughtered in London trading on Monday*."

421.   Also on May 29, 2010, *The New York Times* published an article entitled "Documents Show Early Worries About Safety of Rig."  The article stated:

> Internal documents from BP show that there were serious problems and safety concerns with the *Deepwater Horizon* rig far earlier than those the company described to Congress last week.
>
> *         *         *
>
> The documents show that in March, after several weeks of problems on the rig, BP was struggling with a loss of "well control."  And as far back as 11 months ago, it was concerned about the well casing and the blowout preventer.

422.   On May 30, 2010, Dudley conducted a series of interviews with United States media outlets in which he admitted that BP's original oil flow estimates – which he himself had personally reiterated just two weeks earlier – were vastly understated.  On these disclosures, the Company's ADSs declined from a close of $42.95 per share on Friday, May 28, 2010 to a close

of $36.52 per share on Tuesday, June 1, 2010, a decline of $6.43 per share, or approximately 15%.  BP's ordinary shares declined from a close of 494.80 pence per share on May 28, 2010 to close at 430.00 pence per share on June 1, 2010, a decline of 64.80 pence per share, or 13%.

423.    On June 1, 2010 (the first trading day since the failure of the "top kill" effort), United States Attorney General, Eric Holder, reported that the DOJ opened formal criminal and civil probes of BP.  News of the Attorney General's action and BP's inability to cap the well with its "top kill" procedure sent its ADSs tumbling nearly 15% on heavy trading volume. Likewise, the Company's ordinary shares declined 13%.

424.    The closing price on June 1, 2010 represented a cumulative decline in the value of BP's ADSs of nearly $24.00 per ADS since April 20, 2010, or approximately 40%.  Moreover, the decline over this period in BP's ordinary shares was more than 225 pence, representing a decline of more than 34% since April 20, 2010.  These declines are directly related to the market absorbing information revealing risks concealed by Defendants throughout the Relevant Period, specifically that BP conducted its operations in the Gulf of Mexico without a legitimate spill response plan and that BP's statements about reforming its safety profile were false.

425.    On June 2, 2010, Hayward admitted that it was "an entirely fair criticism" to blame BP for the disorganized and poor cleanup effort because *"[w]hat's undoubtedly true is that we did not have the tools you would want in your tool kit"* to stop the leak from the Macondo well in the Gulf of Mexico in the aftermath of the explosion.

426.    On June 9, 2010, fears that BP would suspend its dividend caused a further decline in BP securities.  On this news, BP's ADSs declined from a close of $34.68 per share on June 8, 2010 to a close of $29.20 per share on June 9, 2010, a decline of $5.48 per share, or almost 16%.  BP's ordinary shares declined from a close of 408.90 pence per share on June 8,

2010 to a close of 391.55 pence per share on June 9, 2010, a decline of 17.35 pence per share, or 4%.

427.    Speculation regarding the possibility that BP would suspend dividend payments continued on June 9, 2010.  An *Associated Press* article published on the afternoon of June 9, 2010, entitled "Dividend Worries Weigh on BP Shares," explained, "cutting the dividend would have a big impact in Britain, as BP accounts for around 12-13 percent of payments from companies in the blue-chip FTSE 100 index . . . ."

428.    On June 14, 2010, BP's Board of Directors officially met to discuss suspending the Company's dividend payments in light of BP's agreement to set up a $20 billion claim fund for damages caused by the *Deepwater Horizon* catastrophe.  On that date, *The New York Times* reported:

> To make sure that all claims are paid, the Obama administration has stepped up the pressure on the company, demanding that it set aside money to pay for future liabilities before paying dividends to shareholders, which now amount to about $10.5 billion annually.  Senate Democrats are asking BP to set up a $20 billion cleanup fund.  BP, which has spent about $1.5 billion on the cleanup so far, has said it expects to be able to pay all spill costs from its regular operating funds.  But in response to the federal government's requests, BP's board met Monday to consider its options.  A spokesman said the company did not expect to announce decisions about its dividend until after its chairman and its chief executive spoke with Mr. Obama on Wednesday at a meeting the president had called.  A person with direct knowledge of the discussions said the board was considering three options:  suspending payment of the dividend for two quarters, paying the dividend in bonus shares rather than cash, or placing an amount equal to the dividend payment in escrow while continuing to pay for the cleanup separately.

According to another news source:  "Shares in BP plunged again Monday [June 14, 2010] as the company's board discussed US demands that it suspend dividend payments until it pays for the cleanup of the Gulf oil spill."  On this news, the Company's ADSs declined from a close of $33.97 per share on Friday, June 11, 2010, to a close of $30.67 per share on Monday, June 14, 2010, a decline of $3.30 per share, or almost 10%.  BP's ordinary shares declined from a close of

391.90 pence per share on June 11, 2010 to a close of 355.45 pence per share on June 14, 2010, a decline of 36.45 pence per share, or 9%.

429.   The next day, on June 15, 2010, the FRTG released its latest public report, revising its oil flow rate estimates upward again, to between 35,000 and 60,000 BOPD.  On this news, BP's ordinary shares fell from a close of 355.45 pence per share on June 14, 2010 to close at 342.00 pence per share on June 15, 2010, a decline of 13.45 pence per share, or almost 3.8%. The FRTG maintained this estimate until August 2, 2010, when it issued its final report, estimating the oil flow rate at between 52,700 and 62,200 BOPD during the course of the leak, meaning a total of 4.9 million barrels of oil.

430.   On June 21, 2010, at 2 a.m. EST, BP issued a press release updating the spill response and estimated the cost of the response to date to be approximately $2 billion.  The $2 billion estimate equated to about $33 million per day, compared with an estimate on June 14 of $1.6 billion or about $30 million per day.  Also, on June 21, BBC interviewed a *Deepwater Horizon* worker, Tyrone Benton, who claimed to have spotted a leak in safety equipment weeks before the explosion.  Benton claimed the leak in the blowout preventer was not fixed at the time, but instead the faulty device was shut down and a second one used.  Benton said:  "We saw a leak on the pod, so by seeing the leak we informed the company men.  They have a control room where they could turn off that pod and turn on the other one, so that they don't have to stop production."  He said to repair the control pod would have meant temporarily stopping drilling work on the rig at a time when it was costing BP $500,000 per day to operate the *Deepwater Horizon*.

431.   On this news, BP ADSs declined from a close of $31.76 per share on Friday, June 18, 2010, to a close of $30.33 per share on Monday, June 21, 2010, a decline of $1.43 per share,

or 4.5%.  On June 22, 2010 BP ADSs fell an additional $0.65, or 2%.  BP's ordinary shares declined from a close of 357.45 pence per share on June 18, 2010 to a close of 349.50 pence per share on June 21, 2010, a decline of 7.95 pence per share, or 2.2%.  On June 22, 2010 BP ordinary shares declined an additional 15.30 pence, or 4%.

432.   On June 25, 2010, at 2 a.m. EST, BP issued a press release updating the spill response and estimated the cost of the response to date to be approximately $2.35 billion.  There was also concern that tropical storm Alex could disrupt the clean-up response.

433.   On this news, BP ADSs declined from a close of $28.74 per share on June 24, 2010 to a close of $27.02 per share on June 25, 2010, a decline of $1.72 per share, or nearly 6%. BP ordinary shares declined from a close of 325.25 pence per share to a close of 304.60 pence per share, a decline of 20.65 pence per share, or 6%.

434.   Governmental investigations following the oil spill have primarily blamed BP for the initial explosion and the ensuing oil spill.  For example, a September 14, 2011 Interior Department Report stated:

> The loss of life at the Macondo site on April 20, 2010, and the subsequent pollution of the Gulf of Mexico through the summer of 2010 were the result of poor risk management, last-minute changes to plans, failure to observe and respond to critical indicators, inadequate well control response, and insufficient emergency bridge response training by companies and individuals responsible for drilling at the Macondo well and for the operation of the *Deepwater Horizon*.

> BP, as the designated operator under BOEMRE regulations, was ultimately responsible for conducting operations at Macondo in a way that ensured the safety and protection of personnel, equipment, natural resources, and the environment.

## X.   NO SAFE HARBOR APPLIES TO DEFENDANTS' FALSE AND MISLEADING STATEMENTS

435.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this

Complaint.   The specific statements pleaded herein were not identified as forward-looking statements when made.

436.   To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

437.   Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are nonetheless liable for making such statements because, at the time each statement was made, the speaker knew the statement was false or misleading

## XI.   DEFENDANTS INTENDED FOR PLAINTIFFS TO RELY ON THEIR FALSE AND MISLEADING STATEMENTS AND OMISSIONS

438.   During the Relevant Period, Defendants intended for Plaintiffs to rely on the false and misleading statements and omissions alleged herein.   Specifically, Defendants must have known, or appreciated, that the natural consequence of their false and misleading statements made in communications directed to investors, at industry conferences, and in the public media concerning post-spill estimations would induce Plaintiffs to rely on those statements when deciding to invest in BP Shares.

### A.   Communications Made Directly to Investors

439.   Defendants' false and misleading statements and omissions in corporate reports, meetings, and teleconferences were expressly aimed at the investing public, including Plaintiffs. Defendants were aware of the public documents or settings in which their false and misleading statements were made, and they anticipated that those statements would affect the investing public's, and Plaintiffs', investment decisions in BP Shares.   For example, as alleged herein, BP and Hayward made false and misleading statements:

a.      During conference calls with analysts and investors, see ¶¶ 320-21;

b.      In Annual Reports, which were filed with the SEC, ¶¶ 322-23; 331-33; 338-39;

c.      In Annual Reviews, Sustainability Reviews and Sustainability Reports, which were made available to the investing public on BP's official website, ¶¶ 318-19; 329-30; 334-35; 336-37; 344-45; and

d.      During Annual General Meetings with shareholders, which were also made publicly available on BP's official website and were filed with the SEC on Form 6-K, ¶¶ 324-26.

### B.      Statements Made To Investors During Industry Conferences

440.    Defendants' false and misleading statements and omissions during industry conferences were also expressly aimed at the investing public, including Plaintiffs.  Defendants were aware of the public setting in which their false and misleading statements were made, and they anticipated that those statements would affect the investing public's, and Plaintiffs', investment decisions in BP shares.  For example, as alleged herein, BP, Hayward, and Inglis made false and misleading statements at the HRH Prince of Wales's 3rd Annual Accounting for Sustainability Forum, ¶¶ 327-28, the 2010 Howard Weil Energy Conference, ¶¶ 340-41, and the Peterson Institute for International Economics in 2010, ¶¶ 342-43, all of which were subsequently made available to the investing public on BP's official website.  Moreover, the Howard Weil Energy Conference billed itself as "one of the premier investor conferences in the energy industry."  ¶ 341(b).

### C.      Defendants' Post-Spill Statements To The Public

441.    Defendants' false and misleading statements and omissions after the *Deepwater Horizon* incident concerning the amount of oil spilling into the Gulf were also expressly aimed at

the public, including Plaintiffs. Defendants were aware of the public settings in which their false and misleading statements were made, and they anticipated that those statements would affect the investing public's, and Plaintiffs', investment decisions in BP shares. For example, as alleged herein, BP, Dudley, Hayward, McKay, and Suttles made false and misleading statements:

a.    On nationally-broadcast television shows or to nationally-distributed newspapers, ¶¶ 362-63, 365, 379-80, 383-86, 390-94;

b.    During Unified Command press conferences, ¶¶ 362-63, 388-89, 391-92;

c.    In Form 6-Ks filed with publicly with the SEC, ¶¶ 368-69, 377-78;

d.    On BP's official website, ¶ 370; and

e.    During a public hearing before the U.S. House of Representatives, ¶¶ 381-82.

## XII.    PLAINTIFFS' RELIANCE IS PRESUMED THROUGH THE FRAUD-ON-THE-MARKET DOCTRINE

442.    To the extent available, Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

a.    Defendants made public misrepresentations or failed to disclose material facts during the Relevant Period;

b.    The omissions and misrepresentations were material;

c.    The Company's ADSs traded on the NYSE and the Company's ordinary shares traded on the LSW, both are efficient markets;

d.    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's ADSs and ordinary shares; and

e.  Plaintiffs purchased BP ADSs and ordinary shares between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

443.  At all relevant times, the markets for BP ADSs and ordinary stock were efficient for the following reasons, among others:  (a) BP filed periodic reports with the SEC; and (b) BP regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.  Plaintiffs relied on the prices of BP ADSs and common stock, which reflected all the information in the market, including Defendants' false and misleading statements.

## XIII.  PLAINTIFFS' RELIANCE ON DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS

444.  Plaintiffs justifiably and reasonably relied, to their detriment, on the false and misleading statements and omissions alleged above in purchasing, holding, and/or selling BP common stock and/or ADSs during the Relevant Period by, among other things:  (1) reading the statements made by Defendants in BP's SEC filings, press releases, and other public sources; (2) reviewing analyst reports and news articles about BP that quoted, summarized, or otherwise incorporated such statements; and (3) as discussed in greater detail in Section XIV, *infra*, relying on the assumption that BP's stock price reflected truthful and accurate information disseminated by or on behalf of the Company and had not been impacted by false or misleading information. Plaintiffs did not know the false and misleading nature of Defendants' statements and omissions when transacting in or holding BP securities during the Relevant Period.

445.    Generally, in evaluating potential investments and in making investment decisions, Plaintiffs read and relied upon publicly available information, such as SEC filings, analyst reports, and other public information concerning companies in which it might invest.

446.    Specifically, in connection with their Relevant Period investments in BP and transactions in BP Shares, Plaintiffs read, and reasonably and justifiably relied upon, some or all of the material false and misleading statements and omissions of fact alleged herein, and, on that basis, purchased BP Shares during the Relevant Period.  Throughout the Relevant Period, Plaintiffs reviewed and relied on information pertaining to BP drawn from a variety of informational sources, which included, summarized, and/or otherwise incorporated some or all of Defendants' false and misleading statements and omissions at issue, including, prior to the Macondo well blowout, BP's purported progress in operational safety and, subsequent to the Macondo well blowout, the amount of oil spilling from the well.

447.    Acting in such reliance, during the Relevant Period, Plaintiffs purchased BP Shares beginning in November 2007, following Defendants' first alleged misrepresentation, and subsequently made purchases of BP Shares thereafter.  *See* ¶ 23.  Plaintiffs purchased BP Shares in the days and/or weeks following all or almost all of Defendants' false and misleading statements (as set forth in Section IX, *supra*).[3]  Due to the misconduct alleged herein, Plaintiffs suffered monetary damages in excess of $75,000.

448.    Throughout the Relevant Period, Plaintiffs' analysis of whether they should purchase, hold, or sell BP Shares, and at what price, was affected by the accuracy of the BP-related information they reviewed and relied upon.  Plaintiffs would have wanted to know true

---

[3]  If the Court requires additional detail concerning such purchases, Plaintiffs are prepared to supply such further information under seal.

and accurate information, including but not limited to information concerning BP's implementation of and progress in safety reforms, BP's capacity and ability to respond to deepwater well blowouts, and, subsequent to the Macondo well blowout, the oil flow rate and BP's ability to plug it.

449.   Had Plaintiffs known the truth about the false and misleading statements and omissions, it would have affected Plaintiffs' investment evaluations and decisions during the Relevant Period, in that:  (a) Plaintiffs would either not have purchased BP shares at all or, if they did, they would not have done so at the price that was paid; or (b) Plaintiffs would either not have held or sold BP shares, or, if they did, would not have done so at the price they did.

450.   Additionally, Plaintiffs also purchased or otherwise acquired BP Shares prior to the start of the Relevant Period.   During the Relevant Period, Plaintiffs monitored these investments in order to determine whether such securities should be sold (and at what price), held, or added to through additional purchases (and at what price).   In monitoring these investments and making these decisions, Plaintiffs relied on the misstatements and omissions at issue for the reasons explained herein.   Losses related to these pre-Relevant Period purchases or acquisitions constitute an additional basis upon which Plaintiffs suffered monetary damages.

## XIV.   PLAINTIFFS' RELIANCE ON THE PRICE INTEGRITY OF BP SECURITIES

451.   BP and the Individual Defendants voluntarily disseminated the information in the false and misleading statements alleged herein to the market.

452.   That information materially inflated the price of BP's Shares.

453.   The misrepresentations and omissions alleged herein were material, inflated the price of BP Shares, and induced reasonable investors to misjudge the value of BP Shares.

454.   In purchasing BP Shares, Plaintiffs and/or their agents justifiably or reasonably relied on the assumption that the market prices of BP Shares was not affected by material

misrepresentations and omissions issued by Defendants, and that the price of BP Shares reflected accurate and truthful information issued by Defendants.

455.    Without knowledge of the misrepresented or omitted facts alleged herein, Plaintiffs and/or their agents purchased or otherwise acquired BP Shares during the Relevant Period, during which time the prices of BP Shares were artificially inflated by Defendants' false and misleading statements and omissions.

456.    Defendants intended that their false and misleading statements alleged herein be conveyed to Plaintiffs and their agents because those statements were directed to existing BP shareholders, investors, and the market at large.  Thus, Defendants had every reason to expect that their statements would materially inflate the prices of BP Shares, and thereby cause Plaintiffs and/or their agents to purchase BP Shares at artificially inflated prices, in justifiable reliance on the statements.  Defendants are responsible for Plaintiffs' damages, which resulted from Defendants' misconduct.

457.    Moreover, Defendants filed several Forms 20-F and 6-K with the SEC, pursuant to the statutory requirements of the Exchange Act, 15 U.S.C. § 78a *et seq.*, which mandates periodic filings of disclosure documents and is devised to protect Plaintiffs and other investors. As alleged herein, those SEC filings contained material misstatements and omissions, made with scienter.   As such, Defendants are presumed to have reason to expect that the false and misleading statements contained therein would reach and influence Plaintiffs, as they did.

## XV.    PLAINTIFFS' CLAIMS ARE TIMELY

458.    The claims asserted herein under the Exchange Act with respect to Plaintiffs' purchases of BP ADSs on the NYSE are timely because the filing of the initial class action complaint in the first action, which would become *In re BP plc Sec. Litig.*, Civil Action No. 4:10-md-02185 (S.D. Tex.), served to toll the statute of limitations for all individual claims of

putative class members.  Plaintiffs benefitted from this tolling because they were absent class members of the putative class at issue in such complaint until the filing of this instant action. Such tolling continued with respect to claims based on BP ADSs until December 6, 2013, when the Court denied the motion for class certification.

459.    The claims asserted herein under English law with respect to Plaintiffs' purchases of BP ordinary shares on the LSE are also timely because they were filed within six years from the date on which the cause of action accrued pursuant to U.K. Limitation Law 1980 §§ I.2 and I.9.

## XVI.  PLAINTIFFS' CLAIMS, PRAYER FOR RELIEF, AND DEMAND FOR JURY TRIAL

460.    The federal causes of action set forth below relate exclusively to Universal's purchases of BP ADSs and are not brought in the alternative to any other cause of action.

### FIRST CAUSE OF ACTION

**Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**

**(Brought by Universal with Respect to its ADS Transactions
Against All Defendants)**

461.    Universal repeats and realleges each and every allegation contained above as if fully set forth herein.

462.    This cause of action is brought against the BP Defendants and the Individual Defendants for fraud under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

463.    This cause of action is brought in connection with, specifically, the misrepresentations, misleading statements, and/or omissions detailed in Sections VIII.A.1-11 and 13-14, VIII.B.1-2, and VIII.C.1-2, *supra*.

464.     The BP Defendants and the Individual Defendants both directly and indirectly used the means and instrumentalities of interstate commerce in the U.S. to carry out a plan, scheme, and course of conduct which was intended to and did:  (i) deceive the investing public, including Universal, as alleged herein; and (ii) cause Universal to purchase BP ADSs at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, these Defendants, and each of them, took the actions set forth herein.

465.     The BP Defendants and the Individual Defendants both directly and indirectly:  (i) used the means and instrumentalities of interstate commerce in the U.S.; (ii) employed devices, schemes, and artifices to defraud; (iii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iv) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon purchasers of the Company's ADSs (including Universal) in an effort to artificially inflate and maintain the market prices for BP ADSs in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

466.     As a result of the conduct of the BP Defendants and the Individual Defendants, Universal purchased BP ADSs at artificially inflated prices and was damaged thereby when the price of those ADSs declined as alleged herein.

## SECOND CAUSE OF ACTION

### Section 20(a) of the Exchange Act

### (Brought by Universal with Respect to its ADS Transactions
### Against All Defendants)

467.     Universal repeats and realleges each and every allegation contained above as if fully set forth herein.

468.     This cause of action is brought against the BP Defendants and the Individual Defendants for control person liability under Section 20(a) of the Exchange Act.

469.     This cause of action is brought in connection with, specifically, the misrepresentations, misleading statements, and/or omissions detailed in Sections VIII.A.1-11 and 13-14, VIII.B.1-2, and VIII.C.1-2, *supra*.

470.     These Defendants acted as controlling persons within the meaning of Section 20(a) of the Exchange Act as alleged herein. Specifically:

       a.     Hayward and Dudley directly or indirectly controlled BP as alleged above;

       b.     BP, Hayward, Dudley, McKay, and Rainey directly or indirectly controlled BP America as alleged above;

       c.     BP, BP America, Hayward, Dudley, McKay, Rainey, Suttles, and Inglis directly or indirectly controlled BP E&P as alleged above; and/or

       d.     BP, BP America, and BP E&P directly controlled the Individual Defendants who worked for them during the Relevant Period.

471.     By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the BP Defendants' operations, and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, these Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the BP Defendants, including the content and dissemination of the various statements which Universal contends are false and misleading and/or omitted material information.  These Defendants were provided with or had unlimited access to copies of the statements alleged by Universal to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

472.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the BP Defendants and, therefore, is presumed to have had the power to control or influence the particular transactions, statements, and omissions giving rise to the securities violations as alleged herein, and to have exercised the same.

473.    As set forth above, the BP Defendants, and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

474.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Universal suffered damages in connection with its purchases of BP ADSs.

### THIRD CAUSE OF ACTION

### Common Law Deceit

**(Brought by All Plaintiffs with respect to their Ordinary Share Transactions Against All Defendants)**

475.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

476.    This cause of action is brought in connection with, specifically, the misrepresentations, misleading statements, and/or omissions detailed in Sections VIII.A.2-14 and VIII.C.1-2, *supra*.

477.    Defendants made the foregoing false and/or misleading statements and/or failed to disclose or concealed information necessary to make such statements not misleading; which were material; with the intent and/or foreseeability that Plaintiffs would rely thereon; and upon which Plaintiffs actually and/or justifiably relied to their detriment.  Plaintiffs and/or their investment advisers acted in justifiable reliance on Defendants' false and misleading statements, the market

price of BP Shares, and/or the integrity of the market, without knowing the statements were false, when making investment decisions regarding BP Shares. Defendants' false and misleading statements also induced Plaintiffs and/or their investment advisers to retain Plaintiffs' holdings in BP Shares during the Relevant Period.

478.    Defendants had a duty to disclose the truth because: (i) where a person or entity voluntarily discloses information, it must disclose the whole truth; (ii) when a person or entity makes a representation and new information makes that earlier misrepresentation misleading or untrue, it must disclose the whole truth and correct its prior misrepresentation; and (iii) when a person or entity makes a partial disclosure and conveys a false impression, it must disclose the whole truth. Defendants voluntarily disclosed information concerning BP that, when viewed in the best light imaginable, disclosed only partial, deceptive information and half-truths (and in a more realistic light, was utterly false). Accordingly, Defendants had a duty to tell the whole truth.

479.    Defendants knew or, but for their egregious recklessness would have known, that their misstatements and omissions were false and/or misleading at the time they were made.

480.    Plaintiffs would not have acquired their BP securities had they known the truth about the matters alleged herein, at least not at the prices that they paid, which were inflated by Defendants' misconduct.

481.    As a result of Defendants' false and misleading statements and omissions, Plaintiffs suffered substantial damages, the amount of which will be proved at trial.

482.    The misrepresentations and omissions, as set forth herein, constitute deceit under English common law.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs demand judgment in their favor and pray for relief as follows:

A.      An award in favor of Plaintiffs against all Defendants, jointly and severally, for all damages sustained by Plaintiffs as a result of Defendants' wrongdoing, in an amount to be proved at trial;

B.      An award in favor of Plaintiffs against all Defendants, jointly and severally, for all punitive damages Plaintiffs are entitled to as a result of Defendants' wrongdoing, in an amount to be proved at trial;

C.      An award in favor of Plaintiffs of the costs, expenses, and disbursements of this action, including attorneys' and experts' fees, if applicable, together with pre- and post-judgment interest; and

D.      An award in favor of Plaintiffs of any other relief as this Court deems just, equitable, and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated April 18, 2014                                Respectfully submitted,

                                                            JOYCE, McFARLAND + McFARLAND LLP

                                                            */s/ Ben Wickert*
                                                            Ben Wickert
                                                            State Bar No. 24066290
                                                            Federal ID No. 973044
KIRBY McINERNEY LLP                                 Jeff Joyce
Ira M. Press                                        State Bar No. 11035400
Daniel M. Hume                                      Federal ID No. 10762
J. Brandon Walker                                   712 Main, Suite 1500
Melissa A. Fortunato                                Houston, Texas  77002
825 Third Avenue, 16th Floor                        Telephone:  (713) 222.1112
New York, NY  10022                                 Facsimile:  (713) 513.5577
Telephone:  (212) 371.6600

*Attorneys for Plaintiffs*                          *Attorneys for Plaintiffs*